1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3    ------------------------------------------------------------

4    In re: National Hockey League        MDL No. 14-2551 (SRN/JSM)
     Players' Concussion Injury
5    Litigation
                                             St. Paul, Minnesota
6                                            Courtroom 7B
            (ALL ACTIONS)                    July 2, 2015
7                                            9:00 a.m.

8    ------------------------------------------------------------

9

10        BEFORE THE HONORABLE SUSAN RICHARD NELSON

11         UNITED STATES DISTRICT COURT JUDGE

12

13                  **STATUS CONFERENCE**

14

15

16

17

18

19

20

21

22

23   Official Court Reporter:   Heather Schuetz, RMR, CRR, CCP
                                U.S. Courthouse, Ste. 146
24                              316 North Robert Street
                                St. Paul, Minnesota 55101
25

```
 1                      A P P E A R A N C E S

 2                      For the Plaintiffs:

 3
     ZIMMERMAN REED, PLLP
 4   Charles "Bucky" S. Zimmerman, Esq.
     Brian C. Gudmundson, Esq.
 5   David M. Cialkowski, Esq.
     1100 IDS Center
 6   80 S. 8th St.
     Minneapolis, MN 55402
 7

 8   ZELLE HOFFMAN VOELBEL & MASON, LLP
     Michael R. Cashman, Esq.
 9   500 Washington Ave. S., Ste. 4000
     Minneapolis, MN 55415
10

11   BASSFORD REMELE, P.A.
     J. Scott Andresen, Esq.
12   Jeffrey D. Klobucar, Esq.
     33 S. 6th St., Ste. 3800
13   Minneapolis, MN 55402-3707

14
     ROBBINS GELLER RUDMAN & DOWD, LLP
15   Mark J. Dearman, Esq.
     120 E. Palmetto Park Rd., Ste. 500
16   Boca Raton, FL 33432

17
     SILVERMAN, THOMPSON, SLUTKIN & WHITE
18   Stephen G. Grygiel, Esq.
     201 N. Charles St., Ste. 2600
19   Baltimore, MD 21201

20
     GOLDMAN SCARLATO & KARON, P.C.
21   Brian D. Penny, Esq.
     101 E. Lancaster Ave., Ste. 204
22   Wayne, PA 19428

23
     GUSTAFSON GLUEK
24   Joshua Rissman, Esq.
     120 S. 6th St., Ste. 2600
25   Minneapolis, MN 55402
```

1                     **For the Defendant:**

2

3     **SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
      John H. Beisner, Esq.
      Jessica D. Miller, Esq.

4     1440 New York Ave. NW
      Washington, DC 20005

5

6     **SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
      Richard T. Bernardo, Esq.

7     Matthew M. Martino, Esq.
      Four Times Square

8     New York, NY 10036

9

      **SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**

10    Matthew M. K. Stein, Esq.
      500 Boylston St.

11    Boston, MA 02116

12

      **FAEGRE BAKER DANIELS**

13    Daniel J. Connolly, Esq.
      Linda S. Svitak, Esq.

14    2200 Wells Fargo Center
      90 S. 7th St.

15    Minneapolis, MN 55402

16

17    **For U.S. NHL Clubs:  BRYAN CAVE LLP**
                            Christopher J. Schmidt, Esq.

18                          211 N. Broadway, Ste. 3600
                            St. Louis, MO 63102-2750

19

20    **Also Present:**  Dennis Kiker, Granite Legal Systems

21

22

23

24

25

1                     I N D E X                    Page:

2    Discussion re Future Hearing Dates.................... 7

3    Defendant's Document Production....................... 12

4    Master Complaint Plaintiffs' Document Production....... 20

5    Board of Governors' Document Production............... 21

6    Deposition Scheduling................................ 31

7    Class Certification Issues/Plaintiff Fact Sheets....... 57

8    Third-Party Discovery Update......................... 62

9    Motion to Enforce Subpoenas to U.S. Clubs............. 75

10   Defendant Fact Sheets................................ 89

11   Production of Text Messages by NHL Custodians.......... 93

12   Confidentiality Designation Challenges................ 97

13   Discussion re Publicly Filing Agendas................. 109

14   Discussion re Appointment of Special Master........... 113

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2                       IN OPEN COURT
3                   (Commencing at 9:05 a.m.)
4           THE COURT:  We are here this morning in the matter
5    of the National Hockey League Players' Concussion Injury
6    Litigation.  This is MDL 14-2551.  Let's begin by having
7    notice of appearances, please.  We'll start with the
8    Plaintiffs.
9           MR. STEPHEN GRYGIEL:  Morning, Your Honor.  Steve
10   Grygiel for the Plaintiffs.
11          MR. CHARLES ZIMMERMAN:  Good morning, Your Honor.
12   Bucky Zimmerman for the Plaintiffs.
13          MR. MARK DEARMAN:  Morning.  Mark Dearman for the
14   Plaintiffs.
15          MR. MICHAEL CASHMAN:  Morning, Your Honor.  Michael
16   Cashman for the Plaintiffs.
17          MR. BRIAN PENNY:  Morning, Your Honor.  Brian Penny
18   for the Plaintiffs.
19          MR. BRIAN GUDMUNDSON:  Morning, Your Honor.  Brian
20   Gudmundson, Zimmerman Reed, on behalf of the Plaintiffs.
21          MR. SCOTT ANDRESON:  Morning, Judge.  Scott Andreson
22   on behalf of the Plaintiffs.
23          MR. JEFFREY KLOBUCAR:  Morning, Judge.  Jeff
24   Klobucar on behalf of the Plaintiffs.  Appearing
25   telephonically this morning with us are Stu Davidson from the
```

1   Robbins Geller firm; Hart Robinovitch from Zimmerman Reed; Tom

2   Byrne from the Namanny, Byrne & Owens; Bill Gibbs from Corboy

3   Demetrio; and Bill Sinclair from the Silverman law firm.

4           THE COURT:  Very good.  Any other Plaintiffs in the

5   audience?

6           **(None indicated.)**

7           THE COURT:  And the defense.

8           MR. JOHN BEISNER:  Morning, Your Honor.  John

9   Beisner on behalf of Defendant, NHL.

10          MR. DANIEL CONNOLLY:  Morning, Your Honor.  Dan

11  Connolly on behalf of the NHL.

12          MS. JESSICA MILLER:  Morning, Your Honor.  Jessica

13  Miller on behalf of the NHL.

14          MR. MATTHEW MARTINO:  Morning, Your Honor.  Matt

15  Martino for the NHL.

16          MR. RICHARD BERNARDO:  Morning, Your Honor.  Richard

17  Bernardo on behalf of the NHL.

18          MR. MATTHEW STEIN:  Morning, Your Honor.  Matthew

19  Stein on behalf of the NHL.

20          MS. LINDA SVITAK:  Morning, Your Honor.  Linda

21  Svitak on behalf of the NHL.

22          MR. CHRISTOPHER SCHMIDT:  Morning, Your Honor.

23  Chris Schmidt on behalf of the U.S. Hockey Clubs.

24          MR. DANIEL CONNOLLY:  Your Honor, in addition we

25  have David Zimmerman and Julie Grand listening by telephone

1    for the NHL.  We have Shep Goldfein from the Skadden Arps firm

2    by telephone, and we have Joe Baumgartner and Adam Lupion also

3    listening by phone from the Proskauer Rose firm.

4              THE COURT:  Very good.

5              MR. DANIEL CONNOLLY:  Thank you.

6              THE COURT:  I thought we would start with a

7    housekeeping matter.  I believe the next status conference is

8    scheduled for August 6th.  I have a criminal trial that can't

9    be moved for that day, so I have two questions for you.  One

10   is can we do it the -- that Friday, which is the 7th, in the

11   morning, and do you want to have another informal status

12   conference in August?  The next formal status conference after

13   that would be September 3rd.

14              Any thoughts about that?  Mr. Zimmerman.

15              MR. CHARLES ZIMMERMAN:  Your Honor, yes, I would

16   like to have an informal.  August 7th, if I -- I don't have

17   my -- my iPad around.  It ran out of juice last night and I

18   forgot to charge it, and so I don't have my calendar in front

19   of me.  August 7th, I may or may not have a conflict.  I will

20   need to check, if that's okay.

21              THE COURT:  Okay.  Sure.

22              MR. CHARLES ZIMMERMAN:  And I could get back to

23   defense and to the Court before the middle -- after we're done

24   today.

25              THE COURT:  Perhaps you all look at your calendars

```
 1    when you get a chance and then we can -- if it doesn't work

 2    for you, you could propose a couple of other dates in August,

 3    perhaps.

 4            MR. JOHN BEISNER:  Just so you know, August 7th

 5    works fine for us, Your Honor, so we'll just wait to hear from

 6    Plaintiffs on that.

 7            THE COURT:  Okay.  All right.

 8            And then as I said, the conference after that is --

 9    the next formal conference is September 3rd.  So, the question

10    is whether we want to have something in like the week of the

11    18th, perhaps, of August by way of an informal conference.

12    And if so, to be honest with you, I'm in Duluth that week.  I

13    have two trials in Duluth that week.  You could come to Duluth

14    if you wanted, but -- I have time in Duluth.

15            MR. CHARLES ZIMMERMAN:  It's not Minot.  It's

16    beautiful (laughter).

17            MR. JOHN BEISNER:  I've spent a lot of time in

18    Duluth.

19            MR. CHARLES ZIMMERMAN:  We'll come to Duluth, Your

20    Honor.

21            THE COURT:  I understand.

22            MR. JOHN BEISNER:  I will comment no further.

23            THE COURT:  Okay.  Early the following week, it

24    looks like I could do it on the 24th or the afternoon of the

25    25th, so those might be the best dates for it.
```

```
1              MR. CHARLES ZIMMERMAN:  Those are the informals,
2      Your Honor, or --
3              THE COURT:  Informals, yeah, because again that week
4      of the 17th I'm in Duluth the whole week.
5              MR. CHARLES ZIMMERMAN:  Could you give me those two
6      dates again?
7              THE COURT:  Monday, August 24 and Tuesday,
8      August 25.
9              MR. CHARLES ZIMMERMAN:  Can we get back to you on
10     those?
11             THE COURT:  You can.  Mr. Beisner has got his iPad,
12     so he's going to tell me if he's --
13             MR. JOHN BEISNER:  I have a charger, by the way.
14             MR. CHARLES ZIMMERMAN:  That's the second offer I've
15     had from both you guys for a charger.  We're getting along too
16     well.
17             MR. JOHN BEISNER:  Either of those dates I think
18     would work fine.  Your Honor, I'm sorry, you said the morning
19     of those two or --
20             THE COURT:  Um, the 24th I'm available all day.  The
21     25th I have a motion in the morning, so -- it's actually just
22     a motion.  We could start at 11 or we could start at 1:30
23     or --
24             MR. JOHN BEISNER:  Either of those would be fine, so
25     whatever is acceptable to Plaintiffs would be fine with us.
```

```
 1              THE COURT:  Okay.  Then we'll hear back from

 2   Plaintiffs on that.

 3              MR. JOHN BEISNER:  And are we planning anything for

 4   middle of this month?  Have we set a date --

 5              THE COURT:  We hadn't.

 6              MR. JOHN BEISNER:  And perhaps it isn't necessary,

 7   but I just wanted to ask to make sure I hadn't missed

 8   something here.

 9              THE COURT:  Any thoughts about that?

10              MR. CHARLES ZIMMERMAN:  I think when you see the

11   issues in the agenda, I think you're going to want to have us

12   come back.  I think there's a lot of open issues that probably

13   would be helpful.  We could probably get them resolved if we

14   have a target date for an informal and then if we can't

15   resolve --

16              THE COURT:  That's fine.  I'm going to e-mail my

17   calendar clerk who's not here.  I didn't bring my July

18   calendar with --

19              MR. CHARLES ZIMMERMAN:  But do you have a charger

20   (laughter)?

21              THE COURT:  I do, yeah.  All right.  So, remind me

22   to get back to that July date later on.  All right.

23              Let's move ahead on the agenda, then.

24              MR. CHARLES ZIMMERMAN:  Are you prepared to begin,

25   Your Honor?
```

```
1              THE COURT:  Yes, please.
2              MR. CHARLES ZIMMERMAN:  Thank you.  Charles
3    Zimmerman for the Plaintiffs.
4              Just by way of sort of introduction, we're about six
5    months now into the discovery program.  I think we really
6    started discovery somewhere around January of this year.  And
7    we're almost a year into the assignment of the MDL to this
8    Court, so it's kind of a midterm exam grading time to do --
9    grade our papers, perhaps, a little bit.  So, I'm going to
10   hope to do that today and put some context into everything
11   we're presenting so that the -- everybody in the courtroom and
12   especially the Court gets kind of an overview of how far we're
13   getting and are we, you know, are we on track.  And I think
14   the conclusion will be we're going to need a lot more time to
15   do discovery.
16             I'm just -- I'm putting that out there because I
17   think you'll see where we are with things and what's really
18   going on in the real world.  And that we're just going to have
19   to -- we're just going to have to enlarge -- enlarge the
20   timeframes.  But the Court -- you'll make that conclusion, of
21   course.  But I just want you to know that the context of
22   things will be so that the Court has really an overview of how
23   hard we've been trying and how, really, the cooperation we've
24   had -- I've gotten two offers for chargers today, so I just
25   can't even believe it.
```

```
1              THE COURT:  And we had depositions without phone
2     calls to the Court.
3              MR. CHARLES ZIMMERMAN:  We had one phone call.
4              THE COURT:  We did have one phone call, yes.
5              MR. CHARLES ZIMMERMAN:  And then we can have a
6     discussion about that, and if the Court would like formal
7     motion practice with regard to it by -- at the end of the
8     conference, we can kind of wrap up and determine how the Court
9     wants to --
10             THE COURT:  Well, let me ask you this.  Have you met
11    and conferred about extending the schedule?
12             MR. CHARLES ZIMMERMAN:  We've talked about it at the
13    last informal status conference, but we have not.  So it's not
14    a formal thing I'm asking.  I'm just putting it into context
15    in sort of where we are in light of where we need to get.
16             THE COURT:  I think it would be useful to put that
17    on the agenda for the next informal status conference, and so
18    I'd like you to meet and confer about whether extensions are
19    necessary.
20             MR. CHARLES ZIMMERMAN:  Sure.  And that's perfectly
21    appropriate and we will certainly -- we will certainly do
22    that.
23             So, the first issue then, Your Honor, is the
24    document -- the Defendant's document production.  And with
25    all -- with all due respect to everybody's professionalism,
```

 1    there's a lot of open items that are really the items in the

 2    rest of the agenda that all relate to discovery issues, many

 3    of them are document production issues.  But what I think

 4    is -- is really very obvious is if you look at the end of May

 5    through the end of June production, 1.9 million pages of

 6    documents have been produced in that 30-day period, and that's

 7    about 90-some percent of the entire production.

 8          I'm not accusing anybody of anything.  I'm just

 9    being factual that although we tried to prevent back loading,

10    I think we have had to be appreciative of the fact that that's

11    the way it's occurred.  And so I just need to point that out

12    and we're working diligently, but there's just so much

13    capacity we have and it is sort of forcing us into where we

14    are today, which is sort of letting the Court know that a lot

15    has happened in the last 30 days with regard to documents.

16    We're not going to be able to catch up as quickly as we had

17    hoped had this been rolled out from the February date.  But

18    I'm not -- I just want the Court to be aware of it.

19          And then there's three other things, or four other

20    things the Court will want to know in a summary fashion, and

21    then we'll talk about them individually, is that that doesn't

22    include the Board of Governors' documents, which are still in

23    play.  It doesn't include the text messages issue, which is

24    still in play.  It doesn't include the U.S. Clubs' documents,

25    which are still in play, the Canadian Club documents that are

1    still in play, and the private medical information questions

2    and withhold of documents that is still in play.

3           So, even though we've got about a million-nine of

4    new documents in the last 30 days, we've still got these other

5    things that have got to get -- got to get filled in.  I'm

6    highly confident, Your Honor, we will get them, we'll get to

7    them, we will be able to resolve the issues that are contained

8    within those issues.  But it does go to the question of

9    timing.

10          Having said that, I think Brian Gudmundson of my

11   office or -- I'm sorry, Scott -- Brian Gudmundson is going to

12   tell you a little bit more about the document production, and

13   defense will comment, and then we'll see --

14          THE COURT:  Let me ask you this, Mr. Zimmerman.  I

15   think we talked last time at the informal about a protocol for

16   handling privilege log disputes.  Have you met and conferred

17   about that yet?

18          MR. CHARLES ZIMMERMAN:  Yes, that's what he's going

19   to talk about.

20          THE COURT:  Okay.  Very good.

21          MR. BRIAN GUDMUNDSON:  We have not, and I

22   unfortunately was unable to attend the last informal status

23   conference --

24          THE COURT:  You know, that podium goes up.  Right in

25   the front, there's a --

```
 1              MR. BRIAN GUDMUNDSON:  You mean the arrow that goes
 2    up, right?  Got it.  We have not met and conferred.  We --
 3    it's on the radar.  We received a new privilege log last night
 4    just after midnight with an additional approximately 2,000
 5    entries.  We're up to about 6,200 entries in the privilege log
 6    right now.  The issue of the private medical information
 7    privilege in that log and the content of that is still in the
 8    open.  I understand that the volume of that is substantially
 9    more than what we've seen already on the -- on the -- what we
10    would call the regular privilege log.
11              So, our intention is to meet and confer in the very
12    near future, but we're trying to get our arms around, first of
13    all, whether their log in the first place is sufficient.  We
14    are analyzing that.  But we intend to meet and confer in a
15    process for challenging that.  But it's a little difficult,
16    not having seen the privilege log with respect to private
17    medical information, where they all look different or the
18    same.
19              THE COURT:  So you haven't gotten one of those yet,
20    or not?
21              MR. BRIAN GUDMUNDSON:  We have not.
22              THE COURT:  You have not.  But you've been told that
23    the number of documents on it exceeds the documents on the
24    privilege logs combined, is that what you're saying?
25              MR. BRIAN GUDMUNDSON:  Well, we've been told that
```

1    there's about 15,000 entries approximately in the private

2    medical information.  And I'm unclear at this time about

3    whether that's just the NHL's hold back of documents or

4    whether that includes the U.S. Clubs.  But the issue of

5    private medical information is being addressed by others that

6    I'm sure can speak to that a little bit better.

7            I don't have a lot to add to what Mr. Zimmerman said

8    about the privilege -- or I'm sorry, the document production

9    to date.  I think he did adequately point out that from

10   February to May, we received about 230 pages of -- 230,000

11   pages of documents; and in the last month, we've received

12   1.9 million, while at the same time we've got all these other

13   issues sort of pulling down the production and our ability to

14   sort of analyze it in the context of depositions and pending

15   motion practice.

16           So, again, I share Mr. Zimmerman's view that this is

17   going to get worked out, it's just taking longer than we

18   anticipated.  I'm sure that it's taking longer than everyone

19   anticipated, and there's -- I'm certain there's good faith

20   reasons for all of that, but it's just a matter of time.

21           THE COURT:  Okay.  Would it be possible or -- do you

22   think it would be wise to try to meet and confer on these

23   privilege log challenges before the next informal, or is that

24   too quick?

25           MR. BRIAN GUDMUNDSON:  No, I don't think it's too

 1 | quick, and we can -- we can talk about that with them.  I
 2 | think we can do that.  And it's within the next couple of
 3 | weeks, I think we can do that for sure.
 4 |           THE COURT:  Okay.
 5 |           MR. BRIAN GUDMUNDSON:  I don't know if we're going
 6 | to get a private medical information log by then, but we can
 7 | certainly visit with defense counsel and get that straightened
 8 | away.
 9 |           THE COURT:  Thank you.
10 |           Mr. Connolly.
11 |           MR. DANIEL CONNOLLY:  Your Honor, just quickly on
12 | that topic since you focused in on the privilege logs, we
13 | think it would be great if we could focus in on the legal
14 | privilege log.  The medical privilege log is a different
15 | issue, a totally different breed of cat.  And what we think we
16 | have -- we're ready to talk about this, we've been producing
17 | the privilege logs for some time on a rolling basis at the
18 | Court's request and Plaintiffs' request, and we haven't
19 | engaged on that topic.  We think that would be a helpful area
20 | because those are the only documents other than the medical
21 | ones that we'll discuss later that the parties don't have an
22 | agreed-upon access to.  So, we think it would be great if we
23 | had a process in place by the next informal that we could
24 | begin an orderly process of reviewing these with the Court, if
25 | necessary.

```
1              THE COURT:  Mr. Connolly, are you in a position to
2    tell me when you expect to produce this privilege log with the
3    medical entries, and are you doing a different privilege log
4    than Mr. Schmidt is on that?
5              MR. DANIEL CONNOLLY:  Mr. Martino is the one to
6    speak to on the medical -- the privilege log.  He has -- I'll
7    let him speak to that.  I'm not conversed with that particular
8    topic.
9              THE COURT:  Okay.  All right.
10             Good morning.
11             MR. MATTHEW MARTINO:  Morning, Your Honor.  Matt
12   Martino, obviously, for defense.  For the -- let's see.  The
13   problem with having tall guys before you, I'm going to raise
14   it --
15             THE COURT:  You can put it back down if you want.
16             MR. MATTHEW MARTINO:  For the private medical
17   information, that's a separate log from the attorney-client
18   privilege log.  We are in process of reviewing those documents
19   now.  There won't be 15,000 entries necessarily.  There are
20   15,000 documents that are in second review for that, that have
21   been marked by some earlier review as potentially containing
22   private medical information, and that review is ongoing.
23   Hopefully we'll be completed within the next couple weeks, and
24   that log -- we'll start rolling those logs, as well.  I guess
25   there will probably be a little more -- it won't be like a
```

```
 1   slow log roll like it was for the privilege because we're

 2   almost completed with that review.

 3           THE COURT:  But by mid-July, there should be the

 4   production of at least one of those logs?

 5           MR. MATTHEW MARTINO:  Yeah, I think we could do

 6   that, yes.

 7           THE COURT:  Okay.  And giving your reviewers

 8   guidance about this, I presume you're incorporating some of

 9   the thoughts that we discussed at the last informal

10   conference?

11           MR. MATTHEW MARTINO:  Yes.  Yes.  And we will be --

12   some of that we'll be redacting and things like that, as well.

13           THE COURT:  Okay.

14           MR. MATTHEW MARTINO:  I think that was it for that

15   issue.

16           THE COURT:  Okay.  Yep.

17           MR. MATTHEW MARTINO:  Okay.

18           THE COURT:  Very good.

19           MR. MATTHEW MARTINO:  Oh, and one more thing.  On

20   the privilege logs, we anticipate hopefully being completed

21   with the entire privilege log process by the middle of July,

22   as well.

23           THE COURT:  Okay.

24           MR. MATTHEW MARTINO:  So that we sort of -- to the

25   extent -- you know, we have been rolling them, as Mr. Connolly
```

```
 1  said, so, you know, we're ready and willing and able to set up
 2  that process.
 3           THE COURT:  All right.  Very good.
 4           MR. MATTHEW MARTINO:  Thank you.
 5           THE COURT:  Thank you, Mr. Martino.
 6           All right.  Anything else on Defendant's document
 7  production?
 8           MR. CHARLES ZIMMERMAN:  Master Complaint Plaintiffs'
 9  document production is Mike Cashman's issue, and so if
10  Mr. Cashman will advise the Court on the status of that.
11           THE COURT:  Thank you.
12           Good morning, Mr. Cashman.
13           MR. MICHAEL CASHMAN:  Morning, Your Honor.  As the
14  Court knows, the Plaintiffs, the six Master Amended Complaint
15  Plaintiffs produced documents sometime ago, and then we've
16  been in the process of collecting ESI for all six of these
17  individuals.  And it has taken some effort through third-party
18  sources to get access to some of this ESI.  We've accomplished
19  that, we've reviewed it now, and we've produced two of the six
20  this week; and within the next couple days, we hope to get the
21  other four produced, and we should be ready to go.
22           THE COURT:  Okay.  You don't have any privilege
23  logs, Mr. Cashman, do you?
24           MR. MICHAEL CASHMAN:  At this time, we don't have a
25  privilege --
```

```
 1            THE COURT:  But have you withheld for privilege in
 2    that review?
 3            MR. MICHAEL CASHMAN:  We haven't withheld anything
 4    as privileged.  We are not -- and I don't think the NHL is
 5    doing this -- are not producing documents after the lawsuit
 6    was commenced.  For example -- and they're not logging those
 7    documents, to the extent we have communications which would be
 8    privileged.
 9            THE COURT:  Okay.  I think that's usually the rules,
10    so very good.  All right.  Thank you.
11            Did Defense wish to talk about Plaintiffs'
12    production?
13            MR. DANIEL CONNOLLY:  We have nothing further to
14    add.  We were satisfied with that -- that summary, Your Honor.
15            THE COURT:  Thank you, Mr. Connolly.
16            Mr. Zimmerman.
17            MR. CHARLES ZIMMERMAN:  Good.  Good.  The next item,
18    Your Honor, is the status of the Board of Governors' document
19    production.  Scott is going to -- Scott Andreson is going to
20    report on that, but I think a little bit of the history -- and
21    Scott will give it -- is important in the context of this
22    because obviously we find the Governors, Board of Governors'
23    documents to be extremely important, and we don't have any of
24    those yet.
25            MR. SCOTT ANDRESON:  Morning, Judge.
```

```
 1              THE COURT:  Good morning.  It looked like you've
 2     reached agreement on search terms.
 3              MR. SCOTT ANDRESON:  We have, and I'm happy to do
 4     that.  There was actually a fairly straightforward process
 5     which I think once -- once we got to the point of the
 6     agreement to produce these documents, it was a fairly -- very
 7     civil and fairly easy process.  The problem that we have that
 8     relates to the bigger picture here is the fact that we're in
 9     July and we haven't seen any yet.  And we asked for documents
10     that should have come from the Board and we asked it
11     January 15th.  And the initial response was to say, no, the
12     NHL said no, the Board of Governors are third-parties.  And so
13     we -- we didn't agree with that.  But we subpoenaed the teams
14     and said, well, the NHL says that the teams should give us
15     this information.  And then we subpoenaed the teams and then
16     the teams said, well, we're not going to give you that
17     information, you should talk to the NHL.
18              And we went through this back and forth, and finally
19     I think after we sent quotes from the bylaws saying these are
20     the folks that run the League, the NHL said, we'll produce for
21     the 30, we had a negotiation, and from there it went smooth.
22     But that was May 28th that we finally agreed on search terms.
23     We haven't seen any documents.  And we asked for a
24     commitment -- and if you recall I think it was at one of the
25     informals here -- by August 1.  The NHL said, look, we can't
```

```
 1   do that, considering everything else we're doing on the main

 2   production.  Understand.  But we don't have any commitment.

 3   We don't know when -- when it's going to start, we don't know

 4   when it's going to end, we don't know what the volume is.  And

 5   the next wave of depositions which Mr. Grygiel is going to

 6   talk about includes Governors.  Right?  And so we need those

 7   documents.  And if we aren't going to get them for months on

 8   end, it's just going to keep up pushing everything back.

 9           So, quite frankly, we would be thrilled if out of

10   today we came out with a commitment that we will have

11   documents starting on a date and substantially complete by a

12   date.

13           THE COURT:  Well, has there been discussion about

14   prioritizing documents for the depositions that are upcoming?

15           MR. SCOTT ANDRESON:  There has not been any

16   discussion as to which -- what the priority is and how they're

17   going to roll that out.  We're not even sure how they're going

18   to collect it or what the process is.  Their status report

19   indicates that they've started collecting, but we don't know

20   how they're doing it and we don't know the process, and so it

21   would be great if we could get some update on that.

22           THE COURT:  Thank you.

23           MR. SCOTT ANDRESON:  Thank you, Judge.

24           THE COURT:  Mr. Martino.

25           MR. MATTHEW MARTINO:  Sure, I can speak to that.
```

1   So, as we mentioned at some of the previous conferences,

2   the -- the issue with the collection here is that there are 30

3   different Clubs, 30 different systems.  Some of the Governors'

4   e-mails are not on the Club system even, they're on another

5   company's system -- I'm sorry, another third-party's system.

6   And so we have issues, you know, with dealing with the

7   third-party systems, and it is more of a collection issue than

8   a review issue.  The document volume is not going to be

9   anywhere near the volume that we've had for the NHL

10  production, the 200,000, 2 million pages that we've had.  But

11  we have begun collecting.  We've received documents from about

12  10 of the teams so far, and we're in the process of reviewing

13  those.  We hope to start producing documents by the end of

14  next week for some of the Governors.

15          We did say to the Plaintiffs that we couldn't commit

16  to an August 1st date because, as I said, it's sort of a lot

17  of balls in the air with 30 different Clubs and --

18          THE COURT:  What --

19          MR. MATTHEW MARTINO:  -- it's really the third-party

20  system that does the --

21          THE COURT:  What can you commit to for the 10 teams

22  from which you've collected documents?

23          MR. MATTHEW MARTINO:  For the 10 that we've -- oh,

24  sure, yeah, I think we could -- we could commit to --

25          THE COURT:  Can you commit to July 15th for that?

1            MR. MATTHEW MARTINO:  Could we do the third week of

2     July for those?  I'm just concerned about, as we review these,

3     we're including, you know, the third-party --

4            THE COURT:  Okay.  By the 21st, how about that?

5            MR. MATTHEW MARTINO:  Yeah, I think that's --

6            THE COURT:  Ten teams by the 21st.  But I'd also

7     like you to take a look at the upcoming Governor

8     depositions --

9            MR. MATTHEW MARTINO:  No, I understand.

10           THE COURT:  -- and prioritize those and collect

11    those and keep the Plaintiffs informed about that progress and

12    then me at the informal.  Okay?

13           MR. MATTHEW MARTINO:  Sure.  Sure.  That makes

14    sense.

15           THE COURT:  Now, how many teams again, U.S. teams,

16    are there?

17           MR. MATTHEW MARTINO:  Well, we're collecting both

18    for the U.S. and Canadian Clubs, so there are 30 total Clubs.

19           THE COURT:  Thirty total.  And what is your best

20    estimate for, given some of the collection issues, these --

21    your success in collecting the documents for the remaining 20,

22    not production, but how about just collecting?

23           MR. MATTHEW MARTINO:  By -- when we would have that

24    collected?  Uh, I would hope we would have them all collected

25    by the end of July.  But, you know, again, hope is -- hope

```
 1    springs eternal.  It's -- there are a lot of conversations
 2    ongoing and running search terms and things like that on these
 3    systems that we have no control over.  So, we are pressing the
 4    urgency to the Clubs.  And they understand, I think, that we
 5    need to start getting this in so we can review it.
 6               THE COURT:  Have you received any hard copy?
 7               MR. MATTHEW MARTINO:  I think we have received a
 8    little hard copy, but we have requested hard copy for all the
 9    Clubs, yes.  So to the extent they have hard copy, they will
10    be sending that to us, as well.
11               THE COURT:  All right.  Good.  So it looks like just
12    to sum up here, by the 21st you'll have produced from the 10
13    teams that you've already collected from --
14               MR. MATTHEW MARTINO:  Yeah, I think it's about 10.
15    It could be nine, but yeah.  But from what we've already
16    collected, I think we can --
17               THE COURT:  And you're going to prioritize the
18    Governor depositions coming up so that those get produced in
19    time for the depositions?
20               MR. MATTHEW MARTINO:  Sure.  Yeah.  And we can work
21    that out with the Plaintiffs on sort of scheduling.
22               THE COURT:  Great.  Okay.
23               MR. MATTHEW MARTINO:  All right.  Thank you.
24               THE COURT:  Mr. Beisner?
25               MR. JOHN BEISNER:  Your Honor, if I may emulate my
```

```
1    friend Mr. Zimmerman on a context point; I did want to clarify
2    one issue here.  I think the statement -- I don't mean to take
3    this literally about not getting any Board of Governor
4    documents yet -- and I'm not sure that's what Counsel meant --
5    but I want to be clear about what we're talking about here.
6    There has been a huge amount of Board of Governor materials
7    produced, Minutes, you know, books for the meetings and so on,
8    to the extent that they're relevant, have been produced.  And
9    to the extent that there is e-mail activity that's been going
10   on between the custodians at the NHL and any members of the
11   Board of Governors that are relevant, those have been
12   produced.
13           So, really what we're talking about here.  And I
14   suspect Plaintiffs would characterize that a little
15   differently, but I want to stress Mr. Martino's point that
16   we're talking here about a fairly, we think, fairly limited
17   collection of material.  We're looking at e-mails from these
18   individual Governors that haven't been picked up already from
19   the NHL production.  So, those may be e-mails with others and
20   things of that sort.  I'm not saying there is nothing there,
21   but we're not talking about, you know, the first time anybody
22   is seeing anything about the Board of Governors, the
23   deliberations.  This is sort of icing on the cake.
24           THE COURT:  Are you deduping?  In other words, no,
25   you're not comparing what you're getting from a particular
```

```
1    Governor to the NHL production and --
2              MR. MATTHEW MARTINO:  No, we would not -- to the
3    extent there's the same exact e-mail that's in the Governor's
4    files, that would still be produced.
5              THE COURT:  All right.  Thanks.
6              MR. JOHN BEISNER:  And I suspect, you know, there
7    will be differences in the characterization, but I just want
8    to make clear this is not the first time that there's been any
9    dipping into the Board of Governors --
10             THE COURT:  I remember you saying that before.
11             MR. JOHN BEISNER:  We're not debating the
12   entitlement to those, and I understand why counsel want them.
13   I just want to make clear that the volumes and new material
14   we're talking about, I suspect, is limited.
15             THE COURT:  Okay.  Very good.
16             MR. SCOTT ANDRESON:  And, Judge, that's -- quite
17   frankly, that's what we're trying to learn.  That's why we
18   have the status conferences so we get to learn this
19   information.  And I do think that Matt and I can figure out,
20   for instance, I mean if it's nine teams or ten teams, it would
21   be helpful for us to know which of them are we talking about,
22   right, because that might relate to them, the issue of the
23   depositions and what's been collected.
24             A couple of points that I want to clarify -- and you
25   hit one of them, Judge -- and that is that the hard copy --
```

```
 1    that we're not just looking for e-mails.  We're looking for
 2    hard copy documents that are responsive to our original
 3    document requests sent back in July and then related to the
 4    search terms that we've provided.  The other thing is that
 5    Mr. Beisner just referenced this being principally a search of
 6    e-mails, and this is going to come up again in the context of
 7    NHL documents generally, but we'd also expect that, you know,
 8    this would include texts and other sort -- all forms of ESI,
 9    whatever they might be.  It could be spreadsheets on their
10    computers, not just e-mails.  And I just want to clarify that
11    the broader definition of ESI is what you're collecting for
12    the Board of Governors.
13            THE COURT:  Mr. Martino, do you agree that's what
14    you're doing?
15            MR. MATTHEW MARTINO:  We are certainly -- I think
16    we'll need to actually go back to Plaintiffs with that because
17    I think we have a protocol in place about how we're going to
18    search e-mails and search non-e-mail electronic documents from
19    their computers or whatnot.  I think that's already in place.
20    And so, you know, if they have any -- we can discuss that
21    again and just to clarify if they have any issue with that.
22    But I think we're doing what we said we were going to do with
23    them, which is basically searching e-mails with search terms
24    and for non-e-mail, we've agreed to manually go through and
25    see if there's anything relevant, not download all of the
```

```
1   e-mail on-- as you would -- as we did for the NHL -- NHL
2   custodians.  We downloaded all of their relevant electronic
3   documents and ran search terms.  We would not be doing that
4   for the Board of Governors, pursuant to agreement with the
5   Plaintiffs that what we would do instead is have them go
6   through their non-e-mail computer files and see where they
7   would have relevant information and sort of search that like
8   you would hard copy:  This is relevant, pull that out; this is
9   relevant, pull that out.
10            MR. SCOTT ANDRESON:  And that is what we understood
11  as it relates to non-e-mail electronic information that might
12  be on their computer systems, the spreadsheet I'm talking
13  about or a Word document or a PowerPoint.  But how about texts
14  as it relates to the Board of Governors?
15            THE COURT:  Does your ESI protocol address texts?
16  Do you know?
17            MR. SCOTT ANDRESON:  Our ESI protocol -- I mean, the
18  ESI protocol generally that we have in this case is --
19            THE COURT:  For all ESI?
20            MR. SCOTT ANDRESON:  -- for all ESI, so it isn't
21  limited in any way.  And that issue is going to be raised
22  later and discussed in the context of the broader NHL
23  production.  And I just want to understand if, you know, if
24  you're going down that road as it relates to the Board of
25  Governors so that we don't end up debating it three months
```

```
 1   from now like we're debating the fact that we didn't get them
 2   to begin with from the NHL custodians.
 3          THE COURT:  All right.  I want you to meet and
 4   confer on the Board of Governor texts and report to me at the
 5   next informal.
 6          MR. SCOTT ANDRESON:  Thank you, Judge.
 7          THE COURT:  Okay.
 8          MR. CHARLES ZIMMERMAN:  Okay.  Status of depositions
 9   scheduling.  Steve Grygiel is going to talk about that with
10   Your Honor.  And we're going to talk about the number that
11   we've asked, who we've asked for, the schedule, and the
12   back-up -- and the back-up documents so that you have some --
13   we also have some context as to this whole process.
14          THE COURT:  Okay.
15          MR. STEPHEN GRYGIEL:  Thank you.
16          THE COURT:  Good morning, Mr. Grygiel.
17          MR. STEPHEN GRYGIEL:  Morning, Your Honor.  As you
18   know, Steve Grygiel.
19          I'd like to talk about depositions in terms of just
20   a couple of categories.  One obviously -- and perhaps most
21   easily -- is the scheduling, what we've asked for, what has
22   been completed, and what remains to be done that hasn't yet
23   been scheduled but has been requested.  Then I'd like to talk
24   about the timing of these depositions, particularly with
25   respect to the issues you've heard about already, and that is
```

```
 1    production of Board of Governors' documents, production of

 2    text messages, completion and review of the other document

 3    production, and those issues.  Because obviously when we pick

 4    a deposition, particularly in the first set of depositions, we

 5    did it with an eye towards a discovery plan.  And as those

 6    depositions do not get completed in accordance with our

 7    originally-forecasted timetable, that of course pushes our

 8    other depositions and the rest of our discovery, including,

 9    for example, request for admission, down the road.

10            Altogether, Your Honor, we have requested, in terms

11    of a summary, 21 deponents to be deposed so far.  There's been

12    21.  Seven of those have actually been completed.  We have now

13    tentatively scheduled, some are more tentative than others,

14    nine.  Of the remaining deponents, which is five for whom we

15    have asked for dates, we have not yet gotten dates.  So,

16    essentially we have 21 requested, seven completed, and nine

17    scheduled, some of them more tentatively, so that means about

18    33 percent of the requested depositions have thus far been

19    taken.

20            One of the important points here, Your Honor, is to,

21    I suppose, put some factual specificity to the way that

22    Mr. Zimmerman was referring to, and I can give you some

23    examples.  And I think what's most relevant for the Court's

24    understanding and for our process going forward is for the

25    Court to understand how long it takes from when we seek a
```

1    deposition to when we actually get a date to when they

2    actually get scheduled.  One easy example is, for example, we

3    asked for the deposition of Mr. Anschutz.  Thirty-nine days

4    later, we received a date.  That date is another two months in

5    the future.  Essentially, we have, from the date of the

6    request, four months from the date of the request to the

7    actual date.  For Brian Burke, an NHL executive and now a team

8    executive, 28 days elapsed between the date we asked for his

9    deposition and the date we got a date for it.  And then, of

10   course, the actual date of the deposition is another three

11   weeks later.

12           In terms of the early depositions -- and there was

13   only one -- that ship sailed with very little cargo.  That was

14   Dr. Burke; 53 days elapsed between the date we asked for his

15   deposition and the date we finally got a date for it.  A

16   number of other examples:  Dr. Audrey, important to the

17   concussion study, 39 days elapsed between the date, Your

18   Honor, we actually said we'd like to depose Dr. Audrey and the

19   date we received a date that we could take his deposition.  At

20   that rate, Your Honor, we are never going to complete

21   discovery by December 31st.  It just can't be done.

22           There are some other issues that go along with these

23   scheduling issues.  And I don't mean to be unfair.  In some

24   cases we asked for depositions and we got dates fairly

25   quickly.  I asked for Mr. Cigarran.  You remember me

1    discussing him at the last informal conference, and I got a

2    date 19 days later.  And for some others, they were a little

3    more expeditious.  But generally speaking, it takes a long

4    time.

5          Another issue comes up, Your Honor, which is that

6    when we're scheduling these depositions, for example,

7    Mr. Gapski is the trainer of the Blackhawks, obviously has

8    implications for medical issues.  Well, that's tentatively

9    scheduled for July 15th, but that most likely is not going to

10   go forward that date for a number of reasons.

11         Leaving aside Plaintiffs' scheduling issues, we have

12   the issue of personal medical information.  And that issue, of

13   course, as Your Honor has already heard in the Holmgren

14   deposition and in the McCrossin deposition, that issue has to

15   be resolved I think before we can meaningfully go forward with

16   remaining depositions.  As Your Honor knows, one of the NHL's

17   defenses is we gave the warnings that should have been given.

18   And Plaintiffs then, of course, want to say:  To whom, when,

19   where, how, in what form, how often, and what was the

20   response?  And we get back to the defense, well, that's

21   personal medical information to the extent it involves a

22   particular Plaintiff and you need to get a release and go

23   through a panoply of protocols to make sure that no private or

24   personal medical information is divulged.

25         THE COURT:  So despite my guidance, we are not

```
1    getting any closer to agreeing on these issues, so you need an

2    order from me.  Is that what you're --

3              MR. STEPHEN GRYGIEL:  I believe we will, Your Honor.

4    And yesterday we spoke with Mr. Schmidt.  We had a fairly -- I

5    think it was 45-minute call, according to my clock.  We spoke

6    for 45 minutes about the issue, about what we're going to do

7    about this because it comes up all the time, as Your Honor

8    knows, in this case.  And it would.  And we decided after

9    going back and forth with, frankly, an awful lot of lawyer

10   pontificating, and I was one of the culprits, about what's

11   privileged, what's not privileged, when is the privilege

12   waived, to whom is it waived, and to what extent is it waived

13   if there's information in the public domain.  I think we

14   decided that perhaps the best way to proceed would be for

15   Mr. Schmidt and I or my colleagues to put together a list of

16   issues and questions that are clearly going to come up in

17   these depositions.  And each side, I think, to frame this

18   narrowly, would then put their proposal down for what they

19   think the scope of the privilege is and perhaps cite some

20   authority to say why they think they're correct about that and

21   then ask the Court for an order --

22             THE COURT:  I think that's a good idea.

23             MR. STEPHEN GRYGIEL:  That's where we came out in

24   that yesterday after 45 minutes of talking past each other.

25             THE COURT:  Do you think that's something you could
```

```
 1    get together by the informal?

 2              MR. STEPHEN GRYGIEL:  I believe we can, Your Honor.

 3    In fact, we will.

 4              I spoke for you there, Chris, but we will.

 5              MR. CHRISTOPHER SCHMIDT:  We will need to follow

 6    Mr. Grygiel's lead on that and see the questions that they

 7    want to pose.

 8              MR. STEPHEN GRYGIEL:  Right.  And a number of them,

 9    Your Honor, of course, everyone is well aware, nothing is

10    going to come up as a surprise because we had it come up in

11    the McCrossin deposition.  Your Honor may remember one of the

12    issues there was -- and it's worth thinking about so that

13    we're all thinking about it the same way, I think, and don't

14    waste more time.  Mr. McCrossin had said in the public domain

15    that he couldn't live with himself if he permitted Keith

16    Primo, a former Philadelphia Flyer, to play again.  And

17    Mr. Dearman correctly said, "And why did you say that?"

18              Our view, obviously, is because he knew that there

19    would be longterm neurocognitive impairments and we wanted him

20    to say it, and we couldn't get at that information.  We think

21    that's fair game.  The Clubs and the Defendants don't, and

22    that's what we're going to sort out.

23              THE COURT:  Mr. Grygiel, I would suggest that you do

24    your set of questions first and try to do that within the next

25    week to ten days and get that to Mr. Schmidt and Mr. Beisner
```

1    or who's ever dealing with this on the NHL.  And then we'll

2    give them a week to get back to me, and I think that will be a

3    good way to resolve it.

4           MR. STEPHEN GRYGIEL:  Thank you, Your Honor.  That

5    makes good sense.

6           And then finally with respect to document

7    production, we do have a date now for -- just for example

8    Mr. Anschutz.  It's September 29 in Denver.  And he, of

9    course, is an owner of a team and was an alternate Governor.

10   But until we're sure we do have that entire universe that

11   Mr. Beisner kindly said they're not contesting our right to

12   see, until we have that, it doesn't make much sense for us to

13   agree firmly to dates; I want to pencil them all in because we

14   want to move forward.  But until we have a full and fair

15   opportunity to review the documents -- because I don't think

16   at this late date anyone can say, well, Judge, Grygiel was the

17   guy here urging early depositions.  The only early deposition

18   at all was Dr. Burke's and that was just taken about a month

19   ago.

20          THE COURT:  Well, the nine scheduled and the five

21   that you're waiting for dates, or whatever the numbers are,

22   who are the Governors?

23          MR. STEPHEN GRYGIEL:  I can give that to Your Honor.

24   Of the ones that are scheduled now, the only Governors or

25   alternate Governors, I believe, are Mr. Cigarran.  And that's

```
 1    August 28th in New York City is what we hope to do, assuming
 2    we have all the documents by then, which Mr. Beisner and I
 3    have already talked about by e-mail.  And Mr. Anschutz is
 4    September 29 in Denver.  Other than that, we have team
 5    executives, doctors, former player, and, of course,
 6    Commissioner Bettman is coming up.
 7             THE COURT:  Mr. Martino, have you collected
 8    documents from Cigarran and Anschutz?
 9             MR. MATTHEW MARTINO:  From --
10             THE COURT REPORTER:  You need to come to the mic.
11             MR. MATTHEW MARTINO:  From Mr. Cigarran, yes.
12             THE COURT:  You have.
13             MR. MATTHEW MARTINO:  I believe we have collected
14    for him.
15             THE COURT:  So you expect for him at least you
16    should produce by the 21st of this month?
17             MR. MATTHEW MARTINO:  Okay.  Sure.  Yeah.
18             THE COURT:  All right.  And Mr. Anschutz, are you
19    able to prioritize that, then, given the September 29th date?
20             MR. MATTHEW MARTINO:  Yes, and I -- September 29th
21    is pretty far off.  I would think we could have his documents
22    produced in advance of September 29th, yes.
23             THE COURT:  Well in advance.
24             MR. MATTHEW MARTINO:  Yeah, sure.
25             THE COURT:  Okay.
```

```
 1              MR. STEPHEN GRYGIEL:  And finally, Your Honor, on

 2    that point, since Matt's here, of the remaining depositions

 3    for which we have asked dates and have not received dates, 41

 4    days on.  Three of them are Governors or alternates, and

 5    that's Mr. Lemieux, Jeremy Jacobs, and Ted Leonsis.  And for

 6    those Governors, we have neither dates nor, as I understand

 7    it, do we yet have a forecasted completion date for all of

 8    their ESI and whatever other documents have not been produced.

 9              THE COURT:  Mr. Martino, for those three Governors

10    or alternate Governors, have you collected documents yet for

11    them?

12              MR. MATTHEW MARTINO:  No.

13              THE COURT:  All right.  Can you prioritize, then,

14    those, one, two, three, four Governors?  That's an Anschutz,

15    Lemieux, Jacobs and Leonsis.

16              MR. MATTHEW MARTINO:  Yeah, we'll make all efforts

17    to prioritize them, yes.

18              THE COURT:  Okay.  Great.  Thanks.

19              MR. STEPHEN GRYGIEL:  I think with that, Your Honor,

20    I've said what I needed to say.  Thank you very much.

21              THE COURT:  Okay.  Very good.

22              Mr. Beisner.

23              MR. JOHN BEISNER:  Your Honor, if I may just a

24    couple of points on this from the League's perspective.  First

25    of all, on the scheduling, I understand Mr. Grygiel's
```

1    frustration on the timing.  I do think this, it took X days to

2    schedule a deposition is probably not a very fair measure.  As

3    Your Honor is well aware, for example, with respect to the

4    five owners, our understanding initially from Mr. Grygiel's

5    communication was that the focus of those depositions was

6    going to be on Club operations.  You heard the concerns

7    expressed by the Clubs at the last informal discovery

8    conference.

9            On the apex issue, the Court gave your views.  And

10   when Mr. Grygiel said, no, the focus is more on the Board of

11   Governors' activities of these individuals, we at the League

12   took over the scheduling process.  And we're doing our best to

13   get these scheduled as soon as we can.  And these dates are

14   being guided, in part, by what you just discussed with

15   Mr. Martino, and that is getting documents gathered.  So, it's

16   not a matter of getting a request in.  And we've had to do

17   this with all of these others, as well, is figure out what the

18   document production is, talk to the person, work out dates,

19   and so on.

20           And so I -- we shouldn't belabor this point, Your

21   Honor, but I just think for the record need to indicate we've

22   not been dragging our feet on this.  There have been

23   intervening events that the Court has had to address on some

24   of these.  And I think the main thing to look at is, you know,

25   the Plaintiffs asked for ten early depositions before the

1    completion of -- substantial completion of document

2    production.  And, you know, a substantial number of those have

3    been completed.

4           Those that haven't, you know -- Mr. Fraser retained

5    counsel at some point, so we had to put that off.  Mr. Gapski

6    has been delayed primarily -- and I appreciate Counsel's

7    willingness to do it, but he was involved in the play-offs and

8    so we waited to schedule that.  So, these are -- and I just

9    want to make clear.  I'm not debating the timeframes that he

10   indicates, but I do think that to suggest that there's been

11   some foot dragging on that is inappropriate.

12          Your Honor, let me -- if I may, I wanted to come

13   back to the objections in the depositions because there's a

14   couple of fundamental things here that I think we all need to

15   be thinking about on this front.  And this is just to make

16   sure we're all on the same page here based on some discussions

17   we had earlier.  The questions that are being asked in the

18   depositions regard the experiences of former players, for the

19   most part, who are not any of the six named Plaintiffs or the

20   others who have filed lawsuits from whom we will be getting

21   waivers.  And I just wanted to make sure we're all on the same

22   page of the scope of discovery that we're supposed to be

23   talking about here, because I have no problem with the

24   questions being asked about individual players who are not

25   named Plaintiffs or in that other group.

```
1              But there was a point during our discussion of the
2     Plaintiff fact sheet where I think Plaintiffs were taking the
3     position that, you know, this is all going to be about the six
4     named Plaintiffs.  We are permitted to gather information
5     through the Plaintiff fact sheet regarding the 54 others who
6     have filed actions.  But during that discussion, the
7     Plaintiffs were saying, well, but you can't use that for class
8     certification.  That's not part of it.  And I just want to be
9     clear we're on the same page that these inquiries -- and I'm
10    not debating them, I'm not suggesting that these should be
11    shut down in any way -- but that we're all in agreement here
12    that these inquiries about former players who are putative
13    class members and -- but are not the six named Plaintiffs are
14    appropriate because I think both sides are going to want to be
15    making inquiry and producing evidence on the class
16    certification issue that goes beyond the six named Plaintiffs.
17    And I just want to make sure that if we're doing this, the
18    same rules apply to both sides on this.
19             THE COURT:  So, are you saying that to the extent
20    the Plaintiffs inquire about other players, you should get a
21    fact sheet from them?  Is that --
22             MR. JOHN BEISNER:  No, no, no, no, Your Honor.  I
23    just want to -- and there's really two things here I want to
24    make sure about is that -- that we're likewise able to make
25    inquiry -- I'm not talking about, to be clear, taking
```

1   discovery from any of the Plaintiffs, making them be part of

2   the discovery process.  But if any are willing to provide

3   information or we otherwise have information about those --

4   those players that are part of the discovery process, that we

5   have the equal right to talk about those, as well, as part of

6   the class certification process.

7            THE COURT:  Okay.  I'm not completely understanding

8   what you're saying.  Are you saying that if you have some

9   information about these players, you can use that during the

10  class certification --

11           MR. JOHN BEISNER:  That's fundamentally what I'm

12  saying, Your Honor --

13           THE COURT:  Are you sharing that information you're

14  going to use?

15           MR. JOHN BEISNER:  I'm talking about things that are

16  in the discovery process.  Yes, Your Honor.  Really what I'm

17  getting at, Your Honor -- just to make sure we're on the same

18  page and I'm remembering -- during the discussion of the

19  Plaintiff Fact Sheets, so these were for the 54 who are not

20  the named Plaintiffs, there was a point at which, if I'm

21  remembering correctly, Plaintiffs were saying you don't need

22  that until next year because that's not relevant to class

23  certification.

24           Your Honor said, no, we're going to get those done.

25  And I think implicitly in that was saying, yeah, that some of

1    that information may be relevant, as well, but I just want to

2    make sure we're on the same page because if the rule is we're

3    only focusing on the six, then that's an easy resolution to

4    this.  I'm not arguing for that, Your Honor.  I just want to

5    make sure we have an equal playing field on this.

6              THE COURT:  Okay.  All right.

7              MR. JOHN BEISNER:  Your Honor, the other thing that

8    I did want to raise on this issue that I -- and as I've

9    listened in on these calls, I think there's been some

10   confusion about is the following on this issue.  The

11   privileges that are being asserted with respect to these

12   medical record inquiries don't belong to the League, they

13   don't belong to the Clubs.  These belong to the former

14   players, the putative class members.  And, you know, it's sort

15   of like a situation where I get called as a witness to testify

16   about privileged communications that I had with a client.  As

17   an attorney, I would have to decline to answer those questions

18   unless my client waived the privilege.

19             THE COURT:  But, you see, it's very different here

20   because the privilege in the medical setting is a privilege

21   being physician and patient.  And I worry, as I said at the

22   informal, that you are extending this way beyond that to any

23   reference to any medical question, whether or not it had

24   anything to do with a communication with a doctor.

25             MR. JOHN BEISNER:  Well, Your Honor, and that's --

 1     that's the scope issue on that, which will resolve through the

 2     process.  But what is concerning to me is the fact that it's

 3     fundamentally the privilege of the patient.  The patient can

 4     waive it.

 5             THE COURT:  The patient privilege has to do with his

 6     communications with his doctor.

 7             MR. JOHN BEISNER:  Correct.

 8             THE COURT:  All right.

 9             MR. JOHN BEISNER:  And let's assume we're talking

10     about that.  I don't mean to be saying that.

11             THE COURT:  Yeah.

12             MR. JOHN BEISNER:  But it's the patient who needs to

13     waive that.  The League can't --

14             THE COURT:  If the question, in fact, inquires about

15     communications between patient and --

16             MR. JOHN BEISNER:  Yeah, and I'm just --

17             THE COURT:  But some of these questions don't do

18     that.  That's why we need to drill down on this.  Yeah.

19             MR. JOHN BEISNER:  And I'm not disagreeing with that

20     at all, Your Honor.  I guess my point is the following, is

21     that we would love to just talk about this.  As you said

22     before, we're between a rock and a hard place.  We had no

23     concerns about any of these folks talking about those

24     communications, and a very simple solution to this is to ask

25     the player if he has any objection to this.

```
 1              THE COURT:  But only if it, in fact, has to do with
 2     privileged communications.
 3              MR. JOHN BEISNER:  Your Honor, I have --
 4              THE COURT:  And the fact that somebody who is not
 5     the physician or the player knows all this stuff makes you
 6     wonder whether that's been waived to begin with, you see.
 7              MR. JOHN BEISNER:  But, Your Honor, I'm saying that
 8     you could cut through all of this by simply asking the player
 9     before the deposition if there was any concern about questions
10     being asked of the treating physician on this issue.  We could
11     deal with this.  And the documents that have been used were
12     disclosed before the deposition.  There's no secret about
13     these questions being asked.  All that has to happen is for
14     someone to call the player and say, "We want to ask some
15     questions in this deposition about this concussion event.  Do
16     you have any objection to the physician answering?"  And we're
17     done with this.
18              THE COURT:  All right.  Well, we'll keep that in
19     mind, but I want to see these questions, as well, because some
20     of them we don't need to call the player I guess is my point.
21              MR. JOHN BEISNER:  Your Honor, I agree completely
22     with that.  But there's this assumption here that -- and
23     again, Your Honor, we need to go through this and I'm not
24     suggesting that there isn't need for clarification on breadth.
25     I thought what Your Honor had said provided clarity.  And it's
```

```
1    not clear to me what we're still arguing about on that, but it

2    seems to me that though this suggestion about inquiry about

3    that as though the League or the Clubs are blocking this, it

4    is simply an effort to make sure that privilege line isn't

5    crossed.  The Court needs to give some guidance on that.

6            But again, we're talking here about getting

7    information about putative class members.  They're Plaintiffs

8    in this case.  All they have to do is say, ask any question

9    you want and we don't -- and we'd love to have that be the

10   outcome because we have no concern about talking about that.

11   But nobody is making an effort to ask these players if they

12   care.  They're putative class members here.  So, to go back to

13   my example --

14           THE COURT:  I hear you.  I understand.

15           MR. JOHN BEISNER:  -- it's like nobody asking my

16   client if it's okay for me to talk about it.  That's -- and it

17   seems to me we've missed the boat on the easiest way to deal

18   with this.

19           THE COURT:  Certainly if we're going to take team

20   doctors' depositions, we might want to do that.  The question,

21   I think, is when we take others who know about this

22   information because perhaps it was published in an article

23   or -- why we're still implicating privilege in that setting.

24   And that's why we need to determine where the line is.

25           MR. JOHN BEISNER:  Yeah, and I'm not debating it.  I
```

1    thought we had that resolved from Your Honor's comments, but

2    I'll let Chris address that since he's been in those

3    conversations.

4                 MR. CHRISTOPHER SCHMIDT:  Thank you very much, John.

5                 Good morning, Your Honor.

6                 THE COURT:  Good morning, Mr. Schmidt.

7                 MR. CHRISTOPHER SCHMIDT:  I think that issue is not

8    the issue before the Court, the one that you're raising.  From

9    the beginning, the Clubs, if there's publicly-available

10   information, we would always produce that.  If somebody -- if

11   there's a public information that somebody knows from a public

12   source, that's fair game.

13               What we're dealing with in the example Mr. Grygiel

14   gave was Jim McCrossin.  Jim McCrossin is an athletic trainer

15   who works hand in glove with the doctor under the doctor's

16   direction.  He's the eyes and ears of the doctors, often how

17   an athletic trainer is termed.  Involved in his rehab,

18   involved in the confidential medical communications.  In those

19   instances, if you want to know why he did something or why a

20   doctor and Mr. McCrossin together reached a medical

21   determination that a player couldn't be cleared to play, for

22   example, and they weren't going to return him to the ice, that

23   implicates a whole host of very confidential, sensitive

24   medical information.

25               And this is something that the first time we talked

1    about scheduling the depositions, I raised two concerns.  My

2    first concern was I'm concerned about going forward with these

3    before you have the documents.  I don't want to put these

4    gentlemen up first.  And Counsel said, we understand, that's

5    what we want to do.  I said, okay, fine.  So, my second

6    concern is this private medical privilege, especially for our

7    team docs and our athletic trainers, because if you want to

8    talk about any player beyond the six -- or the 60, then we're

9    going to have issues.  And what I suggested was, hey, we're

10   months in advance of scheduling these, these are -- it's very

11   early, let us know any player you want to talk about and go

12   get the authorization.  Let us know in advance, and the

13   trainer or doctor will talk about it.

14          I think Mr. Beisner said it well:  The trainers and

15   doctors would be happy to talk about any care they provided

16   whatsoever, but they need to know that they can do that.  And

17   this is ultimately the players' privilege.  And so as Clubs,

18   we're in a really difficult position, Your Honor.  And the

19   position is it's not our privilege to waive.  We can't do that

20   on behalf of the player, and we need to find the right line.

21   And so as a result, you provided very helpful guidance in

22   Mr. Holmgren's deposition:  Facts are fair game, what you saw

23   are fair game.  If you're the person and you experienced it,

24   what you felt is fair game.  Whether someone returned to the

25   ice or not, that's a fact, that's fair game.  But the actual

1    medical diagnosis or treatment or the discussions between the

2    trainer and doctor and the player about their medical

3    treatment are protected.  And all of those are fair game if we

4    get an authorization from the player, but without that, that's

5    something that we can't do.

6            As a result of your guidance, there was -- I wasn't

7    sure if we had actually reached agreement.  I thought we had,

8    based on your guidance, and we're prepared to live with that

9    and think it's the right line.  Plaintiffs had made some

10   statements to me that made me think we had not reached

11   agreement.  I said, can we have a call to discuss these

12   issues?  And we finally got it set up for yesterday and did

13   have a long, substantive call where we -- my goal was to try

14   and find common ground.  What questions can we ask?  All the

15   facts are fair game.  Where's the line going to be drawn?  And

16   I think the challenge where we got to was, what happens when

17   you have an article where a person or player talks about their

18   medical condition to some extent?  How far can we go?  Has

19   there been a waiver?

20           And on that issue, what we've said is, you can ask

21   about what's in the article; you can ask if they recall making

22   that statement.  Did they make that statement?  But you can't

23   go beyond it.  And the case law supports that.  And we can

24   brief that, and I can take you through chapter and verse.  But

25   essentially -- and I can cite one case from the Colorado

1    Supreme Court where the Court -- where Plaintiff had actually

2    put his medical condition arguably at issue by claiming

3    emotional distress and mental anguish.

4            The Defendants wanted to get into that

5    Plaintiffs' medical condition.  And the Colorado Supreme Court

6    said, no, you can't.  Just because you claim mental anguish

7    and even though you're the Plaintiff, that doesn't operate as

8    a complete waiver.

9            THE COURT:  Well, but what -- I've seen those cases.

10   I've seen that argument made in connection with employment

11   cases.

12           MR. CHRISTOPHER SCHMIDT:  Right.

13           THE COURT:  Where there are claims for emotional

14   distress, that is a very different issue.

15           MR. CHRISTOPHER SCHMIDT:  I agree, but what I think

16   is instructive about that, Your Honor, is that there it was

17   actually the Plaintiff.  Here we're dealing with nonparties,

18   parties who have not put their medical conditions at issue.

19   And so when we get to these questions, there's, I think, two

20   solutions.  One is the court could -- a court could find that

21   there has been some sort of waiver, and then we'd have to

22   define to what degree; or we could get an authorization or

23   some -- some permission to talk about those conditions and --

24           THE COURT:  I don't disagree with you.  I think the

25   first inquiry is, is it seeking privileged information?  Is

1     the question seeking privileged information?

2                 MR. CHRISTOPHER SCHMIDT:  Agreed.

3                 THE COURT:  And then if it is seeking privileged

4     information, has there been a waiver?

5                 MR. CHRISTOPHER SCHMIDT:  Agreed.  And then to what

6     extent --

7                 THE COURT:  (Inaudible due to overlapping speakers.)

8     And I think frankly from the discussion we had during the

9     deposition, I was concerned that we were talking about some

10    questions that didn't seek privileged information.  That's

11    what I'm trying to say.

12                MR. CHRISTOPHER SCHMIDT:  And I understand that, and

13    that's an appropriate distinction.  And your guidance was very

14    helpful.  What we are focused on and what they're focused on

15    is the doctors and the trainers where it's clearly medical

16    privileged information.  They've acknowledged it in their

17    briefs.  And there, we -- I can't make that decision, and the

18    trainer can't, and the doctor can't.  Only the player can or a

19    Court.  If you want to rule on an individual player basis that

20    there's been a waiver, then -- then that seems incredibly

21    cumbersome to me.  I think there's a more eloquent solution, a

22    simple solution which is, if you want to get into that,

23    there's only, in any given deposition, going to be two or

24    three players that are nonparties that they really want to

25    talk about.

```
 1              THE COURT:  Okay.
 2              MR. CHRISTOPHER SCHMIDT:  They can get those -- and
 3    if they can't get those authorizations, then I think the
 4    player has spoken, he really doesn't want -- has spoken by
 5    silence that the player doesn't want his medical conditions
 6    discussed any further.
 7              THE COURT:  But you're willing to participate in
 8    what Mr. Grygiel said, this briefing to the Court where I
 9    actually see the kinds of questions that might be asked and
10    your response to --
11              MR. CHRISTOPHER SCHMIDT:  Absolutely.
12              THE COURT:  -- whether they're privileged in the
13    first instance and the like?
14              MR. CHRISTOPHER SCHMIDT:  Absolutely.  Your Honor,
15    thank you very much.
16              MR. STEPHEN GRYGIEL:  Very briefly, Your Honor,
17    Steve Grygiel again.
18              I'd like to make just a couple of points.  I
19    understand Mr. Beisner's approach and Mr. Schmidt echoed it
20    which is, Your Honor, if we could just cut through all, and
21    the pronoun was "this."  Well, the "this" is an artificial
22    construct in many cases, as Your Honor points out.
23              For example, let's make this specific so everyone
24    understands exactly what we're talking about.  Apart from the
25    NHL defense I've already mentioned -- that we gave the
```

1    warnings, you guys are all wet, we gave the warnings --

2    there's another one, and that is, we had a Concussion

3    Protocol, and we have modified it, and we gave it to the

4    Clubs, and the Clubs are required to follow it.

5           But then we get a document that shows Julie Grand,

6    who's on this call, saying, the Clubs aren't following it to

7    the extent of some 36 percent of the time, we see players

8    visibly concussed on the ice.  Those are players observed by

9    the Concussion Working Group, not the team doctors, and not

10   the team trainers, who are visibly concussed while they're

11   playing the game.  And then there's an e-mail chain saying,

12   that doesn't sound like it's being complied with.  I'm

13   paraphrasing, but Your Honor gets the point.  Those are

14   certainly things we're going to want to inquire about.  How

15   did they measure that?  Who were the players?  What was the

16   team?  And make sure that maybe there is -- maybe there is

17   more players like that.

18          Very important to us.  So, it's not as Mr. Schmidt

19   said.  I think in fairness, it's not just doctors and

20   trainers.  It's going to be the fact witnesses, as well.  And

21   number two, as to the question of the "this," we can just call

22   these forecasted players whose names may or may not come up

23   and ask them, not only is it cumbersome, I think it's

24   completely legally unnecessary and unduly burdensome for the

25   Plaintiffs if there is no privilege in the first place.  And

1    if there is an NHL document that lists the names of the

2    players who have been concussed, where on the ice they were,

3    what their symptoms were, or whatever it was that details this

4    particular concussion and it goes to the Board of Governors

5    and it goes to the General Managers and it goes to the NHL

6    executive offices who are talking about it, I find it hard to

7    see, Your Honor, how anybody could say that is a protected

8    patient privilege.  That's just not there, and that's what

9    we're going to be talking about in this upcoming

10   correspondence with the Court.

11          Two other points.  Mr. Beisner made the point that

12   early --

13          THE COURT REPORTER:  Mr. Grygiel.

14          MR. STEPHEN GRYGIEL:  I'm sorry.  When I try to get

15   done quickly, you see what happens.

16          THE COURT:  And she appreciates that.

17          MR. STEPHEN GRYGIEL:  I know she does, Your Honor.

18   And I told her I have no shame, you can tell me any time.

19          In terms of the early depositions, while we

20   scheduled three, we asked for three on February 23rd.  Of

21   those three, we have two, and they didn't take place for, I

22   think, two-and-a-half months, and that was Mr. McCrossin and

23   Dr. Burke.  They didn't take place for at least two-and-a-half

24   months after we asked.  Obviously Mr. Bettman is not going to

25   be until July 31.  I think to say that we asked for early

1    depositions and we got them all is just not right.  That's not

2    where we are today.  Now these are standard.  Lots of

3    documents out there.  Since they're there, we're going to use

4    the documents and take these depositions.

5            And finally, Your Honor, on the question of the

6    owner depositions, I don't think I said at our conference that

7    we were strictly going to focus on the owners' rules as

8    members of the Board of Governors.  And Mr. Beisner and I have

9    had an exchange about this.  I think we're in agreement, we

10   will obviously ask these folks questions about their Club

11   operations concerning the concussion issues, and if they don't

12   know, they don't know.  It will shorten the deposition.  But

13   as Your Honor knows, we'd like to do this only once, and it

14   makes sense to ask them since they're going to be there.

15           Thank you, Your Honor.

16           THE COURT:  Okay.  I have a suggestion here.  It

17   would apply to both sides of the case, and I think it might

18   help you when you're scheduling your witnesses to say, hey,

19   the Court has a rule on this.  And the rule would be that

20   either side would have to respond to a request for a

21   deposition within two weeks.  So, if the request is made,

22   there needs to be a response within two weeks with a date, and

23   that date needs to be within the following six weeks.  That

24   seems like a reasonable schedule, and I think that will

25   actually assist primarily the defense with their witnesses

```
 1    saying, hey, I got to get back, the Court has a rule.
 2          So -- okay.  I haven't heard from the Plaintiffs on
 3    Mr. Beisner's point.
 4          MR. JOHN BEISNER:  Your Honor, just a quick point on
 5    that because I think it applies to most of these.  I do -- I
 6    did want to just make sure that if there are issues regarding
 7    the deposition, we will raise those --
 8          THE COURT:  We'll call it a rebuttable presumption.
 9    Okay?
10          MR. JOHN BEISNER:  Just wanted to make sure because
11    that, for a large number of these, we did have some
12    clarification we could --
13          THE COURT:  Good cause will work, yes.  Okay.
14          All right.  Mr. Zimmerman, do you want to address
15    Mr. Beisner's question about the scope of briefing on class
16    certification with respect to these non-class folks?
17          MR. CHARLES ZIMMERMAN:  Yeah.  Well, what I really
18    wanted to say, Your Honor, on that was I think we should be
19    talking on the agenda going forward, is this whole thing of
20    class certification and preparing for that because this is
21    really what Mr. Beisner is starting to talk about, which is
22    the impact of all this on class certification and how wide
23    this tent of privilege and/or the tent of discovery go with
24    regard to class certification issues.  And so even though I
25    wasn't prepared for it today because it wasn't something on
```

```
 1    the agenda and I know that John gets crazy if I talk about
 2    something that's not on the agenda, it's fair game that we
 3    should be a little more free-wheeling here and be able to
 4    address it.
 5              I'm not sure what John was really driving at there.
 6    We don't have any problem with trying to provide information
 7    that -- from Plaintiff Fact Sheets of the 50, of the 54.  We
 8    don't have a problem with this medical question as much as
 9    they do.  They -- it seems to continue to bother them, and
10    we're of the mind that we're looking not for individual
11    medical information as between doctor and patient -- doctor
12    and player.  I don't know that there's a trainer privilege.  I
13    think that's a little broad.  I don't think we have trainer
14    privilege.  I think there's a doctor privilege.  We're not
15    trying to get to that, and we're not using that in any way for
16    our discovery purposes, but we're trying to find out who the
17    protocols were, what the practices were, what things have been
18    put out to the press, as Steve Grygiel has just mentioned.
19              The impact on class certification, I'm not prepared
20    to address that really particularly today, other than to say I
21    think we should be starting to talk about it and be prepared
22    to have free discussion with the Court on it.  But it seems to
23    me what we're really talking about, practice and procedure,
24    policies that were in place, how things were handled in a
25    generic way, used, of course, by example in particular
```

1    instances.  But we're talking about class issues that are the

2    type of process and procedure and common course of conduct and

3    the way the League handled itself and the way the trainers

4    handled direction from above, that's where the class

5    certification questions come in.  And these are not about

6    individual players.

7            Obviously, the defense, in an effort to perhaps

8    defeat class, will try and talk about, oh, no, no, this is

9    really an individual question, it's really a question of

10   individual -- done to an individual player and you have to get

11   a waiver and you have to get the player to sign on and waive

12   and we just don't think we have to go there.

13           THE COURT:  Mr. Zimmerman, I appreciate that you are

14   going to argue what you're saying now at the time of class

15   certification motion, and I think you appreciate that

16   Mr. Beisner is going to focus probably entirely on the

17   individual folks.  I think his question is this:  Are you on

18   the same page about absent class members?  I mean, we have

19   Plaintiff Fact Sheets from the named Plaintiffs and the 54,

20   but he's talking about absent class members now, and I think

21   you need to talk about that.

22           MR. CHARLES ZIMMERMAN:  Sure.

23           THE COURT:  I don't have the answer to that off the

24   top of my head, but I want you folks to have some

25   understanding about that.

```
 1              MR. CHARLES ZIMMERMAN:  I can tell you this, Your

 2   Honor, and we've talked about this in chambers and I think

 3   we've talked about it in court.  We are setting up a protocol.

 4   We're setting up a way to do Plaintiff Fact Sheets that would

 5   be easy and available and efficient for the entire group of

 6   Plaintiffs or putative class members that are out there when

 7   the time comes that that's important and relevant.  The whole

 8   idea of doing the Plaintiff Fact Sheet came from me, as well,

 9   saying let's come up with a Plaintiff Fact Sheet that's

10   ordered, that's reasonable, that's reasonable in scope, and we

11   can do it electronically, and then we can have it done in a

12   21st century way.  And we're putting that in place.

13              So, in answer to the question, we're preparing to

14   have that rolled out.  The question is when:  Before class

15   certification, after certification, if class certification is

16   affirmed, if class certification is denied.  Those parameters

17   will help us define it, but we're preparing our Plaintiff Fact

18   Sheet and we're preparing our protocols so that we can roll

19   out to all affected retired players.

20              THE COURT:  I think you need to talk about this.  I

21   am worried you're not on the same page on this.  Yeah.

22              MR. CHARLES ZIMMERMAN:  Okay.  And I'm happy to talk

23   about it.

24              THE COURT:  Okay.

25              Mr. Beisner?
```

```
 1              MR. JOHN BEISNER:  I don't want to belabor the

 2    point, but just while we're here and talking about it, I think

 3    what you just said raises the issue.  And you're talking about

 4    the Plaintiff Fact Sheets, when the time is right and so on,

 5    which suggests to me that you're, again, going back to what

 6    was said during the meetings with the Court which was, well,

 7    nothing -- only information about the six named Plaintiffs

 8    can -- is fair game for discussion during class certification,

 9    such that these drill-downs we're doing with respect to

10    unnamed class members in these depositions and all these

11    communications with physicians and so on is outside that

12    scope.  I love it.  I'm happy for this.  I love that, you

13    know, to test our defenses, there's got to be exploration of

14    individual Plaintiff circumstances.

15              And, you know, you can be sure all of this

16    discussion is going to be in our class certification brief.

17    But I just want to be sure that if we're spending time in the

18    depositions drilling down on people who are not class

19    representatives, as has been happening in these depositions,

20    we're not going to turn around and say, but you can't talk

21    about anybody who isn't in -- named in that Master Complaint.

22    You can't talk about their experiences, you can't talk about

23    any other evidence that may be in the record.  That's simply

24    a -- and, Your Honor, I'm sorry to belabor this.  I just

25    wanted to make sure, agree with you, I think that frames the
```

1   issue.

2           THE COURT:  I think it does, and I can tell you need

3   a meet and confer.  I'm not sure you've had this discussion

4   so -- with each other.  So --

5           MR. JOHN BEISNER:  But again, if the conclusion is

6   we're only talking about the six, that takes care of this

7   because we're not talking about these drill-downs --

8           THE COURT:  Just be on the same page on this.  Okay.

9           MR. JOHN BEISNER:  Yes, that's all.

10          THE COURT:  All right.

11          MR. CHARLES ZIMMERMAN:  So, my suggestion that we

12  should have class certification issues on the agenda seems to

13  be a good one, and we will continue to have it and we will

14  meet and confer.

15          THE COURT:  Okay.

16          MR. CHARLES ZIMMERMAN:  The next issue, Your Honor,

17  is third-party discovery update.  Third-party discovery update

18  is going to be Brian Penny, and it's going to really touch

19  upon a little bit of what we've just -- of what we just

20  discussed.  But I think it's -- I think it's important, and I

21  think this update will again frame -- frame a lot of the

22  questions that we're struggling with right now.

23          THE COURT:  Okay.

24          Mr. Penny.

25          Good morning, Mr. Penny.

1          MR. BRIAN PENNY:  Good morning, Your Honor, Brian

2    Penny for the Plaintiffs.

3          Actually slightly different than the way Bucky just

4    described it, I was going to give you the third-party update

5    and try to be very careful not to let that update bleed into

6    the next agenda item, which is to discuss the motion to compel

7    the subpoenas, responses to subpoenas to the U.S. Clubs which

8    deal with private medical information.  So, just on

9    third-party discovery, aside from PMI issues the update is

10   somewhat similar to the Board of Governors update.

11         As you'll remember, Plaintiff subpoenaed the U.S.

12   Clubs back in the end of January.  We finally agreed on

13   custodians and search terms at the end of May.  That

14   discussion or that negotiation was actually linked to the

15   Board of Governors' discussion on search terms, and so the

16   search terms for both sets of custodians is essentially the

17   same.  And I believe the collection process is also

18   essentially the same.  And I think Mr. Schmidt will probably

19   give us an update of where they are because, frankly, we don't

20   really have a good sense of where they are in the collection

21   process, and we certainly don't yet have a commitment date on

22   when the first productions were -- will start rolling out and

23   by when those productions will be substantially complete.  So,

24   I'll wait to hear that update from Mr. Schmidt.

25         As regards to some of the other third-party

1    discovery, we've been taking a wait-and-see approach a little

2    bit, trying to be very cognizant not to seek duplicative

3    discovery from other third-parties.  So, examples of that are

4    Dr. Lovell and ImPACT.  If we can get some of the information

5    and databases that Dr. Lovell and ImPACT have collected

6    through their neuropsych testing program from the NHL, we

7    might not have to seek it separately from those two entities.

8    Same goes for Chubb Insurance Corporation that provides some

9    workers' comp insurance for the teams.  If we can get certain

10   data and information from the NHL, we may not need to seek all

11   of that or some of that from Chubb.

12            So, we're taking a little bit of a wait-and-see

13   approach with them.  And if there are holes that need to be

14   filled in and those third-parties can fill them in, then we'll

15   resume the negotiations with them.  And I can just give you,

16   it's essentially the same update on the Canadian -- the

17   letters rogatory to the Canadian Clubs.  We really feel like

18   we're only going to get one shot with each of those Club -- or

19   excuse me, with each of those courts in the various provinces

20   in Canada.  And part of our burden will be to show that we are

21   not seeking discovery from those third-parties that we can get

22   from, perhaps, the NHL.  So, we need to first see what the

23   Board of Governors are going to give us, see what the NHL

24   database can give us before we actually embark on the letters

25   rogatory process.  So, that's the update for third-parties.

```
 1              THE COURT:  You bet.

 2              Mr. Schmidt.

 3              MR. CHRISTOPHER SCHMIDT:  Good morning, Your Honor.

 4    Our update is similar to Mr. Martino's.  We are coordinating

 5    with the Clubs to try to get the relevant e-mails.  I think we

 6    could really follow very similar schedule by July 21st to have

 7    roughly about 10 of the Clubs' first production completed.

 8    And the goal then, I believe the Court gave the -- to complete

 9    all of those was the end of August.  Was that the goal on that

10    and that's what we're striving to, as well.  And we will

11    continue to pursue it --

12              THE COURT:  And to the extent that the Plaintiffs

13    would like you to prioritize any of that, you should --

14              MR. CHRISTOPHER SCHMIDT:  Happy to do so.  And, in

15    fact, we were planning to do that without even them asking.

16    We had scheduled already Mr. Gapski's deposition for

17    July 15th, as soon as the Stanley cup was finished, and we

18    just heard yesterday they may want to postpone it.  But we

19    were going to try and get that production out in an

20    expeditious fashion.  It looks like that's not an issue right

21    now, but we will do that, of course, Your Honor.

22              THE COURT:  Okay.  Sounds good.

23              MR. CHRISTOPHER SCHMIDT:  Thank you.

24              THE COURT:  Mr. Penny?  Oh, Mr. Beisner.

25              MR. JOHN BEISNER:  Your Honor, if I may just on one
```

1  point, and perhaps Mr. Penny will respond to this.  Just in

2  terms of timing issues here, Plaintiffs are perfectly free to

3  proceed as they wish, but consistent with the concern about

4  timing.

5          At the very first status conference, there was

6  discussion made by one of Plaintiffs' counsel about initiating

7  a letter rogatory process to get the information needed from

8  the Canadian Clubs.  And, you know, I think the information

9  that is being -- that we agreed to collect from the Clubs is

10  with respect to the BoG members that had been agreed upon.  I

11  just want to make clear that if Plaintiffs are intending to

12  seek the broader collection of discovery that's been sought

13  from the U.S. Clubs, that's not going to be part of that.

14  We're doing the review -- correct me if I'm wrong, Matt --

15  with respect to the BoG members who have been specified.  This

16  isn't a general production from the Clubs.

17          And, you know, they're separate entities, and that's

18  the decision they've made.  We've done the Governors' search

19  because of the purported relationship with the League.  So,

20  just in terms of timing, so we're not coming back here later

21  and saying, oh, we've got a big delay, get the train started.

22  You know, this initial issue is raised at the very first

23  status conference, and if those requests are to be made, get

24  them started.  The -- my understanding from the Clubs --

25  Canadian Clubs' counsel is they're not resisting discovery,

1    they're just saying, go through this process so we can deal

2    with these issues in the Canadian court system.  But they're

3    not saying they're not producing.  And the delay here is that

4    no one has started that process.

5            THE COURT:  Okay.  Mr. Penny makes a good point,

6    though, about concern about whether the courts will order this

7    production.  And in Canada, I presume the letters rogatory

8    have to go through the court system there.

9            MR. BRIAN PENNY:  They do, and it's a very detailed

10   process.  And like I said, I really believe we'll only get one

11   shot at that.  So with all due respect to John's concerns

12   about timing, we really can't proceed until we feel like we've

13   got our best position to put forward to those courts.

14           THE COURT:  But it looks like we'll have substantial

15   completion by the end of August, so you should, early fall, be

16   able to take a look at that.

17           MR. BRIAN PENNY:  I mean, I just heard Mr. Beisner,

18   though, say that the Canadian Clubs are not resisting

19   production, but we have to then go through this very long and

20   detailed process of getting the letters rogatory issued first.

21   If they're really not resisting production, I wish they would

22   just respond to the subpoenas.  I'd be happy to send them out,

23   you know, tomorrow, and we could go through the same process

24   we did with the U.S. Clubs.  But --

25           THE COURT:  Mr. Beisner, do you think there's any

1  chance we could avoid this unnecessary process?

2         MR. JOHN BEISNER:  Your Honor, the problem is what

3  we talked about earlier, and it's the medical records issue.

4  They need a Canadian court direction on what they would be

5  doing on those issues, which is based on the request of the

6  U.S. Clubs, a lot of this.

7         THE COURT:  Well, then let's do this.  When -- I'll

8  get these questions, I will give you my viewpoint.  Perhaps we

9  can then stipulate to an approach to that, and you can give

10  that to the Canadian court.

11        MR. JOHN BEISNER:  And, Brian, I understand your

12  position, but I think just getting this rolling, it may mean

13  it gets winnowed, it may mean there aren't disputes about

14  things, but I'm just not sure that it's wise to be waiting on

15  that.  Again, I -- I don't mean to be telling anybody how to

16  litigate the other side of the case, but it -- you know, I

17  think we heard in the first status conference we're going to

18  need a letter rogatory and get this started and it just hasn't

19  happened.

20        THE COURT:  But Mr. Beisner, wouldn't you agree that

21  the Canadian court is going to wonder how this Court has been

22  handling the medical issues with the U.S. Clubs, and so I'm

23  not sure it could have happened any faster.

24        MR. JOHN BEISNER:  I didn't mean to suggest that

25  what you were just suggesting isn't the appropriate way to

1    proceed.  But what I'm saying is, you probably would have had

2    production there by now had the process been started when you

3    did it with the U.S. Clubs.

4            MR. BRIAN PENNY:  Okay.  So, this is all new

5    information, again, and this is now the first time I've heard

6    that the only objection that the Canadian Clubs might have is

7    really just a private medical information because the U.S.

8    Clubs are producing other information, apparently, is being

9    collected as Mr. Schmidt just mentioned about e-mails that

10   don't relate to private medical information.  So, again, if

11   the process is I send them the subpoena and they start

12   producing non-PMI and we talk about PMI separately with them,

13   I'm happy to start that process --

14           THE COURT:  Is that possible, Mr. Beisner?

15           MR. JOHN BEISNER:  Again, I don't know why there

16   hasn't been a discussion with the Clubs there about what can

17   get started.  It just hasn't been pursued --

18           MR. BRIAN PENNY:  Well, the problem --

19           MR. JOHN BEISNER:  And I can't speak for the Clubs,

20   Your Honor.  I don't mean to suggest that.  But the -- there

21   has been no presentation of -- as far as I know, tell me if

22   I'm wrong -- of a proposed subpoena to them --

23           MR. BRIAN PENNY:  Oh, there has been.  In fact, the

24   very first conversation I had with Mr. Shamie, Canadian Clubs'

25   counsel, was I offered -- I gave them an example -- or an

1    exemplar of one of the subpoenas.  I said, here's what I would

2    like to serve on your Clubs; will you accept it?  He said, no,

3    you have to go through the letters rogatory process.

4           It was the same conversation I had with him when we

5    tried to schedule Mr. Shanahan's deposition which was, here's

6    a subpoena for Mr. Shanahan; can we have a date?  He said, no,

7    you have to go through the process of serving it through

8    Canadian law.  I drafted an 18-page motion.  I tried to meet

9    and confer with Mr. Shamie on it for two weeks -- actually,

10   three weeks.

11          He couldn't get in touch with his counsel -- excuse

12   me, his client.  I then filed the motion.  A day later we got

13   the date, and Mr. Shanahan told the Toronto press, I never

14   objected to having my deposition taken.  Well, if that's true,

15   why did I have to jump through the hoop of writing an 18-page

16   motion to get a date for a deposition?

17          MR. JOHN BEISNER:  Well, I think what's missing here

18   is they are saying that they want you to go through Canadian

19   process.  That doesn't mean that they don't agree to produce

20   once you have done that.  And that seems to me to be the

21   disconnect here is, if you talked -- and again, I haven't been

22   in these conversations, and I apologize --

23          MR. BRIAN PENNY:  I understand.

24          MR. JOHN BEISNER:  -- because I haven't been there,

25   but it seems to me if I can make a third-party suggestion here

1    that if you talk to Canadian counsel and say, we're going to

2    go through this process, we're going to do this under Canadian

3    law, but let's talk about what you are going to do once we do

4    that, it seems to me you're not getting past the point of your

5    saying, will you do it without my going through the letter

6    rogatory process?  That's where the conversation is ending,

7    and that's what I'm just suggesting.  And I should probably

8    stand down now because this is a discussion with the Clubs.

9           MR. BRIAN PENNY:  I will take that suggestion.  I

10   will call Mr. Shamie again and see if he's had a change of

11   heart.  But what I don't understand is why Mr. Shamie is

12   going -- has told me before, and with Shanahan's deposition

13   scheduling he told me the same thing, you have to go through

14   the process.  If going through the process means he's not

15   going to then object to the process once it gets underway, why

16   did I even have to start it to begin with, why didn't you --

17          THE COURT:  Why don't you place a call.  Why don't

18   you tell him what Mr. Beisner has suggested.  And I mean,

19   Mr. Schmidt, can you be of use here too (laughter) --

20          MR. CHRISTOPHER SCHMIDT:  That may be debatable.

21   So, here is my thought on this process is we went through a

22   pretty extensive, very civil meet and confer process and

23   reached an agreement on the U.S. Clubs.  I think Mr. Beisner's

24   point is entirely right, that the Canadian counsel -- Clubs

25   should have the right to the procedural protections of going

```
1   through the letters rogatory process.  I'm not aware of
2   Plaintiffs, though, going to Canadian counsel and saying, hey,
3   this is the deal we reached with the U.S. Clubs.  If we go
4   through this process, would this be acceptable?
5           I kind of think there might be a middle ground here,
6   but the Canadian Clubs clearly are entitled to the protection
7   of Canadian law and are clearly entitled to go through the
8   letter rogatory process.  But as Mr. Beisner said, that
9   doesn't mean they've ever said, hey, we're going to resist
10  this or we're not capable of finding a reasonable solution.
11  So, I think what we have, to quote Cool Hand Luke, is a
12  failure to communicate here.  Plaintiffs should start the
13  process; it should call Canadian counsel.  We reached a deal
14  in May.  Why haven't they done anything?  And we're in July on
15  this issue.
16          THE COURT:  Well, maybe what would be useful is if
17  you would be on the phone so you can describe what you've done
18  for the U.S. Clubs.
19          MR. CHRISTOPHER SCHMIDT:  Happy to do so, Your
20  Honor.
21          THE COURT:  Okay.  Very good.
22          MR. BRIAN PENNY:  Okay, I'll take those suggestions
23  and I'll make some phone calls to see where we get.
24          THE COURT:  Okay.  Sounds good.  You'll report to us
25  at the next informal, then.
```

1          MR. BRIAN PENNY:  Yes, Your Honor.

2          THE COURT:  Okay.  Very good.

3          MR. CHARLES ZIMMERMAN:  I saw Cool Hand Luke.  I

4    feel like the guy that's been in that box where we had -- that

5    was a result of the failure to communicate.

6          Really, Your Honor, you know, I listened to this and

7    we're trying to find easier ways, not harder ways.  And so

8    anything we can do to cooperate and anything the Court can do

9    to help us reach these points, I mean as Plaintiffs, we're not

10   trying to make it difficult.  We're trying to make it easy.

11   We're not trying to wait and delay and make -- give ourselves

12   more work.  We're trying to have less.  And so it's a little

13   counterintuitive.

14         But having said that, more communication is better.

15   We'll communicate more.  We'll ask more questions, and maybe

16   the Court, with its guidelines on the private medical

17   information question, will help break a little bit of the

18   logjam.  But up to now, we've really been told that, you know,

19   you got to go through the Canadian stuff and the Canadian

20   stuff is your only way to get it.  And we assumed that what

21   that meant was we have to go through the Canadian stuff.  And

22   we didn't want to start doing it until we had the parameters

23   of what we could ask for determined by this Court.  So --

24         THE COURT:  Where is Canadian counsel located?  Is

25   he in Toronto?

1              MR. CHRISTOPHER SCHMIDT:  Yes, Your Honor.

2              THE COURT:  Okay.  All right.

3              MR. CHARLES ZIMMERMAN:  Okay.  Motion to enforce

4      subpoenas directed to the U.S. Clubs.

5              THE COURT:  You know what, I think what we'll do is

6      take a break.

7              MR. CHARLES ZIMMERMAN:  Sure.

8              THE COURT:  Where are we here, yeah, we're just on

9      item six.  So, we will resume in 15 minutes, at quarter to.

10     Court is briefly adjourned.

11             **(Short break taken.)**

12             MR. DANIEL CONNOLLY:  Your Honor, if I may.

13             THE COURT:  Yes, Mr. Connolly.

14             MR. DANIEL CONNOLLY:  When I made the introductions

15     of the people on the phone earlier today, I forgot to point

16     out for the Court that we have brought along Rich Bernardo,

17     Matt Stein, and Dennis Kiker, who is from the Granite Legal

18     System.  And they are here to talk to the Court about the

19     database issues you asked during the informal conference that

20     they be present, and I just wanted to let the Court know that

21     that resource was available to you.

22             THE COURT:  Thank you.  We appreciate you being

23     here, and we're going to get to you soon.

24             MR. DANIEL CONNOLLY:  Thank you, Your Honor.

25             THE COURT:  All right.  Very good.

```
 1              Mr. Zimmerman.

 2              MR. CHARLES ZIMMERMAN:  I think with those

 3     introductions, it does tip the balance towards the more

 4     populated side being the defense this time.

 5              The next issue, Your Honor, is motion -- motion to

 6     enforce the subpoenas directed to the U.S. Clubs.  And again,

 7     that will be Brian Penny for the Plaintiffs.  The good news

 8     is, though, Your Honor, number eight, the medical -- personal

 9     medical information privilege, I think we've exhausted that

10     issue, so that one can be stricken.

11              THE COURT:  Okay.  Very good.

12              MR. CHARLES ZIMMERMAN:  Thank you.

13              THE COURT:  Mr. Penny.

14              MR. BRIAN PENNY:  Morning again, Your Honor.  Just

15     by way of an update, we did receive the NHL's letter

16     describing the various databases that they have.  I know that

17     the Court is in receipt of that letter, as well.  That was

18     very helpful, and I appreciate all the disclosure in that

19     letter.

20              For one thing, I think it helped confirm a little

21     bit for Plaintiffs that there is a bit of redundancy between

22     the various databases.  So, one of the things that we are

23     working on right now is to try to determine, through

24     consultation with some of our experts, both IT experts and

25     other consultants, if gaining access to some but not all of
```

```
 1    the databases might give us all the information we need.  I

 2    don't know if that's going to be practical, but if it is,

 3    we'll certainly try to pursue it from that approach.

 4           But one issue that is becoming quite clear, and I

 5    think I forecasted this being an issue back on June 4th when

 6    we had the discussion -- or excuse me, the argument on the

 7    motion, and that is that when we try to de-identify some of

 8    these databases, it's becoming very challenging.  And I think

 9    the challenge stems in large part from the fact that the

10    injuries themselves are very public events, they happen in --

11    most of them happen in NHL hockey games that are seen,

12    broadcast on T.V. and seen in the arena by thousands of fans.

13    And the players themselves are very public persona.

14           And so when you try to go about de-identifying

15    fields in the database that discuss these injuries or the

16    players, it becomes very challenging because even a little bit

17    of information might be used by some expeditious person to

18    identify the player.  For example, one of the fields that is

19    being claimed as sort of private is the players' native

20    language.  And I think the concern there is that for some

21    native languages, there are only so few hockey players that

22    speak some of those languages, that just knowing the player's

23    native language alone might help you identify the player.  But

24    yet you'll see in the letter, as well, the description of why

25    knowing the player's native language is important to
```

1    interpreting the neuropsych testing results for that player.

2    And so if you take that field out in an attempt to de-identify

3    the database, you're losing critical information that the

4    Plaintiffs need to assess both what the NHL did with that

5    database and what we might do with that data.

6           Another very acute example of that is the date of

7    injury.  Because the injury was so public, if you have the

8    date of the injury, somebody might be able to pull an actual

9    video clip, a very public event, to identify the player from

10   the date of the injury.  But, of course, I think you can -- as

11   I think you can imagine, the date of the injury is going to be

12   an important piece of information for us when we try to use

13   this data with some of our experts.  It also becomes a major

14   issue when you talk about the database that was created for

15   the video analysis project.  And that was a project which

16   attempted to match the video of the injury to some of the

17   medical information about the injury.  And so I really can't

18   think of a practical way in which you can de-identify the

19   video itself or disaggregate it from the medical information

20   and still have the same database and same information that the

21   NHL collected.

22          And so I think part of the problem, again, is

23   because all of this is so public, it's becoming very

24   challenging to try to de-identify it.  And so that's where I

25   think the most elegant solution -- and I'll sort of renew my

1    argument that none of this information is actually private,

2    protected medical information.  And I think that becomes quite

3    clear when you look at some of the Defendants' own documents.

4            In opposition to the motion to compel -- and we cite

5    this in our reply brief -- there was a Daly -- a Declaration

6    from Bill Daly in which he includes -- or attaches several

7    authorizations that were signed by the players in connection

8    with collecting a lot of this information for the Concussion

9    Program.  And these authorizations have the same language

10   going all the way back to 2003.  And the authorizations

11   explicitly state -- and this is the player who signs this --

12   "I understand that any of my health information that is

13   disclosed pursuant to this authorization may be redisclosed by

14   the recipient of such information and, upon such redisclosure,

15   may no longer be protected by federal healthcare privacy laws

16   and rules."

17           That's a clear indication from the player that he

18   knows the information about his concussion is not going to be

19   held confidential.  Also on the June 4th argument I showed

20   Your Honor some PowerPoint slides of some of the injury

21   reports that the teams issued, and then some other public

22   media reports and press inquiries that were all collected by

23   CBS Sports about a certain player's concussions.  It was all

24   sorts of information there, not just on the diagnosis of the

25   concussion but on the treatment of the concussion, when the --

1    when he was expected to return to play, et cetera.  And all

2    that information, again, going back decades, players

3    understand that that information is going to be made public.

4          And as Your Honor mentioned at the June 4th hearing,

5    Article 34 of the most recent CBA makes that quite clear.  And

6    I'm quoting right from it.  The following information is not

7    going to be confidential:  The nature of the player's injury,

8    the prognosis and anticipated length of recovery, the

9    treatment and surgical procedures undertaken or anticipated in

10   regard to the injury.

11         This is essentially all of the information that

12   we're talking about here.  The most elegant solution is to

13   just simply acknowledge that this information is not private.

14   And as Your Honor acknowledged in some of the guidance you

15   gave us on June 4th, information that's in the public domain

16   is not protected by a private medical privilege.  If we can

17   reach that resolution, there's no need to try to de-identify

18   these databases and remove information that is going to be

19   critical to our analysis.

20         That's all I have for Your Honor on that.

21         THE COURT:  Thank you.

22         Response from the NHL?

23         MR. CHRISTOPHER SCHMIDT:  Your Honor, if I may just

24   briefly address the Court -- and, please, please come up, as

25   well -- the consultant and Skadden have taken the lead on the

```
 1    database analysis, and the only thing that I would say is when

 2    we engaged in this process, it was with the Court's guidance

 3    and understanding we would do the database search in an

 4    anonymized, de-identified way.  And there are very important

 5    privacy interests that the players have.  Plaintiffs

 6    acknowledge that in their briefs.  And I don't -- I think if

 7    we get -- I hope we're not re-arguing those issues.  I thought

 8    we were talking about how to produce the data in a

 9    de-identified way, and that's why we have just turned it over

10    to others who could look at it on a global basis.  If we have

11    to revisit these issues, then I would ask for more formal

12    opportunity to brief those issues.

13               With that, I will step down.

14               THE COURT:  Okay.

15               MR. RICHARD BERNARDO:  Good morning, Your Honor.

16    And for the transcript, this is Richard Bernardo.  I will

17    represent the trio of what I will refer to as the Geek Squad

18    from the NHL.  And I think we're getting a little bit ahead of

19    ourselves with --

20               THE COURT:  Are you referring to all of these people

21    being the Geek Squad?

22               MR. RICHARD BERNARDO:  I will leave that to the

23    Court to decide (laughter).

24               THE COURT:  Yes, Mr. Bernardo.

25               MR. RICHARD BERNARDO:  There's an equal one from
```

1   Plaintiffs' side.

2            Let's take a little step back, as Mr. Schmidt

3   pointed out.  There's already been discussion, and we went

4   into these discussions and had a very productive meeting with

5   Plaintiffs' counsel to discuss de-identification and what we

6   did was, as you know, we provided a letter that set forth all

7   the databases.  And as Mr. Penny observed, I think it's become

8   clear that there's a fair degree of overlap from one database

9   to another.

10           We also, as you probably saw with that letter,

11  provided some preliminary analysis of fields that NHL and the

12  Clubs believe ought to be de-identified.  However, as we

13  emphasized to Plaintiffs, that is a concept that we're going

14  to need to continue to discuss because the scope and nature of

15  de-identification is going to depend in large part in what

16  fields Plaintiffs are interested in having information

17  produced from because these databases interrelate.  And while

18  within one database, it may not reveal personal, private

19  medical information if you de-identify it, information from

20  that database can be linked to other databases that would then

21  disclose information.  And again, I'm not here to re-argue,

22  and I'll defer to my colleagues to make the points about the

23  agreements and waiver and all of that.  I'm really here to

24  talk about the practicalities of producing the information.

25           Mr. Penny referred to a few fields in particular,

1   and again I think the process needs to work a little bit more.

2   We talked about I think about 24 fields that Plaintiffs

3   identified at our meet and confer.  And during that

4   conversation, we talked about different ways in which we could

5   anonymize them.  And to be specific, I think de-identification

6   has two components.  One is absolute redaction, where we would

7   not provide the information; and then the other is to

8   anonymize it, to create some code that would give them the

9   benefit of the substance of the information that they're

10  trying to work with without actually disclosing the

11  information itself.  And we believe that there are ways within

12  some of the fields that we talked about to do that and to

13  accomplish that.

14          I'm not here to say that there's not going to be any

15  dispute because there may be one or two fields that we need to

16  come back to Your Honor.  I'm here simply to say I think it's

17  premature for the Court to really address the specific fields

18  and the specific issues that Mr. Penny raised because I think

19  the Clubs' positions are really largely going to be dependent

20  upon them coming back and telling us, okay, we've digested

21  your 60-page letter and these are the databases we want and

22  these are the fields we want.  And in fairness, too, they

23  asked us some questions that we were unable to respond to and

24  we're doing a little bit of due diligence to provide further

25  information.

1          So, I would suggest, if I may, that the Court permit

2     the parties to continue the dialogue that we've been having,

3     which has been very productive, identify what the database is

4     the Plaintiff wants and see if we can narrow down the issues

5     to ones that are clear and crystallized and, if necessary,

6     submit further papers on that.

7          THE COURT:  Okay.  Let me ask one question, and then

8     I'll respond to that.  In terms of the anonymizing piece of

9     this, what I had in my head was that the Plaintiffs would be

10    able to -- it would be coded in a way that the Plaintiffs

11    would be able to track a player throughout all the information

12    about that player in the database.  In other words, fields and

13    various databases would all be anonymized in the same way so

14    that, although you might not know the name, you would know

15    everything that that database had or those databases had about

16    that player.  Do you see what I'm saying?

17         MR. RICHARD BERNARDO:  I certainly do, Your Honor,

18    and that's exactly what we had in mind.  And you really honed

19    in on the very issue we had is that there is an

20    interrelationship among these databases so you can't look at,

21    for example, a video analysis database in isolation and say,

22    well, this is public information, because providing that

23    without anonymization is going to link you to other

24    information, in the way that we do this, that would be

25    private.  So, we completely agree with Your Honor in terms of

```
1    how to anonymize it, but I think that that process may raise

2    other issues.

3            THE COURT:  Well, and I think the issue that

4    Mr. Penny raised is a challenging issue.  So much of this is

5    public.  And of course you weren't there when they argued

6    about the provision of the CBA and the authorizations that

7    permit redisclosure and the like but -- and so I'm still

8    struggling with that.  I'm really sort of hoping you can work

9    this out.  But if I have to rule, I have to rule eventually.

10           MR. RICHARD BERNARDO:  Of course, Your Honor.  And

11   that's what we're hoping that we can do is that maybe through

12   a process, for example, in date of injury, there may be a way

13   to code that where it doesn't pinpoint the specific date but

14   it provides them with the type of information that they would

15   need for their analysis that we want to get from the date

16   that's something other than date itself.  So, we are hopeful

17   as well that we can come to some agreement.

18           Again, there may be some issues we need to come

19   back, but I think it's just premature for the Court and for

20   the parties to focus on particular fields in isolation and say

21   that they are or they are not worthy of anonymization.

22           THE COURT:  Mr. Penny, do you -- would you find it

23   acceptable to continue the meet and confer process, to invite

24   these folks to our informal and so we can attempt to see if we

25   can reach resolution?
```

1          MR. BRIAN PENNY:  We can continue the meet and

2     confer process.  I'm just not very optimistic that we are

3     going to reach a resolution.  And I don't know if you were

4     speaking past each other.  I was maybe misinterpreting what

5     the Court said, but I don't think that the Defendants

6     completely agree with your understanding of how one of these

7     databases would be redacted.

8          What I understood Your Honor to say was that a

9     database would be anonymized in the sense that the player's

10    name would be given an anonymous number.  But all the other

11    information including the date of injury, the date of

12    neuropsych testing, et cetera, would remain in the database.

13    And I don't think that the NHL is going to agree to that.  If

14    they would, we would be fine.

15         MR. RICHARD BERNARDO:  And to Mr. Penny's point,

16    Your Honor, he's right.  I think I understood you to say that

17    one of the things we would do is to anonymize it so you can

18    interpret the data across databases and Player 1 in the first

19    database isn't going to be Player 5 in another database.  But

20    that anonymization may not be sufficient to protect medical

21    information, and that's something that we're prepared to

22    address on an individual basis as it arises.  And we did

23    address that in the letter by pointing to those fields that we

24    thought gave rise to issue.

25         MR. BRIAN PENNY:  And, again, I'm perfectly willing

1    to engage in another or some further meet and confers.  What

2    I'm really hesitant to do is engage in weeks' worth of meet

3    and confers when we've, months later, decide we are at an

4    impasse and then we need Your Honor's guidance because I think

5    we're careening toward that very quickly.  I think there are

6    some critical aspects of the databases that I don't think you

7    will yield to but which we think are incredibly important to

8    our analysis of those databases.

9           One perfect example is this video analysis project

10   database.  The entire idea of that database was to link the

11   videos of the concussive events to the medical records about

12   those concussive events.  You can't disaggregate those and

13   say, well, the videos are public, I'll give you those, but I

14   can't connect them for you to the medical records.  The whole

15   point of the project was to connect those two together and

16   then analyze --

17          THE COURT:  But why can't you connect them in an

18   anonymous way?  In other words, you could connect -- because I

19   guess because the video would --

20          MR. RICHARD BERNARDO:  And this is precisely the

21   issue, Your Honor, I was trying to see if we could avoid in

22   trying to discuss because where we left it in the discussion

23   was Mr. Penny identified, I think the number was 24, fields

24   and I think for a number of them we probably will be able to

25   come to some sort of agreement.  What I'd like to do is figure

1   out which one of those or ones of those we can't agree on and

2   what databases they're interested because I think it will be

3   much easier for both sides to present to Your Honor their

4   positions as to why they should or shouldn't be anonymized,

5   and then Your Honor can decide that.  I just think in the

6   abstract, it's very difficult to -- for us to defend the

7   position without knowing exactly what they want.

8           So I don't think this is something that should take

9   months, and we're certainly committed to work with Mr. Penny

10  to see if we can narrow down and crystallize our issues and

11  then bring them to Your Honor.

12          MR. BRIAN PENNY:  Well, and to be fair, what I tried

13  to do to make the last meet and confer on Friday a little more

14  productive was to put some of the categories of what you were

15  claiming were private fields into categories -- roughly 24

16  categories that we could try to discuss.  But some of those

17  categories, frankly, aren't that important to us, but you were

18  claiming are private, such as the brand of glove the player

19  wears, the type of shoulder pads he wears, the brand of the

20  helmet.  I mean, these are things that aren't that important

21  to us.  And sure, we can meet and confer and probably come to

22  a resolution on those.  But I think we're going to have major

23  issues with things like injury date, date of birth of the

24  player, the video clip being -- the video analysis project

25  database.  I really don't see how we're going to come to an

1    agreement on that.

2              MR. RICHARD BERNARDO:  That may be so, but I don't

3    think we're yet at a specific disagreement that warrants

4    discussion right now.

5              THE COURT:  Okay.

6              MR. BRIAN PENNY:  That's fine, just --

7              THE COURT:  I appreciate the concern that both sides

8    raise here.  Mr. Penny, I hear you that this issue has been on

9    the table a while, it needs some resolution.  I hear that I

10   asked you folks to come forward and you've done that and made

11   some progress on that.  So, I think at our next informal this

12   should be a real focus of it so we can make a pivot on this.

13   I need to do some more thinking about this.  I think that what

14   I was thinking last time we talked about this is that the

15   Plaintiffs -- that there was a way for the Plaintiffs to prove

16   their case with respect to each of these folks and the

17   information in the database about them without identifying

18   them.  But now I can see that because so many pieces of the

19   database will end up identifying it, all of a sudden that

20   connection won't be made and that's the problem.  And I

21   appreciate that, and I don't think I quite appreciated that

22   before I got this letter and heard from you today.  So, that's

23   what I need to struggle with.  You can help me struggle with

24   that and figure out what the fair outcome is on that.

25              MR. RICHARD BERNARDO:  We'll certainly be willing to

```
 1   assist.

 2              THE COURT:  All right.  Great.

 3              MR. RICHARD BERNARDO:  Thank you, Your Honor.

 4              MR. CHARLES ZIMMERMAN:  The next issue, Your Honor,

 5   is the Defendant -- Defendant Fact Sheets.  And there are some

 6   additional questions that we think need to be added to the

 7   Fact Sheets.  Mike Cashman is going to discuss them, but I

 8   think it's time to come to ground on the Defendant Fact Sheet

 9   and get that out.

10              THE COURT:  Okay.  Very good.

11              MR. MICHAEL CASHMAN:  Your Honor, we've had some

12   further discussion.  I proposed a revision to question --

13   section 3, sub 4.  As you'll recall from our discussion at the

14   last informal conference, I've proposed new language to the

15   NHL.  I haven't heard a response to it.  And in addition,

16   based on the discussion that we had at the informal conference

17   and the way discovery has been developing in this case, we had

18   three additional, clarifying questions that we've proposed and

19   the NHL has not gotten back to me yet on any of these.

20   Perhaps -- well, we do want to get this resolved no later than

21   the next informal conference because the Plaintiff Fact Sheets

22   will be due in a couple weeks.

23              And what we had proposed on the Defendant Fact

24   Sheets is they run from the date when the Plaintiff Fact

25   Sheets are provided.
```

1        So, Mr. Zimmerman is correct.  We'd like to get this

2   resolved.  I could go through the language with the Court that

3   we proposed, or we can have some meet and confer.  But

4   regardless, we need to get this resolved no later than the

5   next informal conference.

6        THE COURT:  Okay.  Let me hear from the Defense

7   first.  Yes.

8        MS. JESSICA MILLER:  Good morning, Your Honor.

9   Jessica Miller.

10       THE COURT:  Good morning.

11       MS. JESSICA MILLER:  We received

12  Plaintiffs' proposal on Monday, and due to travel schedules,

13  we haven't had a chance to meet and confer on the additional

14  questions yet.  We have a call set with Mr. Cashman on Monday

15  on confidentiality issues, and so we were thinking we could

16  discuss it at that time as well, if that works for you, so

17  that this would be ripe for the informal.

18       And there's one other issue that I think is going to

19  take a little bit of sensitivity, and that is the fact that

20  there is a little bit of a cross currents going on between the

21  proposals on the Defendant Fact Sheet and what Plaintiffs are

22  asking for with respect to the 54 Plaintiffs on the databases.

23  So, we want to make sure before we have this final, hopefully

24  by the informal, that anything that Plaintiffs are asking for

25  with respect to the 54 from the databases is included so that

1    it's all in one place.

2              THE COURT:  Okay.

3         MS. JESSICA MILLER:  And so that's a little bit of a

4    slow down, but we should have this ripe for the informal.

5              THE COURT:  With respect to this and the previous

6    issue, it's going to be important for me to get position

7    papers about where things stand from the parties a little bit

8    earlier.  Now, we haven't set the informal, so maybe the best

9    thing to do is to do that and then we can come up with some

10   dates here.  I now have my July schedule here, and I think we

11   were looking at sometime the week of the 14th.  Is that what

12   we were looking at for an informal?

13             Does July 15th work for folks?  Of course,

14   Mr. Zimmerman -- no, Mr. Beisner, you don't -- somebody

15   doesn't have -- Mr. Zimmerman, you don't have your schedule.

16             MR. CHARLES ZIMMERMAN:  I don't have a -- I can --

17             MS. JESSICA MILLER:  That works for us, Your Honor.

18             THE COURT:  Okay.  Mr. Zimmerman, let's assume

19   July 15th, which is a Wednesday, works.  If it doesn't, maybe

20   you can tweak it with the parties.

21             MR. CHARLES ZIMMERMAN:  Okay.  I think it works,

22   Your Honor.  I just -- we can set it and if there's a problem,

23   either I won't attend or we'll -- I'll let the Court know.

24             THE COURT:  Okay.  I need to put it -- I have a

25   pretrial at 9:30, so would you prefer to do it at 10:30 or at

1   1:00 or 1:30?

2          MR. CHARLES ZIMMERMAN:  1:30, then people can fly

3   in -- 10:30, then people who won't fly in.

4          THE COURT:  Mr. Beisner?

5          MR. JOHN BEISNER:  Your Honor, we just discovered

6   we --

7          THE COURT:  Have a problem?

8          MR. JOHN BEISNER:  -- can confer, our true Geek

9   Squad isn't available on the 15th.  My apologies.  But if

10  we're going to be discussing the data issues, that's not going

11  to work.

12         THE COURT:  Yes.  How about the afternoon of the

13  14th?

14         MR. CHARLES ZIMMERMAN:  I know I'm tied up that day

15  with a matter in another -- another judge in this courtroom

16  [sic].  But we can go -- probably proceed without me or I can

17  come in late, if necessary --

18         THE COURT:  The morning of the 17th would be

19  available.  That's Friday.  Okay.  Guys, something has to work

20  here.

21         MR. CHARLES ZIMMERMAN:  Let's do the 14th --

22         MS. JESSICA MILLER:  Afternoon of the 14th.

23         THE COURT:  Afternoon of the 14th.  Okay.  Let's

24  make it 1:00, July 14th at 1:00.  And that's an informal.

25  Okay.

1          With that in mind, then, I would like, on the

2    database issue and on the Defendant Fact Sheet issue, give me

3    some time.  So, if you can get me final position papers on

4    that no later than Friday the 10th.  Okay?  And that should be

5    possible because, as I understand it, that gives you a week to

6    meet and confer.  Okay.

7          MR. CHARLES ZIMMERMAN:  The next issue -- are you

8    ready for the next -- the next issue is the production of text

9    messages, which I think Brian Gudmundson of my office is going

10   to be discussing.  And I think there will be some discussions

11   from the Defendants, as well.

12         THE COURT:  Okay.

13         MR. BRIAN GUDMUNDSON:  Good afternoon, Your Honor.

14   I guess it's still morning.  I've been here a while.  I

15   thought I'd bring the Court up to speed on where the text

16   messaging issue is, to give you some historical context.

17         I know you've heard something about this throughout

18   the course of our formal and informal status conferences.  We,

19   you know, of course served our requests a long, long time ago,

20   throughout the middle of March and April of this year.

21   Mr. Andreson and I met and conferred with defense counsel

22   about the scope of their collection, got a sense of how they

23   were collecting their electronically-stored information, what

24   type of custodial interviews they were doing and things like

25   that.  When we started receiving production, we noticed that

1    there were no text messages included.  And we re-inquired with

2    defense counsel May 28th and said, you know, we haven't seen

3    any text messages, are these forthcoming?  The answer was no.

4          We asked why not.  They said, well, we've reasked

5    everybody, and they don't have any text messages, so we're not

6    going to be producing them.  We have no reason to doubt their

7    sincerity on that.  We did, in fact, however do some rather

8    rudimentarily searching of the database for things like the

9    word "text" and "texting" and "texted" and learned that, in

10   fact, they do text and learned that at least four of the

11   custodians they identified talked about texting members of the

12   media, very key alternate Governors such as Glen Sather,

13   referees, and things like that.

14         Where we've left it now is that we've exchanged

15   letters on this subject and we've been told they would

16   consider producing text messages for the four people we've

17   identified.  But the Plaintiffs, of course, believe there are

18   far more people who text and have offered to -- have offered a

19   list of sample custodians they should also search texts for.

20   We've not gotten a commitment on either the four or the -- or

21   the broader list, which was only a sampling, of course.  We

22   always reserve the right to seek more text messages, but --

23         THE COURT:  How many did you propose in the

24   sampling?

25         MR. BRIAN GUDMUNDSON:  We proposed a total of --

```
 1    well, of course we proposed the four, and then we proposed an
 2    additional 10 out of 34 custodians.
 3              THE COURT:  Okay.
 4              MR. BRIAN GUDMUNDSON:  And so that's where we are.
 5    We're sort of awaiting a word on -- obviously we feel we're
 6    entitled to the text messages.  I think that goes without
 7    saying.  But we're still awaiting word on whether we'll be
 8    receiving those, for at least the four we've identified who
 9    have admitted they text on business matters, as well as the
10    others.
11              THE COURT:  Okay.  Thank you.
12              Who wishes to respond?
13              Mr. Martino.
14              MR. MATTHEW MARTINO:  Morning again.  So, the --
15    what we had explained during our meet and confers was that we
16    had inquired multiple times with the custodians about whether
17    they had used text messaging for NHL business or for any
18    purposes or -- that would be relevant to any topics that would
19    be relevant in litigation, and that was -- we were given the
20    negative for all of the custodians.  I think the -- what it
21    really comes down to here is these custodians aren't really
22    using text messaging in their every day business as an
23    ordinary course matter.  Maybe they receive a text message
24    from somebody that they -- you know, that they may get without
25    prompting, and they may reply to that.  But, you know, you
```

1    could understand why when you ask somebody, do you use text

2    messaging for business, that kind of thing does not pop to the

3    mind.

4              But they did identify four people, and we are

5    following up with those four custodians and, you know, at the

6    moment, I think we're inclined to search for text messages for

7    those four people, but we are following up with them.  They

8    also, as they mentioned, requested ten others.  That's a total

9    of 14.  Actually, of the 19 -- we have 19 custodians that are

10   current NHL employees for whom we had electronic

11   communications.  The 34 includes a bunch of former custodians,

12   some of which haven't worked at the League in decades that we

13   looked for paper documents for.

14             So, of the 19 for which we had electronic

15   communications, they've sought 14 of those.  We are -- we're

16   taking that under consideration and we're going to meet and --

17   continue to meet and confer on those other custodians.  I

18   think, as you saw in the agenda, there was a proposal that we

19   could put that on, if there are still disputes, we could put

20   that on the August hearing.

21             THE COURT:  Well, I think we better do it quicker

22   than that.  Why don't you meet and confer this week, and let's

23   put it on the informal agenda.

24             MR. MATTHEW MARTINO:  Yep, that's fine.

25             THE COURT:  All right.

1          MR. MATTHEW MARTINO:  To be clear, that was the

2    Plaintiffs' proposal for August.  We're happy to discuss at

3    the next --

4          THE COURT:  Okay.  Great.

5          MR. MATTHEW MARTINO:  Thank you.

6          THE COURT:  Anything else on this topic?

7          MR. CHARLES ZIMMERMAN:  I believe the next issue,

8    Your Honor, is the confidentiality over-designation issue.

9    Mike Cashman is going to discuss that.  But this we began

10   talking about at the last informal, and we want to bring you

11   up to date and see if we can agree on a process that isn't

12   overly burdensome.

13         THE COURT:  Okay.

14         MR. MICHAEL CASHMAN:  Hello, Your Honor.  You'll

15   recall we discussed this a little bit at the last informal

16   conference, and it is a significant -- significant issue.  The

17   NHL, understandably to get documents produced has designated

18   everything as confidential.  We have done, likewise, the same.

19   From the Plaintiffs' point of view, we're going to go back and

20   review our documents and see if there are some that we can

21   voluntarily de-designate, which we think is our burden.

22         We think the NHL, under the protective order and

23   under the law, has an obligation to do the same.  Again, they

24   designated everything as Protected or Protected - Attorneys'

25   Eyes Only.  I'm not familiar with any documents that they

1    produced without a confidentiality designation.  We think that

2    they have an affirmative obligation to go back and voluntarily

3    look at their production and see what should be de-designated.

4    I think that's what the protective order contemplates and the

5    law contemplates.

6          But above and beyond that, Your Honor, we have

7    provided the NHL with a list of documents that we want to

8    discuss as a first tranche of documents that we think should

9    be de-designated.  And those are representative of some

10   different categories, e-mail correspondences which we don't

11   see any basis for confidentiality under the protective order

12   or applicable law.  And also things such as PowerPoint

13   presentations about fighting analysis or about high-level or

14   sometimes more detailed discussion about concussion analysis

15   or injury analysis.  These aren't the kind of things that are

16   confidential in our view.  Board of Governor or General

17   Manager meeting Minutes, there may be some information in some

18   of those discussions such as financial discussions.  That's

19   really not our focus.  But there are discussions about head

20   hits, concussions, fighting, et cetera, that we don't think

21   are confidential under applicable law.

22         And so we've identified about 100 documents, for

23   starters, that we want to discuss with the NHL.  We have a

24   meet and confer set up for next Monday afternoon at which we

25   will -- time we'll discuss some of these documents.  And our

1    contemplation, as we suggested at the last conference, is that

2    perhaps -- and I'm hopeful that we can pick out a few

3    exemplars -- let's say 10, maybe 15 or 20 -- some number of

4    documents that we can present to you and you can take a look

5    at these and we may get some guidance that we can then apply

6    to the broader spectrum to reduce the burden on the Court and

7    make sure that the Court is informed about these kinds of

8    documents.

9            So, we'd like to tee that up for the next informal

10   conference after this meet and confer.  And I think given the

11   position paper deadlines that you set for some of these other

12   issues, we could do the same with respect to a few exemplar

13   documents on the confidentiality front.

14           THE COURT:  Very good.

15           MR. MICHAEL CASHMAN:  Thank you.

16           THE COURT:  Thank you.

17           Mr. Connolly.

18           MR. DANIEL CONNOLLY:  Yes, Your Honor, I'll try to

19   be quick but not as quick as Mr. Grygiel, as we're all getting

20   close to the end of the day here.

21           THE COURT:  It's only almost noon.

22           MR. DANIEL CONNOLLY:  I know, but it seems -- but

23   all of us are already on the road, Your Honor (laughter).

24           MR. CHARLES ZIMMERMAN:  I want to work at Faegre

25   (laughter).

```
1              MR. DANIEL CONNOLLY:  Really?

2              MR. CHARLES ZIMMERMAN:  Yeah.

3              MR. DANIEL CONNOLLY:  Well, Your Honor, this is a

4    bilateral issue.  Plaintiffs have designated every single

5    document confidential.  While we have designated a large

6    majority of the documents confidential, it's not been every

7    document.  And part of that has been because the Court has

8    urged us and we've agreed to produce materials on an expedited

9    basis and to try to do the fine-tuning of the designation

10   issue early on would slow down the production process.

11             And all of that raises the question that we have.

12   We certainly are prepared to engage in this topic.  And, in

13   fact, at the last informal discovery conference, the Court

14   urged us to have a meet and confer, and I understand

15   Mr. Cashman has been at a number of these depositions, but the

16   first meet and confer that we've been proposed was Monday,

17   which is following this.  So, we're basically revisiting a

18   topic that we've already discussed once in the informal

19   discovery conference.

20             We think, however, that there are more pressing

21   issues.  Mr. Cashman didn't address any prejudice that both

22   sides have somewhat over-designated the documents.  Everybody

23   has access to these same documents.  All the documents are

24   being discussed in the depositions.  There are no pending

25   hearings or trials in which it's critical that these documents
```

1    be un-de-designated in a certain way.

2         So, while we all realize that we have a lot of

3    resources, we suggest that this issue be pushed behind

4    slightly on the list, that is behind resolution of the

5    privilege log which the Court has directed the parties to

6    engage in, behind the issue of the private medical

7    information, both of which relate to access issues.  And we've

8    heard, you know, Mr. Grygiel and Mr. Zimmerman speak at length

9    about what the potential prejudice is.  And so while we really

10   are prepared to engage in this topic, we suggest that this be

11   one of the topics that be trailing a little bit on the process

12   because we've already added a lot to the plate for the

13   July 14th conference, and suggest that we meet and confer

14   about these topics, try to resolve them in an orderly way as

15   we do all the time in this District, and then figure out that

16   process going forward between the parties and not try to

17   engage the Court on this one.

18        And as far as the over-designation, as I said, it's

19   been on both sides.  We have over-designated some documents

20   just to get them out.  They've designated, you know,

21   deposition transcripts that were previously provided and

22   newspaper articles and all kinds of stuff.  So, we just need

23   to get into this process.  But I suggest that this be pushed

24   off to a later informal conference so that the parties can

25   focus in on the issues that the Court has already put on the

1    agenda for next time.

2            THE COURT:  Thank you, Mr. Connolly.

3            Mr. Cashman.

4            MR. MICHAEL CASHMAN:  I respectfully disagree with

5    Mr. Connolly.  This is a -- an important issue.  So, let me

6    just address a few of his points specifically.

7            Prejudice.  This is prejudicial.  For example, if we

8    want to file things with the Court, all the kind of issues

9    that go with that.  There's a pressing issue to get

10   nonconfidential information undesignated, and that's really

11   what the law provides.  I understand the urgency of the

12   productions and how things happen, that things get designated

13   as confidential.  But that doesn't mean that anybody is

14   entitled to maintain confidentiality over something that's not

15   confidential until the very end of the case and put us through

16   the burdens when we make our motions and such to file things

17   under seal and all of the kind of burdens that go with that.

18            As far as the -- I would call it the burden issue,

19   Mr. Connolly suggested we shouldn't be doing this right now.

20   Well, that's exactly why I suggested to the Court that we

21   present a few exemplars.  It's not going to be overly

22   burdensome, but it gives the parties then guidance to perform

23   their affirmative burden to go back and look at what has been

24   produced so that they can de-designate.  So, if we do that

25   with a handful of documents, the Court's been great in

1    providing us guidance that we can apply on a going-forward

2    basis, and there's no reason to push this off and delay

3    everything until the end when we can have a reasonable process

4    to get that done right now.

5              As far as the bilateral issue, I told the Court and

6    we are going to do this, we're going to go and look at our own

7    production because we wanted to get things out.  We're going

8    to go look at our own production and de-designate the

9    documents that we think are not confidential.  And if the NHL

10   thinks there are others which should be de-designated, we're

11   going to be happy to listen.  And I'm glad that Mr. Connolly

12   mentioned deposition transcripts because this is also

13   something that applies to testimony.  What we're running into

14   right now is that the NHL makes a blanket designation for all

15   deposition testimony that's given by a witness.  We think it's

16   incumbent upon them, following the deposition in a reasonable

17   amount of time -- and we haven't crossed this bridge yet about

18   what a reasonable amount of time is, but I would suggest

19   within a few weeks after a transcript is delivered, that the

20   party go through that transcript and say specifically what

21   lines they want to maintain as confidential and de-designate

22   the rest, and that should apply to exhibits, as well.

23             This needs to be an ongoing process, not something

24   we're going to backload later.  That would be an undue burden

25   on everybody, including the Court, whereas the process we're

1  proposing will nip that in the bud, have an affirmative

2  process, we can use some exemplars, and get it under way.

3  Thank you.

4           THE COURT:  Mr. Connolly.

5           MR. DANIEL CONNOLLY:  Thank you, Your Honor.  I

6  think I agree largely with Mr. Cashman, that is that the

7  parties should engage in a discussion on this topic.  I think

8  it's not the highest priority item among the others that we've

9  talked about.  The -- we have designated the depositions as

10  confidential, and we're going to review them.  The depositions

11  have been coming in relatively slowly.  But that's a process

12  that's set forth in the protective order.  And the Court asked

13  the parties already to meet and confer on this.  I think that

14  this is just -- it hasn't -- a full meet and confer hasn't

15  happened yet, and I just think that it -- we should follow the

16  process that the Court has set forth and address the other

17  topics for the agenda -- at the -- at the informal discovery

18  conference.  And I didn't hear -- as far as I'm aware,

19  Mr. Cashman talked about that there is a prejudice because

20  they have to file something under seal.

21           First of all, they can, and parties can do it.  But

22  I haven't heard of any motion that's pending that's going to

23  be filed at this particular time.  In fact, the Court has

24  asked to be informed beforehand and to address whether things

25  can be resolved in the informal process or in the formal

1    process, and we have no pending formal motions at this time.

2    So, we're just repeating the request that this item be

3    addressed in the normal course with meet and confers and that

4    we don't set it on for the next informal discovery conference

5    because we have so many items on already.

6          THE COURT:  Okay.  Well, I think I agree with both

7    of you in many respects, disagree slightly.  I have a slightly

8    different view of this.  Perhaps that's because I view it from

9    the Court's perspective.  We have a very serious problem with

10   over-designation in cases in general, and we're always

11   struggling with it at the court because we always have to file

12   everything -- orders under seal and we get close to trial and

13   there are lots of issues that arise from this problem.  This

14   is a -- a big issue to deal with because we have millions of

15   documents that are designated.  So, I have what I think is

16   sort of an orderly way to approach this that I would suggest

17   to the parties.

18          Instead of pinpointing a few sort of more obvious

19   categories to raise with the Court at the next informal, what

20   I would prefer the parties do is categorize all of the

21   documents.  This is a big job.  You have to put them in

22   categories that can reasonably be judged based on sampling

23   within the categories.  And then we need to do random sampling

24   in the categories instead of cherry-picked documents.  And

25   then a judge -- it may not be me, it may be Judge Mayeron --

```
1    needs to rule on that sampling.  And then whatever that ruling

2    is will apply to every document produced under those

3    categories.

4              So I think you have your work cut out for you.  I

5    think step number one is to affirmatively de-designate your

6    own documents.  I agree every party has an obligation to make

7    sure they haven't over-designated, so you need to do that

8    first.  Then you need to agree on categories, which is a big

9    job.  And then you need to agree on a random sampling method

10   within those categories.  And then you need to do the random

11   sample, and then you need to brief it before Judge Mayeron.

12   So, those are the steps.

13             With respect to transcripts, I think the idea -- I

14   mean, we do this with orders of the Court.  I will give you a

15   couple weeks to come back to me and tell me why it should

16   remain under seal.  I think that's a good idea with

17   transcripts, as well.  Perhaps we put a two-week rule into

18   effect that you have to come back and identify what needs to

19   be redacted and what doesn't and then raise it with the Court

20   if you have a disagreement.

21             But with respect to documents, I'd like to start the

22   process now.  It may not have the priority of other items, but

23   it's a big job and so by the informal conference, I want you

24   to have a meet and confer to start this process, that is to

25   brainstorm about categories at least and a random sampling
```

1   process and then to report to me at the informal discovery

2   conference about your progress.  And then I'm going to have

3   you come up -- and to propose a schedule for when this might

4   be accomplished so I can inform Judge Mayeron and she can

5   prepare herself to rule on these random samples.  Okay?

6             Everybody understand the process?

7             MR. MICHAEL CASHMAN:  Yes, Your Honor.

8             THE COURT:  Any objections?

9             MR. DANIEL CONNOLLY:  Yes, Your Honor [sic].

10            THE COURT:  All right.  Very good.

11            MR. CHARLES ZIMMERMAN:  So, Your Honor, as I said at

12   the beginning, we want to kind of have a six-month look-back.

13   I think we can all reach our conclusions.  I think everybody

14   is operating in good faith.  I think each defines "good faith"

15   differently.  As lawyers say:  Reasonableness is sometimes in

16   the eye of the beholder.  But I think we're all working hard

17   as professionals.  But we're not getting everything done in

18   the way we, I think, anticipated we would at the beginning of

19   the case.

20            I will meet and confer with defense.  We'll come

21   back to you with some ideas hopefully by the informal as to

22   how much time we're really going to need to get the job done

23   because we're doing the job on behalf of lots of people who

24   we're representing, and it's an important case in sports and

25   it's an important case that many, many people are watching.

1    And we want to do it right, and we're not going to get forced

2    to do it on a timeline that we just can't meet.  So I think --

3    I think by playing it out today and letting the Court know

4    exactly where we've gone, what we've done, how hard we've been

5    working, I think we can come to a conclusion as to what is

6    realistic under the circumstances.

7            I want to add two more things, and then I'll stop.

8    I think at some point, Your Honor, on the agenda, we do have

9    to have the class action questions, and I think John and I

10   will meet and confer on that.  I think we also need to put on

11   the agenda endgame discussions.  I think at some point,

12   somebody has to start talking about the end.  And I think we

13   should have discussions about it, privately, publicly, with

14   others, not with others, suggestions.  We need to broach --

15   approach the issue.  I'm always the first one to bring it up

16   because that's the nature of my -- that's my nature.  You

17   can't talk about it, you can't get there until you talk about

18   it.  And if you can't talk about it, you'll never get there.

19           So, I think it should be on the agenda, and I think

20   the Court can maybe take us both aside or do whatever you

21   think or we can suggest some ideas, we can write White Papers

22   on it that are confidential, but I think we just start -- it

23   has to start becoming part of our agenda.  And I hope we can.

24   And it's a delicate topic, but we need the Court's direction

25   or at least decision on how to begin that process.

```
1              Last thing -- and it's not very controversial -- Dan
2    and I were talking while I was in Minot with nothing to do, I
3    was calling Dan all the time because I had nothing to do
4    because -- nevermind -- and --
5              MR. DANIEL CONNOLLY:  So you're aware how I rate,
6    Your Honor (laughter).
7              MR. CHARLES ZIMMERMAN:  But I still would like to
8    work at Faegre if you quit by noon every day.
9              And we discussed whether or not the agenda and the
10   status report or the agenda and a modified status report
11   should be filed.  And I think it should.  I think we started
12   that way.  But when we got into the informals, we started
13   lodging them with the Court.  It's my belief that the agendas
14   are important.  People are following it, both lawyers, both
15   nonlawyers, players, we don't know exactly who with the ECF
16   systems that we have today.  But I think it's good for people
17   to know what's being discussed, what progress that's being
18   made, progress that's not being made.  I think it's important.
19   And so Dan wanted us -- wanted me to bring it up as opposed to
20   just do it or even call you up before today's status --
21             THE COURT:  I have no objection to filing the
22   agendas.  That's just fine.
23             MR. CHARLES ZIMMERMAN:  Yeah, I wouldn't have
24   thought so, and I don't think the defense does either.  But we
25   just wanted to know because nobody wants to do anything
```

```
 1   precipitous or do the wrong thing.  So, I think we should file
 2   it.  I think this one should get filed.  I think we should
 3   file them in the future.  And certainly if there's anything
 4   confidential or anything that people want to redact or that,
 5   we're open to that.  But as we talked before, confidentiality
 6   and the over-designation is a big issue with Federal Courts
 7   today, and so we want to be consistent.
 8          THE COURT:  I would say this.  I think the
 9   informals, in part, have been so successful because we're not
10   making a record of it.  And so I'm not sure I would
11   encourage -- and you'll notice on my -- when I do the Minute
12   orders for them, they're very vague and really don't say much,
13   and that's quite intentional.  I'll take guidance from the
14   parties on that.  I thought that's sort of what the purpose of
15   that was, and I'd be inclined to continue.  But on a monthly
16   basis, to have these agendas filed -- and I will have more
17   specific details in my Minute order, say, from today about
18   what I've ordered in terms of the parties meeting and
19   conferring and the like, does that sound like a good balance
20   for everybody?
21          MR. CHARLES ZIMMERMAN:  It does to me, Your Honor,
22   yes.
23          THE COURT:  Okay.
24          MR. DANIEL CONNOLLY:  Your Honor, if I might just
25   address a slight qualification on that.  I think it sounds
```

1  excellent that we, as you know, the Court has asked us to go

2  from an agenda to an agenda and a status report.  And I agree

3  entirely, or we agree entirely that the agenda and status

4  report for the informal conferences should be e-mailed to the

5  Court.  As far as the formal conferences, I think it would be

6  helpful if we just filed the agendas and not the status

7  report.  There is, as you -- as we -- there is a lot of back

8  and forth on the status report, and there would be even more

9  if these were filed publicly.  So, I think that it would be

10  helpful, as far as the status report, to just send that to the

11  Court and separate the two documents for the formal --

12          THE COURT:  Mr. Zimmerman?  I mean, we want to avoid

13  posturing on the status report.  The purpose of that is so I'm

14  prepared when I come to the hearing and --

15          MR. CHARLES ZIMMERMAN:  I hate to say this, as the

16  last thing I do is I tend to -- is I agree with Dan.  I think

17  that the status -- there would be too much posturing in the

18  status report, and I don't think it's necessary.  I think it

19  would take us so long to get it out in words that everybody

20  could be comfortable with.  Maybe there will be a little more

21  detail now in the agenda but we'll work it out.  But I think

22  I'm comfortable with the agenda and leaving the status

23  report --

24          THE COURT:  I think the combination of the agenda

25  and my order after the hearing would give any follower of the

1     case a pretty good idea of where we're at.

2               MR. DANIEL CONNOLLY:  Yes, Your Honor.  We'll do it

3     that way then.

4               THE COURT:  All right.  Very good.

5               MR. JOHN BEISNER:  If I may chime in on one more

6     issue that goes beyond the question of what we file.  I do

7     think -- I just wanted to agree with Mr. Zimmerman that

8     it's -- it would probably be a good time for us to sit down

9     here.  And I've got some other things that I think we need to

10    have a better understanding of.  We're getting together a

11    letter to send to Plaintiffs with some very basic questions

12    about what the claims are here.  And I don't want to go into

13    detail here because we haven't talked with Plaintiffs about

14    it.  But some of the questioning in the depositions so far

15    have raised questions in our mind about how -- what in the

16    Complaint is being pursued, what isn't, what Plaintiffs are

17    focusing on -- and I don't want to bother the Court with that

18    now.  But I think first and foremost, one of the things that

19    we wanted to suggest is engagement of Plaintiffs about some

20    fundamental questions about what claims are being pursued here

21    and the nature of some of those.

22               We could go through a discovery process with that,

23    but I'm not sure that would be as productive as our sitting

24    down and talking about that.  So I think before we get to some

25    of the other things Mr. Zimmerman talked about, I'm having

1   some difficulties on that and what the class proposal

2   ultimately will be here.  We may be getting the cart ahead of

3   the horse, but it's hard to talk about other things that he

4   was raising without that.

5          Anyway, that's a long-winded way of saying, Your

6   Honor, I think Mr. Zimmerman and I -- maybe we can go to Sioux

7   Falls instead of Minot, but anyway, we'll find a place to sit

8   down and --

9          THE COURT:  You better be careful.  My law clerk is

10  from Sioux Falls and she loves it.  So --

11         MR. CHARLES ZIMMERMAN:  Just say the word "endgame."

12  Say the word.  You can say it (laughter).

13         MR. JOHN BEISNER:  Huh?  "Dismissal"?  Yeah, we're

14  in favor of that (laughter).

15         And let me propose Kansas City, because I know I

16  can't get in trouble there because that's my home turf.

17         THE COURT:  Mr. Beisner.

18         MR. JOHN BEISNER:  Yes, Your Honor.

19         THE COURT:  I have another big case going on sort of

20  similar to this, and in that case one big difference is -- and

21  I am sure in that case that there will be -- there are 73

22  individual cases, and I'm sure that one or more of them will

23  be tried.  I don't have any doubt.

24         Regardless of that, I had a mediation track going on

25  there, separate mediator, sort of a wall so that everyone

1    feels free to be comfortable with the mediator without it

2    leaking to me, and that's proved to be very useful.  I didn't

3    know if it would because I knew in that case, in fact, that

4    some of the bigger cases are just probably going to get tried.

5    And I guess that's something I'd like to hear some feedback

6    from you about, whether it would be appropriate for the Court

7    to appoint a Special Master for mediation purposes, whether

8    you want some input on who that person would be, with the

9    idea, you know, no commitments, just starting the discussion.

10           And, you know, that discussion can be even more

11   expansive than that.  It can talk about what I think you're

12   getting at, which is what does this look like at the time of

13   class certification and if it's not certified, are we doing

14   bellwether trials, or how does this look endgame?  And that

15   can be done through me, or it can be done with a Special

16   Master who is focusing on kind of endgame issues.  I'm open to

17   any ideas, but I kind of agree with Mr. Zimmerman that we

18   ought to start the dialogue.

19           MR. JOHN BEISNER:  We'll provide some views on that.

20   I have some -- some thoughts along those lines based on a lot

21   of other MDLs and whether the third-party assistance at the

22   outset is useful.  But I think it probably makes sense for

23   Mr. Zimmerman and I to go to Kansas City -- no, we'll find a

24   place to do this -- to have a conversation about that.  And to

25   be clear, Your Honor, the part I'm focusing on here isn't so

```
 1    much bellwether trials and so on.  I'm really focusing on what
 2    are the claims here for which class treatment will be
 3    proposed.  We've got some questions about that, pretty
 4    fundamentally.  And I think to understand that is critical
 5    before a lot of other things that flow from that.  And I think
 6    it's time we have a conversation about that.
 7              I think the Court may want to be involved, but I
 8    think it's probably best for the parties to be doing that
 9    first.  And it -- you know, part of it gets to the scope of
10    discovery issue I was raising earlier and so on.  We really, I
11    think, need to have an understanding of that.  I understand
12    there's work product issues and you don't put everything on
13    the table now.  I got that.  But there's some fundamentals
14    that I think we're probably not on the same page about, or at
15    least we should find out if we are.  And I'm happy to engage
16    in those conversations.  And this letter we're preparing was
17    really intended to try to -- not to you, but to Plaintiffs to
18    try to give us a basis for starting to crystallize what some
19    of those -- those considerations are.
20              THE COURT:  Okay.  That's fine.  I think what I'm
21    trying to get you to think about is even if you genuinely
22    believe that there's going to be a basis to dismiss these
23    claims or -- whatever your view on endgame is here, it's good
24    for me to hear some of this so that I can bring in the
25    necessary folks to get the dialogue started.  I don't want it
```

1    to wait too long.

2            MR. JOHN BEISNER:  Understood, Your Honor.

3            THE COURT:  Okay.  Very good.

4            Anything else today?  Now just to be clear, we have

5    our July 14th at 1:00 p.m. informal.  And my understanding is

6    that we're going to try to confirm Friday, August 7th, am I

7    right, for the next formal.  But Mr. Zimmerman, you're going

8    to be looking at your calendar about that Friday, August 7th.

9    Is that right?

10           MR. CHARLES ZIMMERMAN:  For the ones in August.

11           THE COURT:  Yes, which would be the formal and then

12   proposing perhaps the 24th or 25th for an informal.  And I'll

13   hear back from you.

14           MR. CHARLES ZIMMERMAN:  Yes, you will.

15           THE COURT:  All right.

16           Anything further we should address today?

17           Mr. Penny.

18           MR. BRIAN PENNY:  Can I just ask two quick

19   questions.  The first, on the final position papers on PMI

20   issues, should that address the PMI issues just in the context

21   of the databases or in the broader context that we've been

22   briefing?

23           THE COURT:  Well, you're welcome to do it in a

24   broader basis, but I already have your briefing, you know, so

25   I guess only to the extent it would bring up new arguments or

 1   issues.

 2           MR. BRIAN PENNY:  And should that be filed on the

 3   docket or just sent to your chambers, Your Honor?

 4           THE COURT:  I think that could be filed on the

 5   docket, to be honest with you.

 6           MR. BRIAN PENNY:  And then the second question

 7   was --

 8           THE COURT:  And you'll have to decide whether you

 9   want oral argument on that, on the docket.  That might be

10   something you want to preserve, so you better talk about that.

11           MR. BRIAN PENNY:  And that's again for the July 14th

12   informal, whether we would maybe come into the courtroom and

13   put some of it on the record?

14           THE COURT:  Right.

15           MR. BRIAN PENNY:  And then the second question was,

16   John Kessler from Epic joined us today at Your Honor's

17   invitation.  I don't get the sense that his technical

18   expertise will be called upon in the July 14th informal, but

19   would you like him to attend or would you --

20           THE COURT:  Mr. Epic (sic), which one are you?  Oh,

21   from Epic.  Yeah, Mr. Kessler.  I'm sorry.

22           MR. BRIAN PENNY:  Mr. Epic would be a very cool name

23   (laughter).

24           THE COURT:  You wouldn't mind being called Mr. Epic,

25   I suspect.  Thank you for coming today.  It was hard for me to

1    anticipate what -- whether I would need to call on you.  You

2    can see what some of the issues are here today.  At this

3    point, I don't see a reason for you to come on July 14th, but

4    I'm going to get a better idea when I get the briefing on that

5    issue, and I'll certainly advise you on if I think it would be

6    helpful.

7              MR. BRIAN PENNY:  Thank you, Your Honor.

8              THE COURT:  All right.

9              Anything further from any of the parties?

10             **(None indicated.)**

11             THE COURT:  All right.  Very good.  Everyone have a

12   nice 4th.  Court is adjourned.

13             **(WHEREUPON, the matter was adjourned.)**

14                     (Concluding at 11:56 a.m.)

15                  *       *       *       *

16

17                        CERTIFICATE

18

19             I, Heather A. Schuetz, certify that the foregoing is

20   a correct transcript from the record of the proceedings in the

21   above-entitled matter.

22

23

               Certified by: s/ Heather A. Schuetz_____
24                            Heather A. Schuetz, RMR, CRR, CCP
                              Official Court Reporter
25