```
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MINNESOTA

 3    ------------------------------------------------------------

 4    In re: National Hockey League        MDL No. 14-2551 (SRN/JSM)
      Players' Concussion Injury
 5    Litigation
                                           St. Paul, Minnesota
 6                                         Courtroom 7B
           (ALL ACTIONS)                   July 14, 2015
 7                                         1:30 p.m.

 8    ------------------------------------------------------------

 9

10           BEFORE THE HONORABLE SUSAN RICHARD NELSON

11             UNITED STATES DISTRICT COURT JUDGE

12

13                      STATUS CONFERENCE

14

15

16

17

18

19

20

21

22

23    Official Court Reporter:  Heather Schuetz, RMR, CRR, CCP
                                U.S. Courthouse, Ste. 146
24                              316 North Robert Street
                                St. Paul, Minnesota 55101
25
```

1                    A P P E A R A N C E S

2                    **For the Plaintiffs:**

3

4    **ZIMMERMAN REED, PLLP**
     Charles "Bucky" S. Zimmerman, Esq.
     Brian C. Gudmundson, Esq.
5    1100 IDS Center
     80 S. 8th St.
6    Minneapolis, MN 55402

7

8    **ZELLE HOFFMAN VOELBEL & MASON, LLP**
     Michael R. Cashman, Esq.
     500 Washington Ave. S., Ste. 4000
9    Minneapolis, MN 55415

10

11   **BASSFORD REMELE, P.A.**
     J. Scott Andresen, Esq.
     Jeffrey D. Klobucar, Esq.
12   33 S. 6th St., Ste. 3800
     Minneapolis, MN 55402-3707

13

14   **GOLDMAN SCARLATO & KARON, P.C.**
     Brian D. Penny, Esq.
15   101 E. Lancaster Ave., Ste. 204
     Wayne, PA 19428

16

17

18

19

20

21

22

23

24

25

**For the Defendant:**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
John H. Beisner, Esq.
Jessica D. Miller, Esq.
1440 New York Ave. NW
Washington, DC 20005


**SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
Richard T. Bernardo, Esq.
Matthew M. Martino, Esq.
Four Times Square
New York, NY 10036


**SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
Matthew M. K. Stein, Esq.
500 Boylston St.
Boston, MA 02116


**FAEGRE BAKER DANIELS**
Daniel J. Connolly, Esq.
2200 Wells Fargo Center
90 S. 7th St.
Minneapolis, MN 55402


**For U.S. NHL Clubs:**          **BRYAN CAVE LLP**
Christopher J. Schmidt, Esq.
Kenneth Mallin, Esq.
211 N. Broadway, Ste. 3600
St. Louis, MO 63102-2750

1                          I N D E X                    Page:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                   IN OPEN COURT

 3               (Commencing at 1:30 p.m.)

 4          THE COURT:  I apologize for the slight delay in the

 5     starting time.  We had a sentencing, as you saw, that had to

 6     be rescheduled today.  But we'll move along for those of you I

 7     know who want to try to catch a flight, I think.

 8          We are here today in the matter of the National

 9     Hockey League Players' Concussion Injury Litigation.  This is

10     file number 14-2551.  Let's begin by having Counsel note your

11     appearances.

12          MR. BRIAN PENNY:  Afternoon, Your Honor.  Brian

13     Penny for the Plaintiffs.

14          MR. CHARLES ZIMMERMAN:  Good afternoon, Your Honor.

15     Charles Zimmerman for the Plaintiffs.

16          MR. MICHAEL CASHMAN:  Good afternoon, Your Honor,

17     Michael Cashman for the Plaintiffs.

18          MR. BRIAN GUDMUNDSON:  Good afternoon.  Brian

19     Gudmundson on behalf of the Plaintiffs.

20          MR. SCOTT ANDRESON:  Hi, Judge.  Scott Andreson for

21     the Plaintiffs.

22          MR. JEFFREY KLOBUCAR:  Good afternoon, Judge.  Jeff

23     Klobucar for the Plaintiffs.

24          THE COURT:  Very good.

25          Mr. Beisner.
```

```
 1              MR. JOHN BEISNER:  Good afternoon, Your Honor.  John
 2   Beisner on behalf of Defendant, NHL.
 3              MR. RICHARD BERNARDO:  Good afternoon, Your Honor.
 4   Richard Bernardo on behalf of Defendant, NHL.
 5              MR. MATTHEW STEIN:  Good afternoon, Your Honor.
 6   Matthew Stein on behalf of Defendant, NHL.
 7              MS. JESSICA MILLER:  Good afternoon, Your Honor.
 8   Jessica Miller on behalf of the NHL.
 9              MR. DANIEL CONNOLLY:  Good afternoon, Your Honor.
10   Dan Connolly on behalf of the NHL.
11              THE COURT:  Were you demoted today, Mr. Connolly?
12              MR. DANIEL CONNOLLY:  Yes, Your Honor (laughter).
13   No, no, I'm not in the firing line, Your Honor.
14              MR. MATTHEW MARTINO:  Good afternoon.  Matthew
15   Martino for the NHL.
16              MR. CHRISTOPHER SCHMIDT:  Good afternoon, Your
17   Honor.  Chris Schmidt on behalf of the nonparty U.S. Clubs.
18              MR. KENNETH MALLIN:  Kenneth Mallin on behalf of the
19   nonparty U.S. Clubs.
20              THE COURT:  Very good.  All right.  My understanding
21   is the parties would like to handle the first item on this
22   conference agenda for our informal discovery conference today
23   on the record, so we have a record, and that is
24   de-identification issues regarding the databases.
25              Am I correct?
```

```
 1              MR. RICHARD BERNARDO:  Your Honor, this is Rich
 2    Bernardo for NHL, and first I want to thank you.  I am the one
 3    that has the flight schedule, so I appreciate you making --
 4              THE COURT:  Okay.  Are we going to make it or --
 5              MR. RICHARD BERNARDO:  I'm hopeful.  But actually I
 6    propose that, if you'll indulge me for a minute or two, in
 7    talking with our colleagues, I thought if I could make some
 8    comments up front and perhaps a proposal, that might save the
 9    Court from having to address some of the headier legal issues
10    in the privacy of the agreements, I would proceed to do that,
11    if that would be okay.
12              THE COURT:  Have you ever heard a judge say no to
13    that?
14              MR. RICHARD BERNARDO:  I thought I would give you
15    that invitation.
16              THE COURT:  Okay.
17              MR. RICHARD BERNARDO:  And, Your Honor, I want to
18    start by saying that, as a preliminary matter, the NHL
19    recognizes that it is being extremely, extremely careful.  And
20    I would acknowledge some might say overly careful with respect
21    to this data.  But I think the issue that I feel the papers
22    may be losing sight of is we're not just talking about medical
23    diagnosis of concussion, which in itself is protected medical
24    information; but, in fact, we're talking about over 1,000
25    fields of data that contain very, very sensitive information
```

 1  on diagnosis of ADHD, dyslexia, sadness, anxiety, feelings of

 2  these players that have been expressed at these various

 3  neuropsychological testing that that is the core that we're

 4  particularly, particularly interested in making sure special

 5  steps get protected.

 6        And there are significant, significant downsides --

 7  which, again, is why we're being so cautious -- if this data

 8  were to be released.  Just the fact of the players hearing

 9  that a Court's ordering this data be disclosed beyond the

10  scope of what they anticipated creates a chilling effect on

11  their participation in what really is a program that's been

12  created for player safety.  But we also know that there are

13  just significant, significant risks these days of inadvertent

14  data breaches.  I'm actually in another matter trying to pull

15  back data that was inadvertently put on the Internet.  We've

16  all seen that.

17        So, I start by just saying we acknowledge that we're

18  being especially careful, but we're just trying to be mindful

19  of the importance of this information.  And where I'm going

20  with this is we noted that in our discussions with Plaintiffs'

21  counsel, they seem to agree to de-identify at least some

22  information.  For example, the name and the jersey.  Our

23  concern and NHL's concern is that providing other information

24  that could be used to identify these information -- identify

25  these players essentially undercuts de-identifying the player

1     names.  So, if we're to provide information from which a

2     person can deduce who the player; of course that's going to

3     undercut.  So, it strikes us in talking about it that there

4     actually is some agreement that it needs to be de-identified

5     and it's just a matter of how.

6            And Mr. Penny and I had what I think was a fairly

7     productive discussion that went a little bit off insofar as

8     Plaintiffs -- and I'm not being critical here -- are unable to

9     explain what it is they need.  And I think they say,

10    rightfully so, we don't know what we need until we see what we

11    don't have.  So, our proposal is that what we do to move this

12    along is we will agree, for the databases that have

13    identified -- and I think there are five that are at issue --

14    we will agree to produce them in de-identified form.  We will

15    apply the concepts that we think are an effort to address what

16    Plaintiffs need.  For example, intervals of dates so they can

17    figure it out.  It may not be perfect, and it may not be

18    exactly what the Plaintiffs want, but we feel as if by doing

19    that, we're taking a broader and more significant, concrete

20    step toward resolving this and bringing an end to it so that

21    once they get that, then they can look and have their analysts

22    and experts say, Mr. Bernardo, you de-identified this in a way

23    that's just not working for us to make this analysis; can we

24    talk about a different way of doing this.

25            And I've done this successfully in other cases.  I

```
 1    think the concern we have is that there's -- the discussion is
 2    still being in the abstract.  Plaintiffs still aren't clear as
 3    to exactly what they need.  Some of these topics come up or
 4    some of these fields come up in our discussions; others of
 5    them we see on paper.  But I think we're not very, very far
 6    apart.  So, what I'm hoping to do is to see if we can get past
 7    the debate over whether or not this is private since
 8    Plaintiffs seem to agree, at least to some de-identification,
 9    get them the data and then if there are additional disputes --
10    and hopefully they'll be minimal -- then we certainly don't
11    object to teeing them up.  We can do a brief telephone
12    conference and say, Your Honor, we just want to talk about
13    here's this one field now that the Plaintiffs have this data,
14    they can't do X analysis, we don't think this is necessary but
15    we'll propose Y.  So that's --
16              THE COURT:  Let's walk through the fields so I
17    understand just what you mean.  So, the data would be produced
18    and from it would be de-identified the Plaintiff name -- the
19    player name.
20              MR. RICHARD BERNARDO:  Correct.
21              THE COURT:  But that would be coded in a way that
22    could be followed through.
23              MR. RICHARD BERNARDO:  Also correct.  And I believe
24    there's a man number and a name identification.  Those would
25    be consistently coded so it can be followed through.  Correct.
```

```
1              THE COURT:  Okay.  Jersey number, just delete it?

2         MR. RICHARD BERNARDO:  Just delete it.

3              THE COURT:  Team identification deleted?

4         MR. RICHARD BERNARDO:  Correct.

5              THE COURT:  All right.  Dates, you're saying, would

6    be in a interval?

7              MR. RICHARD BERNARDO:  What -- and we talked about a

8    number of different ideas, and to be fair Plaintiffs were

9    going to come back to us with some intervals they want.  What

10   we would propose doing is we would provide a range of -- we

11   would provide the date for the baseline testing, so they have

12   that; then we would provide a -- an age at the injury within a

13   range, again so that you can't pinpoint it to a particular

14   player -- and then from that we would code intervals for other

15   dates.

16             We're still trying to work this through precisely to

17   see how that works, but that's an effort to address what I

18   think Plaintiffs were raising with respect to the need to

19   understand the difference in time yet protecting NHL's concern

20   about pinpointing a particular player.

21             THE COURT:  Okay.  Number of seasons played, what

22   would you do with that field?

23             MR. RICHARD BERNARDO:  The number of seasons played,

24   similarly, what we would do is we would propose ranges, which

25   we actually think is very consistent with what actually the
```

1    authorities that Plaintiffs cite, there's that Harvard Law

2    Review or Law and Technology Review that really supports this

3    notion that extremity data, or people at the fringes of

4    ranges, really become identifiable.  So, trying to produce

5    things within ranges that the data supports; in other words,

6    you take all the data, you put it together, you break it down

7    into particular ranges, and you provide that.  That's how we

8    would deal with that.

9          And again, if Plaintiffs look at that and their

10   analysts look at that and they say, gee, these ranges don't

11   work, can we slice it instead of from four ranges into five or

12   something, we're certainly willing to talk about that.  But we

13   feel as if it will at least bring some clarity and some

14   concreteness to this otherwise abstract discussion.

15         THE COURT:  Now, on the video analysis, it seems to

16   me that the video analysis ought to be produced but not

17   correlated to the player.

18         MR. RICHARD BERNARDO:  We agree with that, Your

19   Honor, with some qualifications.  First, the videos

20   themselves, the videos themselves obviously provide face

21   recognition.  And face recognition --

22         THE COURT:  But that doesn't matter because these

23   are videos.  I mean, there's no medical information there.  In

24   other words, the only -- the fact that you would recognize

25   somebody from the video, you're going to recognize everybody

1    on the videos.  But you're not going to be able to correlate

2    that back to the medical information that's privileged.

3    That's your concern about showing the videos is that it could

4    be correlated back to what you view as protected medical

5    information.  The videos are videos.  There's nothing to

6    protect about a video.

7              MR. RICHARD BERNARDO:  The videos --

8              THE COURT:  Except to the extent it correlates to a

9    particular body of medical data.

10             MR. RICHARD BERNARDO:  One additional piece, Your

11   Honor, it would correlate to is it would identify concussion

12   diagnosis because the whole way that the videos were assembled

13   was to take the concussion diagnosis in the AHMS database and

14   link those through identifying who the players were to that

15   core select group of videos from which further analysis could

16   come.  So, by doing that, it would essentially be identifying

17   those players --

18             THE COURT:  In other words, you're saying the fact

19   that there is a video means there's been a concussion

20   diagnosis?

21             MR. RICHARD BERNARDO:  The fact there is a --

22             THE COURT:  That's all we know, you see, and that

23   might be publicly available as you argue many times in your

24   briefing, the fact that there's been a diagnosis of a

25   concussion probably isn't, if it's publicly known, isn't

1    protected.  It's all the medical discussion around it that is

2    protected.  So, the fact that there's a video of a guy on the

3    ice suffering a concussion, you're going to have a hard time

4    persuading me, in and of itself, should be protected if it is

5    not correlated to the data that you're protecting.

6            MR. RICHARD BERNARDO:  And it's for that very

7    reason, Your Honor, when I ask my colleague, Mr. Schmidt, if

8    it comes to that to further elaborate on why it's NHL's

9    position that the fact of a medical diagnosis of a concussion,

10   irrespective of whether it's something that can be viewed as

11   protected because the viewers aren't seeing a medical

12   diagnosis.  They're seeing --

13           THE COURT:  No, they're not.  They're seeing a head

14   hit.

15           MR. RICHARD BERNARDO:  Correct.  Correct.

16           THE COURT:  On the ice.  They're not seeing anything

17   else.

18           MR. RICHARD BERNARDO:  Correct.  And by linking

19   it -- by producing it, it is telling the receiver of that

20   information, this is a person, this is a player who has a

21   medical diagnosis of a concussion from that event.

22           THE COURT:  That's going to be a long road upwards,

23   Mr. --

24           MR. RICHARD BERNARDO:  That's why I have Mr. Schmidt

25   here.

1          MR. CHRISTOPHER SCHMIDT:  I'm happy to address that

2     briefly.  Would you like me to do so now or --

3          THE COURT:  Um, well, yes, go ahead.  Just --

4          MR. CHRISTOPHER SCHMIDT:  Okay.  Just as an

5     overview, so it's clear, my understanding is the NHL is more

6     than happy to produce videos that they have generally.

7     There's also lots of videos that are publicly available of

8     hits to the head that are on the Internet that you can get.

9     What we're talking about is a small subset of videos where

10    these -- the videos at issue are videos where there's a

11    diagnosis of a concussion, and that diagnosis of a

12    concussion --

13         THE COURT:  Meaning that that player from that head

14    hit that's on the video later, and with a doctor, was

15    diagnosed as having a concussion.

16         MR. CHRISTOPHER SCHMIDT:  That's exactly right.  A

17    medical -- the team doctor, the only one who makes a diagnosis

18    of a concussion is the team doctor.  So, in this limited case,

19    this video project was to take a medical diagnosis of a

20    concussion and then link the video to it and see what happened

21    in the video.  There might not have been a hit to the head.

22    In many cases, there wasn't.  There might have been an

23    incidental hit.  It could have been all sorts of different

24    things that took place, and so it's only in that limited case

25    where you have a medical diagnosis of a concussion and we're

1    only dealing with these videos that it becomes an issue.

2          And it's clear that a medical diagnosis itself of a

3    concussion is private medical information.  You've raised the

4    issue of whether or not that diagnosis has been disclosed in

5    some way.  That's a different issue that would have to be

6    dealt with on a one-on-one basis.  Or if there's video linking

7    one of the Plaintiffs in the case who has put their medical

8    condition at issue, that's a different scenario and you'd have

9    to turn it over.  Or if they obtained releases from a player,

10   that's a different issue and you'd have to turn it over.  But

11   generally, if there hasn't been that sort of release, we're

12   not in a position where we can authorize the disclosure of the

13   video because it would be disclosing a private medical

14   diagnosis in that case.

15         THE COURT:  You know, I'm having a hard time with

16   this.  I'll tell you why.  Imagine that there was a car

17   accident and somebody suffered a burn injury and you had a

18   video of it.  And you say, well, it can't be disclosed because

19   they were diagnosed as having a burn injury.

20         MR. CHRISTOPHER SCHMIDT:  We're not saying that.

21   We'll turn over every video -- and I understand, hopefully I'm

22   not speaking too far, but there's other videos that are

23   generally available.  What we're only talking about is this

24   specific project --

25         THE COURT:  No, I understand.  Your concern here is

1    that in each of these cases the player has been diagnosed as

2    having a concussion.

3              MR. CHRISTOPHER SCHMIDT:  Correct.

4              THE COURT:  Just like the person in my example was

5    diagnosed as having a burn injury.  You see, it's --

6              MR. CHRISTOPHER SCHMIDT:  But there -- there it's

7    been publicly linked and if there was, you know -- if there's

8    a -- in that instance, if the person came out and indicated

9    that they were burned or burned also -- let me think about

10   this -- something you can see physically.  Right?  It's not a

11   concussion which requires a diagnosis.

12             THE COURT:  Maybe one approach would be this.  Let's

13   take each of those videos and run a search to see whether or

14   not there is any publicly-available information about whether

15   there was a concussion as a result of whatever that game was.

16             MR. CHRISTOPHER SCHMIDT:  Well, a couple --

17             THE COURT:  Because then it clearly, as I've said

18   before, would be --

19             MR. CHRISTOPHER SCHMIDT:  Two thoughts on this issue

20   first.  One is backing up for a moment and looking at guidance

21   on de-identification and anonymization.  And one of the key

22   regulatory bodies that have looked at this is in the HIPPA

23   context.  And there, it's clear that anything that would

24   provide facial recognition with a medical diagnosis should be

25   de-identified and anonymized under the federal regulations

1  implementing HIPPA looking at these issues.  And so I think

2  for --

3          THE COURT:  I agree with you if it was correlated

4  back to the medical data that you're protecting.  Here, we're

5  just talking about the video.  There is going to be no way for

6  the Plaintiffs to correlate that video with the data you're

7  producing.  So the question is -- because I'm telling you, you

8  can protect that.  The question is simply whether the video

9  should be produced.

10         MR. CHRISTOPHER SCHMIDT:  Right.

11         THE COURT:  I'm not entirely persuaded that the fact

12  that after whatever happened in this public game there was a

13  concussion diagnosis is enough to protect the video.  But what

14  I'm suggesting is, because it was public, perhaps if we find

15  out if there was a public disclosure, either under the public

16  relations provision of the Collective Bargaining Agreement or

17  by a reporter that there was a concussion, then that shouldn't

18  be protected.  That's a waiver of that privilege.

19         MR. CHRISTOPHER SCHMIDT:  But potentially there

20  could be a waiver.  You're absolutely right, Judge, in certain

21  instances there can be a waiver.  And so on that issue, the

22  individuals who we are trying to protect are not before the

23  Court.  And it's what makes this whole inquiry very difficult.

24  And the cases that Plaintiffs have cited in their briefs

25  are -- where there's a waiver is where the person holding the

1     privilege is before the Court.  And in those cases, the Court

2     looks at that and in certain circumstances says, yes, there's

3     a limited waiver involved.

4              This is the challenge we have.  How do we make that

5     waiver determination?  First --

6              THE COURT:  Well, I make the waiver determination so

7     you're arguing on behalf of your players that it shouldn't be

8     waived; the Court makes a determination, it's not on your

9     shoulders, it's on my shoulders.

10             MR. CHRISTOPHER SCHMIDT:  Correct.  And it's

11    Plaintiffs' burden to show that there's the waiver.  The party

12    seeking to vitiate that privilege has the burden of coming up.

13    And they can do it in many ways.  They can make it easy and

14    provide authorizations for anyone they have and say, we

15    know -- these are the 50 people we really care about and we

16    want to see about your video analysis, and why do we need to

17    look at it for anybody beyond those 50?  We should start with

18    that and get that, if we have it, because that will make it

19    really easy.  And then Plaintiffs can tell us, they can do the

20    public records searches just as easily as us, who do you think

21    is left?  And then we can go back and we can talk about it and

22    see.  That's certainly one way to do it.

23             But the burden is clearly on the party seeking to

24    waive that privilege to establish its waived.  And you're

25    right, I mean, this is the challenge we're in is it's a

```
 1    difficult issue, Judge.  And we don't want to be in a position

 2    where we can't waive that privilege independently.  We don't

 3    hold the privilege.  The player, who is not before this Court,

 4    and -- holds the privilege.  And --

 5           THE COURT:  You know, it's also hard to understand

 6    how this is going to play out down the road because one of the

 7    important defenses that the NHL has here has to do with

 8    statute of limitations and when the claims should have been

 9    brought and you are protecting from disclosure and therefore

10    won't be able to argue that certain hits occurred at certain

11    times because it's all going to be privileged.

12           So, I don't know how that's going to play out.  I

13    mean, I think we need to think through the picture here how

14    that's going to work.

15           MR. RICHARD BERNARDO:  Your Honor, I apologize.  And

16    again, in an effort to maybe see if we can cut through.  How

17    about -- because again I go back to the comments I made, we

18    might be accused of being overly cautious.  But in the phrase

19    of "you can't put the genie back in the bottle," once this

20    stuff is out, it's out.  Could we at least do it in a two-step

21    process because if you think about it, the database is

22    observations of the video.

23           It's the concrete, fielded information that I would

24    think would be the information in which Plaintiffs are

25    interested in, that they could look at and if the production
```

1   of the fielded information to your point anonymized so that it

2   doesn't relate back to the other databases isn't sufficient,

3   then it might be appropriate to address the need issue as to

4   why actually watching it versus reading it is necessary, is

5   the only reason for the discrepancy I would think would be is

6   if there's a distrust of the scriveners' or observers' viewing

7   of the data.

8           Again, I'm not foreclosing the possibility of doing

9   it.  I'm trying to do it in a staged way that focuses on need

10  as opposed to jumping right out altogether.

11          THE COURT:  Okay.  Let me just go through the rest

12  of the fields with you.

13          MR. RICHARD BERNARDO:  Sure.

14          THE COURT:  So, the players' position would not be

15  disclosed, language would not be disclosed.  Have you

16  discussed any other categories between the two of you?

17          MR. RICHARD BERNARDO:  There have been no other

18  categories that I believe we actually had discussion about.

19  Plaintiffs, of course, can correct me if I'm wrong.  I think

20  that frankly the big part of our discussion actually hinged on

21  dates.  And I think that is one that requires the most elegant

22  solution as far as providing the kind of information they need

23  without disclosing it.  And I will also say, just to clarify,

24  NHL isn't going to get this or use this data either.  We're

25  not going to provide Plaintiffs with a subset of what --

 1              THE COURT:  Well, you couldn't do that.

 2              MR. RICHARD BERNARDO:  You know, of what we have.

 3     So I just want to make that clear.

 4              THE COURT:  You heard my concern about that is

 5     someday we're going to have some sort of motion on, I don't

 6     know, statute of limitations and you're telling me that you're

 7     never going to use dates.  So --

 8              MR. RICHARD BERNARDO:  I'm not going that far unless

 9     my colleagues here would say something.  I'm simply saying

10     that with respect to the data on these databases, we're not

11     planning to use for analysis the data on here that we're not

12     providing.  If we do or something changes, we can always

13     address that because the easy thing is adding to what has been

14     produced.  The difficult thing, of course, is you can't take

15     back what has been produced.

16              THE COURT:  I hear what you're saying, and I'm

17     sensitive to this, too.  I'm trying to come up with what's

18     fair, as well.  Let's hear from --

19              MR. RICHARD BERNARDO:  Understood.  Thank you, Your

20     Honor, for allowing me.

21              MR. BRIAN PENNY:  Taking it a little bit out of

22     order from the way I was going to present it, but I might as

23     well deal with redaction issues in the databases first in

24     response to what we just heard.

25              First with regard to the video analysis database in

1   particular, I think Your Honor is right on when you suggest

2   that the diagnosis of a concussion isn't a private event

3   anymore, and it's not even expected to be a private event for

4   the players.  As you noted several times, the CBA acknowledges

5   right off the bat that the nature of the injury, the

6   prognosis, the treatment for it can be publicly disclosed at

7   any time by any person in the know and there's no further

8   waivers or anything that need to happen to make that happen.

9          The video analysis project is important because it

10  takes the videos of the concussions and then it codes them so

11  that the concussions could be placed into certain categories

12  like concussions that came about from fighting, concussions

13  that came about from mid-ice hits, concussions that came about

14  from seamless glass, contact with seamless glass.  And so you

15  can't really disaggregate the video part of the database from

16  the coding of the database and still have it useful.  And, in

17  fact, one of the reasons we would want to analyze that

18  database is to check the NHL's work.

19         And Mr. Bernardo said something like, well, the NHL

20  isn't contemplating using some of this data in its defense,

21  but the point of the NHL's defense all along has been that

22  they've been so proactive about analyzing and studying

23  concussions and here's all the data they've collected, here's

24  the video analysis project they conducted.  Well, we would

25  like to take a look at that and see if there was bias involved

1    in that and see what the results actually show when somebody

2    else who is not biased crunches the numbers or does the

3    analysis.

4            Mr. Bernardo's suggestion that we take it piecemeal

5    is, I think, inefficient in the first instance because if we

6    need more, we have to keep going back and then we have to keep

7    negotiating how we might de-identify or anonymize certain

8    fields, and I don't think that's going to be an efficient way

9    to proceed.  I think the more elegant solution is the one

10   that's endorsed by many courts and it was the one that

11   Plaintiffs' suggested.  And by the way we're not acknowledging

12   in any way that the databases need to be de-identified to be

13   produced under the protective order.  But we were willing to

14   accommodate that and to say, okay, we'll take some modest

15   de-identification, take the player's name out, take the

16   player's jersey number out so that there's no inadvertent

17   re-identification of the player as we go through and analyze

18   the data.  And we were willing to offer them, in writing or in

19   some other specific agreement in which we take these databases

20   in native format that we will not attempt to de-identify any

21   player from that data code.  And as officers of the Court, I

22   think that's a fair accommodation.

23           If it ever came to be that we needed or wanted to

24   de-identify a player or if it came to be that we wanted to

25   file some of this data publicly in a pleading or something

1    along those lines, then we could discuss how to de-identify

2    that data in the context of what we would actually be

3    presenting.  This is even more lenient an approach than some

4    of the Courts took in cases cited by the Clubs and the NHL.

5              For example, in *Wilkinson v. Greater Dayton Regional*

6    *Transit Authority* cited by the Clubs, they cite that case for

7    the proposition that simply redacting a patient's name does

8    not adequately de-identify the medical information.  That

9    case, however, I think perfectly supports our position because

10   in *Wilkinson*, the way it was set up was the protective order

11   at issue actually stated the parties would disclose medical

12   information under the protective order in un-redacted, natural

13   format.  And that it would -- if something would then be filed

14   with the Court, it could either be filed under seal pursuant

15   to the protective order or then it would be de-identified.

16   And the whole discussion in *Wilkinson* was about if we're going

17   to have to -- if the Plaintiffs are going to file some of that

18   information not under seal, how much redaction is necessary?

19             We're not even approaching that.  We're saying,

20   we'll take it in de-- excuse me, in native format and we will

21   protect it.  And the concern that there are data breaches out

22   there, this information is already in the hands of several

23   third-parties.  Having the Plaintiffs protect it -- and we're

24   used to protecting confidential information -- I don't think

25   exposes any greater risk to the Clubs or to the NHL that

1    somebody is going to access this data or that it will leak

2    out.

3            The other risk, though, the countervailing risk that

4    we would run if we endorse Mr. Bernardo's proposition is that

5    there is human error.  The de-identification he's talking

6    about is very complicated.  It's got a lot of moving pieces

7    and if it isn't done 100 percent accurately, then when we

8    crunch those numbers behind the scenes, we could come up with

9    totally false results and not have any way to check whether

10   the results were accurate or whether there was a mistake in

11   the de-identified coding process that led to the result.  So I

12   think the better approach is to give us the databases in not

13   slightly redacted format, just taking out the name and the

14   jersey number, and we will deal with the rest if anything

15   needs to be made public after that, because that's really the

16   concern that courts deal with.

17           And in talking about HIPPA, I notice in the Clubs'

18   brief and in the NHL's brief, they go back and they look at

19   HIPPA for guidance on how deeply you need to redact personal

20   information.  But this morning I found three cases -- and

21   there are probably several others that I haven't found in my

22   quick research -- that say when you're turning over documents

23   pursuant to a HIPPA compliant protective order, you don't have

24   to do any redaction.  There's no reason for that burden

25   because the information is going to be protected by the

1     protective order.

2                On redaction, I don't have anything further, Your

3     Honor.

4                THE COURT:  Thank you.

5                Mr. Bernardo, a couple questions.  This information

6     is being, to the last point, being turned over pursuant to a

7     HIPPA-compliant protective order.  Why is further protection

8     needed?

9                MR. RICHARD BERNARDO:  Well, Your Honor, there's

10    case law -- and I believe some of it's cited in our brief --

11    that there are instances in which a protective order is simply

12    not enough for some types of information.  And I --

13               THE COURT:  And you think that the fact that there's

14    a video of a head hit and just the fact that there was a

15    concussion diagnosis is -- it needs to be protected to that

16    degree?

17               MR. RICHARD BERNARDO:  I'm answering your question,

18    Your Honor, with respect to the entirety of the collection of

19    medical information here.  As to the video analysis, we

20    haven't considered whether that alone, a protective order

21    would protect.  But I would submit that it still could be used

22    to de-identify other information, so I think a protective

23    order wouldn't be sufficient.

24               Protective orders -- and I've been involved in many

25    MDLs where this is the case, it's typically the case where

```
 1    even with a protective order, certain information will be

 2    redacted.  For example, in the medical device arena, there are

 3    CFRs that dictate that reporter information has to be redacted

 4    even if there is a protective order in the litigation.  And it

 5    recognizes some of the sensitivity of this and some of the

 6    chilling effect that it would have on doctors reporting

 7    information.

 8            And I think by analogy, this goes back to a point I

 9    made earlier.  There really would be a significant chilling

10    effect if players became aware that there's a court order that

11    says, all of this information that I have disclosed about

12    myself, information I might even not have disclosed to my

13    spouse, is getting used in connection with the litigation or,

14    worse yet, can end up getting inadvertently disclosed or be

15    found on -- in a newspaper article.  I think it gets to the

16    point that a protective order is --

17            THE COURT:  Well, not without somebody violating the

18    law, you see, so --

19            MR. RICHARD BERNARDO:  Inadvertently, perhaps, and I

20    think that happens all the time and we've seen it, but I --

21            THE COURT:  I don't think that happens all the time

22    at all.  I think lawyers are very good at complying with

23    protective orders.  I would hesitate to suggest that it

24    happens all the time.

25            My other concern is this video analysis, as I
```

1    understand it, is part of the NHL's defense here.  We've

2    proactively studied this, we are taking a look at it, they're

3    not going to use this at all?  This is off base now, can't be

4    used as part of the defense in this case?  I mean, I just want

5    to make sure everybody is coordinating here because I'm not

6    going to be heard later on that you can cherrypick things for

7    your defense that you've argued can't be disclosed to the

8    Plaintiffs.  So --

9                MR. RICHARD BERNARDO:  Understood.  Understood, Your

10   Honor.

11               Do you want to address that point, Chris?

12               MR. CHRISTOPHER SCHMIDT:  Yeah, if I may.  And that

13   might be a little bit outside of my realm, Your Honor.  Let me

14   briefly address that, and then there's a couple points I was

15   hoping to make, as well, and sort of back up.

16               On that point, I believe the comment that Rich made

17   was that anything that was going to be produced over to the

18   Plaintiffs would also be produced in the same way to the NHL,

19   that this is how, you know, they'll be sent off to a

20   third-party who will anonymize it or de-identify and what's

21   sauce for the goose is sauce for the gander.  So, to the

22   extent that information is shared, either side could use it in

23   whatever form is being shared.

24               THE COURT:  Right.  But you understand the proposal

25   is that it not be produced, that the video analysis not at all

1    be produced?

2         MR. CHRISTOPHER SCHMIDT:  That is not my

3    understanding, actually.  My understanding is that the written

4    portion of the analysis be produced, but just the video

5    portion -- so there's a written analysis that is done that

6    describes the results.  That's the really key part, what they

7    gleaned from it, whether it was a mid-ice hit, whether it was

8    a hit to seamless glass, the only portion that would be -- the

9    video itself would not be produced because of the facial

10   recognition problems, but the analysis, which is the core of

11   the issue, would be produced.

12        THE COURT:  That's not anywhere in the briefing.

13   That's news to me.

14        MR. CHRISTOPHER SCHMIDT:  I --

15        MR. RICHARD BERNARDO:  I'm sorry, Your Honor.  Let

16   me try and clarify.  If I didn't do that, I apologize.

17        So, the video analysis has two components.  As I

18   understand it.  Once the concussion information from another

19   database is fully realized, that information is provided to

20   somebody who takes the name and the man ID, et cetera, and

21   goes into their library of videotapes and says, okay, this is

22   the one for this player, this is the one for that player.  So,

23   now we have all the videos.

24        Then somebody watches the video, and I believe there

25   are 100 -- ah, I'm sorry, about 60 fields of information that

1    the person watching the video will record.  Some of them are

2    coded information, some of them link the information back to

3    these other databases, which is what I understood Your Honor

4    to be saying we wouldn't do.  But there's coded information,

5    mechanics of injury, other types of fields that Mr. Schmidt

6    was talking about.  We're willing to produce that written

7    database of data reflecting the observations of the person

8    watching.  It's that data --

9              THE COURT:  All 60 fields?

10             MR. RICHARD BERNARDO:  We would propose to redact

11   those that would link it back to the other databases for the

12   reason we --

13             THE COURT:  I clearly don't have enough information

14   here.  I don't even -- this is not anywhere in what has been

15   provided to me.

16             MR. CHRISTOPHER SCHMIDT:  And if I could, on that

17   redaction, it would just be identifiers.  It would be -- let's

18   say that the video analysis person put down, it's the center

19   for the Minnesota Wild in 2005, the lead center, something

20   like that where it's clear.  It would be very limited

21   redactions of identifiers.  Here's the thing that is --

22   impresses me.  You look at all these databases, there's 900

23   fields of private medical information.  We're talking about a

24   handful of fields that are being proposed to be redacted.  I

25   mean, it's really -- when we're looking at this, it's actually

```
1    a very narrow dispute, Your Honor.

2              THE COURT:  But, you see, I can't tell that from the

3    briefing.  That's my point.  According to the briefing, the

4    proposal is that the entire analysis, that --

5              MR. RICHARD BERNARDO:  Your Honor, if I can --

6              THE COURT:  That (inaudible due to overlapping

7    speakers) the videos would be --

8              MR. RICHARD BERNARDO:  From the briefing, Your

9    Honor, and this is the NHL's submission, it says the NHL has

10   considered whether it's possible for some fields of the video

11   database to be disclosed to Plaintiffs to allow Plaintiff to

12   access the information they seek while still preventing

13   disclosure of identifying information and is determined that

14   it would be feasible to produce the written analysis of the

15   video with identifying information redacted without the video

16   itself.

17             MR. CHRISTOPHER SCHMIDT:  The -- you raise a great

18   point, though, Your Honor, and I think it gets back to

19   Mr. Bernardo's first point which is this is a difficult

20   conversation to have in the abstract.  It's difficult to

21   brief.  We're dealing with 900 fields, which is why

22   Mr. Bernardo proposed, let's turn it over in de-identified

23   basis and then if we need to add anything else incrementally,

24   that's easy to do.  We don't have to start back over.  We've

25   done the lion's share of the work and if it comes back and the
```

 1    date range isn't right or something else isn't right, we can

 2    deal with that after the fact and deal with real, real

 3    scenarios, real data fields.  And we're really talking about

 4    just a handful of almost 1,000 data fields dealing with highly

 5    sensitive information.

 6              If I can back up for a moment, though, we got to

 7    this point because on June 4th, shortly before that,

 8    Plaintiffs did an abrupt change in position, acknowledged that

 9    the players had an interest in the private medical

10    information.

11              THE COURT:  I don't think that's -- okay -- I think

12    they were willing to talk to you based on my concerns that

13    were expressed.  So that's an extreme position.  They've taken

14    the position all the time that this has been disclosed and

15    waived.  But we're trying to work together here, so --

16              MR. CHRISTOPHER SCHMIDT:  Well, here's my concern,

17    though, is if we have 900 fields of private medical

18    information dealing with ADHD, dealing with multiple

19    concussions, dealing with highly sensitive medical

20    information, it's a summary of their medical history.  If we

21    turn that over in a database form and allow identifiers to get

22    in there, as well, we're just allowing all of these medical

23    records to be produced wholesale --

24              THE COURT:  Okay.  So understanding what I was

25    saying was I agree with you.

 1              MR. CHRISTOPHER SCHMIDT:  Thank you.

 2              THE COURT:  I was --

 3              MR. CHRISTOPHER SCHMIDT:  (Laughter.)

 4              THE COURT:  I was focusing on the video piece here

 5     and disagreeing with you about whether the video itself was

 6     protected.  Okay?  That's where this all got started.

 7              MR. CHRISTOPHER SCHMIDT:  Okay.

 8              MR. RICHARD BERNARDO:  And, Your Honor --

 9              THE COURT:  Then I misunderstood this paragraph

10     because it doesn't talk about 900 fields and it says that

11     you've considered the possibility and you could do this or

12     that.  It's really unclear to me what it is that you're

13     willing to produce and what you're not willing to produce from

14     this, to be fair to me in reading this paragraph again, it's

15     right in front of me.  So -- okay?  Let's start from there.

16     All right?

17              MR. RICHARD BERNARDO:  And, Your Honor, and I

18     apologize for the lack of clarity.  And I think that actually

19     to Mr. Schmidt's point focuses on the theme that we're trying

20     to communicate.  It is very difficult.  We're talking about --

21     and frankly we're learning this information ourselves.  We're

22     all talking, the Plaintiffs, we, and Your Honor -- about this

23     data that's -- it's concrete but it's abstract.  That's why I

24     got up at the start by saying, if we give them what we propose

25     to give them, then they can come back and talk about need.

1    And I want to highlight there's one concept that was

2    completely lacking from the comments that Plaintiffs' counsel

3    made which is what they need and why they need it.

4           And I fully respect that they don't know what they

5    need until they have what they don't have so they can figure

6    out what they need, or whatever the right saying is.  And

7    that's all we're trying to do is to take it out of this type

8    of confusing dialogue where we unintentionally are

9    disconnecting and turn it into something more concrete where

10   they can say, Your Honor, look, here's what we have, we have

11   this, this, this, but we don't have this and we need it and

12   they won't give it to us.

13          THE COURT:  Have you provided to the Plaintiffs the

14   list of 900 fields or whatever it is, including the 60 fields

15   that correlate to the video analysis?  Have you provided that?

16          MR. RICHARD BERNARDO:  Yes, we have, Your Honor, and

17   that was the attachment -- that was an attachment to that

18   letter we had submitted on June 25th.  It probably got buried

19   in the 75 pages of other lists of --

20          THE COURT:  No, I saw it.  I couldn't sort out

21   exactly what it was, but -- okay.

22          MR. RICHARD BERNARDO:  That is in there --

23          THE COURT:  I could look at that letter and say

24   these are the 60 fields affiliated with the video analysis.

25   Is that what you're --

```
 1              MR. RICHARD BERNARDO:  May I say a conditional "yes"
 2     and just check with my colleague?
 3              Yes.  Okay.
 4              THE COURT:  Okay.  Good work.  Okay.
 5              MR. RICHARD BERNARDO:  The Geek Squad in perfect
 6     action.
 7              THE COURT:  Okay.
 8              Let me hear from Mr. Penny, and then we can see if
 9     we can reach some resolution here.
10              MR. RICHARD BERNARDO:  Of course.
11              MR. BRIAN PENNY:  I just want to make sure that
12     there's no confusion on what the video analysis data project
13     is and why it's actually useful to anybody who might have
14     access to that database.  And I also want to make sure that
15     you understand that the coded fields, these 60 fields for the
16     video analysis project, do not contain what Mr. Schmidt
17     referred to as this highly sensitive information about who has
18     ADHD, who has learning disabilities, who has multiple
19     concussions, that sort of thing.  What the video analysis
20     project did was it looked at videos of concussions and it
21     coded them, right, so that they could try to determine how
22     certain concussions happened.
23              Wouldn't it be interesting for the Plaintiffs to
24     know if the NHL did that analysis in the video analysis
25     project and found that close to 10 percent of concussions
```

1    happened from fighting?  But what if we went back, looked at

2    the video analysis, found that there was bias in the coding

3    and actually 20 percent were caused by fighting?  That, I

4    think, would be relevant to our case.  But we can't do that

5    kind of checking of the NHL's work unless we have the videos

6    and the data linked together.  And, in fact, I think it's

7    somewhere around 15 to 20 percent of the videos of concussions

8    were marked as inconclusive.  They couldn't even decide what

9    the mechanism of the concussion injury was.

10           Wouldn't it be interesting if we looked at those and

11   we were able to categorize them in a little more specificity.

12           THE COURT:  Now when you say "correlate," you mean

13   the video analysis with the 60 fields --

14           MR. BRIAN PENNY:  Yes.

15           THE COURT:  Not with the 900 fields, am I right?

16           MR. BRIAN PENNY:  Right, Your Honor.

17           THE COURT:  So if I were to rule that you were

18   entitled to the video analysis project in its entirety but

19   that the defense could break the chain, if you will, between

20   any given video of a player and the sensitive fields, the

21   medical fields that are not included in these 60 fields, would

22   that be a fair way of handling this, in your view?

23           MR. BRIAN PENNY:  Sure.

24           THE COURT:  I know Mr. Schmidt disagrees, and he'll

25   tell me why.

1          MR. BRIAN PENNY:  Sure.  I think that's the way the

2     database exists already.  It sort of stands by itself, it's

3     the 60 coded fields and the videos.  That would be one

4     separate production, one database.  And I don't think that

5     it's linked to other databases and these more sensitive fields

6     that exist in those databases, so I don't think there's a

7     cross-pollination concern there --

8          THE COURT:  I see.  So if I were to look at those 60

9     fields, would there be any medical data or is it all about

10    where on the field, what caused the concussion?  Are facts

11    pertaining to what happened?

12         MR. BRIAN PENNY:  It is Appendix F to that letter,

13    if you want to go back and take some time to look through it.

14    But my quick review is almost all the fields have to do with

15    the categorization of what you see on the video.

16         Now, I see there is a field "diagnosis," diagnosis

17    2, 3.  Again, we're talking now about the diagnosis of the

18    concussion, I presume, and that, as we've argued over and over

19    again, we don't think is a -- excuse me -- is a private event

20    and it's not protected by medical privileges.

21         THE COURT:  Okay.

22         MR. BRIAN PENNY:  I think for the most part you're

23    not going to see sensitive medical information in these

24    fields.

25         And just with regard to these other fields, these

1   more sensitive ones about ADHD or drug abuse or anxiety or

2   depression, those sorts of things probably wouldn't even be

3   interested to us even in de-identified format in the NHL and

4   its doctors haven't brought those into play.  The problem is

5   the NHL and its doctors say, well, we don't know exactly what

6   causes the CTE.  It could be the concussions and head hits, it

7   could be those in connection with drug abuse, depression,

8   anxiety.  So, it is important information to us as part of the

9   medical record, and it's difficult to have the data that the

10   NHL has collected on concussion injuries be useful to us if

11   that kind of information is disaggregated or can't be linked

12   back to a player.

13          And again, I can say on the record -- I'll put it in

14   writing -- I'm not looking to find out which player that

15   suffered the concussion and later has anxiety or depression --

16   I don't want to put a name to that player.  But statistically,

17   we need to know how old the player was at the time of

18   concussion, for example, what his symptoms were at the time of

19   concussion, what he later experienced because these are all

20   features that factor into whether there's a longterm

21   impairment from the head injuries or not.

22          So, the best solution I could come up with is we'll

23   keep it all private and protected and de-identified without

24   taking the more industrious step of trying to re-identify

25   something that has, on its face, been de-identified.  Oh, and

```
 1    one last point.  To Mr. Bernardo's concern that it will have a
 2    chilling effect, the fact that most of this data -- again,
 3    players expect that at any moment, the nature of the injury,
 4    the prognosis, the treatment, can be released publicly to
 5    media sources by anybody who knows this information.  It's not
 6    going to have a chilling effect when they find out that it's
 7    been given over to Plaintiffs' attorneys who again purport to
 8    represent their best interest and those of retired players in
 9    the protections of a protective order.  It's not going to
10    become public.
11         MR. CHRISTOPHER SCHMIDT:  Your Honor, if I can -- I
12    want to back up just for a second and start and make sure
13    we're approaching these issues from the framework of the laws
14    that govern these players.
15         First we have state law that protects their privacy.
16    Not only the patient/physician common law privilege, but every
17    state at issue has a statutory regime protecting private
18    medical information, including a diagnosis of concussion.  The
19    diagnosis itself is private medical information that
20    Plaintiffs will have to show that there's a waiver, if there
21    is one.
22         Second, ADA covers all of this, and the ADA is
23    really clear that part of that is an employer can do a
24    fitness-to-work exam, or in this case a fitness-to-play exam.
25    It needs to make sure that its workers -- in this case its
```

1    players -- can work or go back on the ice.  It can employ

2    medical professionals in that, and that information can be

3    shared as part of that process internally.  So, the ADA

4    protects it, and the ADA in part probably because that

5    sensitive employee information or player information in this

6    case is being shared internally in accordance with the

7    dictates of the ADA, there's a confidentiality mandate --

8           THE COURT:  And, you know, I agree with that and I

9    agree with the authorization that is so well briefed and the

10   fact that that's designed to provide those sort of external

11   players in the decision making with that information.  I have

12   to say, though, that the public relations section of the CBA

13   concerns me.  That is not designed to do what you're talking

14   about.  That is designed to give the NHL the right at any time

15   to publicly disclose private medical information as a public

16   relations benefit to them.

17          MR. CHRISTOPHER SCHMIDT:  So, first of all, I would

18   back up for a minute and I would -- I would take objection

19   with the characterization that's "a benefit to the NHL."  That

20   is collectively bargained for between the Players Association

21   and the NHL itself.  There's --

22          THE COURT:  But it's public relations folks.

23          MR. CHRISTOPHER SCHMIDT:  Well, it's public

24   relations but it's also if someone is hit in a game, fans want

25   to know what happened.  And the information that's allowed to

1    be disclosed, talked about is narrow.  And it does not

2    contemplate the disclosure of a single medical record.  In

3    fact, medical records can't be disclosed --

4          THE COURT:  No, but it does, it does contemplate the

5    disclosure of what this video would show, which is that there

6    was a hit and a concussion diagnosis.

7          MR. CHRISTOPHER SCHMIDT:  Well, not necessarily

8    because if -- if the -- often in the case of hockey, what will

9    happen is there may be a diagnosis like an upper body injury

10   or the diagnosis of a concussion may not have been revealed

11   and often is not.  It may be speculation by the media or

12   somebody else, but often it's just X player is out for the

13   next 10 days with an upper body injury.

14         THE COURT:  No, but my point is that the agreement

15   is that if the NHL wants to at any time, they can disclose

16   that any given player suffered a concussion, can't they, under

17   that provision for public relations purposes?

18         MR. CHRISTOPHER SCHMIDT:  I believe -- I believe

19   that to be accurate, that they would be able to, in the -- at

20   least under the terms of the current CBA from 2012 forward, I

21   believe that provision, if that's the diagnosis that a Club

22   doctor makes, that a Club could give that general diagnosis

23   and very little else.

24         Now -- but if it hasn't been given, that doesn't

25   mean that there's been a waiver in that case, Your Honor.  And

```
 1   so it's a scenario where I think we're getting far afield to

 2   say that all players have automatically waived their

 3   diagnosis --

 4             THE COURT:  No, but it's hard to implicate the ADA

 5   because in the ADA -- I mean, the analogy would be an employee

 6   saying to their employer when they come in to work and sign

 7   their Employment Agreement, you can at any time disclose for

 8   public relations purpose any private diagnosis or result of an

 9   injury.  It's hard to say then that person has preserved their

10   medical privilege as to that diagnosis.

11             MR. CHRISTOPHER SCHMIDT:  Well, except you have to

12   look at it, I believe in looking at the case law, that -- even

13   the cases cited by Plaintiffs, the cases all say this that

14   you're looking at it in context and if there's been a waiver,

15   it's been a limited waiver as to what has actually been said.

16   And, for example, one of the cases that they cited to the

17   Court dealt with a doctor who had wrote about his patient

18   without the patient's authorization to a number of other

19   professionals and third-parties.  And the Court found, well,

20   that was a waiver in that case but only as to exactly what was

21   in the letter and nothing else.  And then the -- the Court

22   quashed a deposition because the Court said, well, what's --

23   why could you depose this doctor because you can't ask why he

24   wrote the letter or anything else beyond it.

25             And so if there's a disclosure, you can diagnose
```

     1    things in many different ways.  The diagnosis of what's been

     2    publicly released is fair game, and we've always said that.

     3    We've said from a document production perspective, we'll

     4    produce publicly-available documents.  However, if it's not

     5    been publicly disclosed, then how do we draw that line and how

     6    do we know where to deal with this issue on whether or not you

     7    can disclose a diagnosis or not.

     8             It could be the player revoked his consent and told

     9    the doctor, hey, don't disclose it in this case or it could be

    10    the doctor has a policy that always says it's upper body

    11    injury and that varies Club to Club.  There could be a whole

    12    host of variable factors that deal with that issue.

    13             Thank you.

    14             THE COURT:  Mr. Penny, have you, as your side and

    15    this I suppose is a work product question that you don't have

    16    to answer, but have you done a Google search to find out all

    17    the instances in which we've publicly read about concussions

    18    on the ice?

    19             MR. BRIAN PENNY:  Well, a Google search of all the

    20    hundreds and hundreds of concussions would be difficult to do,

    21    but not impossible.  But what I cited to the Court and what I

    22    showed you some of the other day is just the collection of

    23    injury reports that's available publicly, and that was just

    24    through one cite, CBS Sports.  And as you can see for a number

    25    of players, if you go back and look at that website, it says

1    concussion, concussion, concussion is the diagnosis and then

2    you start reading, there are dozens of articles talking about

3    the concussion.

4            And it's not speculative articles.  Many of them are

5    quoting the player, the coach, the general manager, the doctor

6    talking about the concussion, the symptoms, the treatment for

7    it.  As you noted before, what the CBA shows -- and it's just

8    acknowledging the longstanding practice of disclosing the

9    nature of the injury and the prognosis and the treatment for

10   it -- the implication of that I think is almost not even a

11   waiver, it's that there's no privilege that attaches to that

12   information to begin with.

13           The example of the employee who signs his employment

14   contract is a good one.  From that point on, the employee

15   doesn't expect any of that information to remain private.  But

16   what I'd like to do also is this ADA issue is something that

17   hasn't been talked about in a while, and I know I heard you

18   say you agreed with Mr. Schmidt, but from my opinion, if I

19   read the cases and I read the ADA, it doesn't apply to this

20   situation.  And it certainly doesn't apply to this situation

21   the way the Clubs argue that it do -- it does.

22           The Clubs claim that the ADA's confidentiality

23   provisions regarding medical information both block

24   Plaintiffs' access to it and at the same time allow all of

25   these third-parties within the umbrella of the same employer

```
 1   to get access to it but those third-parties are still outside

 2   the doctor-patient privilege relationship.  And they say this

 3   disclosure regime is permitted under the ADA to further the

 4   purposes of that Act, which they claim are to, quote, ensure a

 5   safe work environment, unquote -- and I'm quoting from Pages 7

 6   and 11 of the Clubs' brief.

 7           But ensuring the safe work environment is not the

 8   goal or purpose of the ADA, that might be OSHA's domain, but

 9   it is not the purpose of the ADA.  The ADA was created to

10   protect against discrimination by employers on the basis of a

11   person's disabilities.  And in some instances the ADA has been

12   used to ensure access of disabled persons to certain public

13   facilities and buildings.  The Clubs -- if the Clubs were

14   willing to acknowledge that these concussions created

15   disabilities that they needed to accommodate for, then maybe

16   there might be some overlap or applicability there, but that's

17   not what they're saying.

18           Rather, they're arguing essentially that the ADA

19   specifically contemplates and condones the redisclosure of a

20   hockey player's medical information to third-parties employed

21   by the teams to ensure their safety in the workplace.  And

22   this is not at all, like I said, what the ADA was meant to do,

23   nor is workplace safety the justification contemplated by the

24   ADA when it permits these limited disclosures of medical

25   information.
```

```
 1              All you have to do is look at the cites in the

 2    Clubs' brief.  They make the statement, the ADA explicitly

 3    authorizes employers to disclose an employee's medical

 4    information to managers, supervisors, and medical personnel to

 5    ensure a safe work environment for the employee.  But then the

 6    case that they cite, which is O'Neil v. City of New Albany

 7    [sic], the quote is, medical information may be given to and

 8    used by appropriate decision makers involved in the hiring

 9    process so that they can make employment decisions consistent

10    with the ADA.  Nothing about safety.  And the employment

11    decisions consistent with the ADA, meaning employment

12    decisions that don't discriminate.

13              As the Court recognized in Scott v. Leavenworth --

14    and that's a case that we cite -- the ADA was enacted to

15    provide a clear and comprehensive national mandate for the

16    elimination of discrimination against individuals with

17    disabilities and to assure equality of opportunity employment,

18    full participation in economic self-sufficiency for

19    individuals with disabilities.

20              Again, the focus of the ADA and the disclosure

21    regime under the ADA has nothing to do with ensuring

22    employees' safety in the workplace.  In fact, the case -- the

23    Court goes on to say, the ADA's confidentiality provisions

24    ensure that in those situations where a medical examination or

25    inquiry is allowed under the ADA, when job related or
```

1    consistent with business necessity, the information is

2    disclosed only to those with a legitimate need for the

3    information.  In other words, and this is still quoting, the

4    confidentiality provisions further the purpose behind the

5    ADA's goal of ensuring equal employment opportunities for the

6    disabled.

7          All you have to do is look at these confidentiality

8    and disclosure provisions as they're set out in the act.  The

9    provisions are conditioned on the employer.  They have nothing

10   to do with the employee, so to speak.  The ADA says to the

11   employer, if you're going to collect medical information on

12   your employees pursuant to the reasons of the Act, then you

13   have to keep it confidential.  To the extent an employer

14   collecting such information must keep it confidential, this is

15   the employer's obligation.  It doesn't create a discovery

16   privilege for the employee.  If such a privilege exists, it's

17   separate from the ADA.

18         As that same case noted, the ADA's prohibitions

19   against disclosure of medical information do not amount to a,

20   quote, unquote, privilege that protects the requested

21   documents from disclosure.  We also cited the *McDonald* case

22   which has basically the same holding.  There, the Court found

23   that although there was no dispute, the reports at issue

24   contained, quote-unquote, confidential information.  Quote,

25   from the case, Defendant has not shown discovery of the

1    reports is precluded by a recognized privilege, unquote.  And

2    in recognizing that confidentiality and privilege are two

3    different things, the Court went on to state:  Confidentiality

4    rights of third-parties, standing alone, do not create a

5    privilege precluding discovery under Rule 26.

6            Even if you look at some of the case law that the

7    Clubs and the NHL cite, they both cite *Bennett v. Potter*,

8    rather prominently, for the proposition that responding to a

9    subpoena is outside the limited discovery permitted by the

10   ADA.  *Bennett* is an EEOC decision, and there the EEOC found

11   that discovery -- or excuse me, disclosure of medical

12   information in response to a subpoena did violate the ADA.

13   But the EEOC did not find that a court of competent

14   jurisdiction was prevented by the ADA from ordering the

15   disclosure.

16           Again, the subpoena was not enough, but there was

17   nothing to say an order requiring disclosure wouldn't be

18   sufficient and, in fact, the *Bennett* court noted, they say,

19   quote, we note that the Privacy Act allows for disclosure of

20   an individual's records, quote, pursuant to the order of the

21   court of competent jurisdiction but this exception does not

22   apply in this case because the state court subpoena signed and

23   issued by the deputy clerk did not qualify as an order for

24   purposes of the Act.

25           The idea now being advanced by the Clubs that the

1    ADA protects medical information from disclosure is not

2    supported by the case law.  Also, the idea that the Clubs and

3    the NHL and the players got together and created some sort of

4    medical records disclosure regime centered around the ADA is

5    not only nonsensical because the ADA doesn't deal with these

6    workplace health issues but it lacks support in the record and

7    it's notable that none of the authorizations cited in

8    Mr. Daly's Declaration and the CBA, none of it mentions the

9    ADA.  So, our position is the ADA just doesn't apply in this

10   instance.

11            THE COURT:  Okay.

12            I -- Mr. Schmidt -- no, go ahead.

13            MR. CHRISTOPHER SCHMIDT:  Your Honor, I think our

14   briefing speaks for itself on that.  Thank you.

15            THE COURT:  This has been very well briefed and

16   argued and maybe I'm a little slow on the uptake.  It's just

17   taking me a while to really absorb all of this, and I have to

18   go back and study the letter and the fields more carefully.  I

19   think I am going to rule.  I'm going to rule in a written

20   order so it's -- there's a good record and it's carefully

21   thought through, and it's going to take me a couple of weeks.

22   I appreciate that I'm holding up depositions now.  I'm sorry

23   about that, but this is a big issue, and it ought to be

24   handled correctly.

25            So, Mr. Bernardo, I'm not going to take you up on

1   your offer.  As nice as it was to make the offer for now, give

2   me a couple weeks and I will make it really clear in an order

3   what needs to happen.

4           MR. RICHARD BERNARDO:  I appreciate that and without

5   beating a dead -- could I just make one small point for you to

6   consider?

7           THE COURT:  You certainly may, yes.

8           MR. RICHARD BERNARDO:  If Your Honor is inclined to

9   rule with respect to the video analysis, we just want to make

10  it clear that there are some fields in the video analysis

11  database that, in addition to man number, we would request

12  that you could consider could get redacted so it doesn't link

13  it back to the other databases.

14          THE COURT:  Okay.  I want you to give me a really

15  short letter, okay, that tells me which of those fields you

16  would object to.

17          MR. RICHARD BERNARDO:  We will do that, Your Honor.

18  Thank you very much for the opportunity.

19          THE COURT:  All right.

20          Mr. Schmidt, you can weigh in on that, as well,

21  okay?

22          MR. CHRISTOPHER SCHMIDT:  I have nothing further.

23  Thank you, Your Honor.

24          THE COURT:  All right.

25          Anything else on this issue for the record today?

1    Or should we resume with our informal conference?

2            Everyone on board?  All right.  Let's take 15

3    minutes.  We'll be back in the jury room at 20 minutes --

4    quarter to 3.  Court is adjourned.

5            **(WHEREUPON, the matter was adjourned.)**

6

7                        *      *      *      *

8

9                         CERTIFICATE

10

11           I, Heather A. Schuetz, certify that the foregoing is

12   a correct transcript from the record of the proceedings in the

13   above-entitled matter.

14

15
                     Certified by: s/ Heather A. Schuetz_____
16                                 Heather A. Schuetz, RMR, CRR, CCP
                                   Official Court Reporter
17

18

19

20

21

22

23

24

25