# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In Re: National Hockey League        MDL No. 14-2551 (SRN/JSM)
Players' Concussion Injury
Litigation

This Document Relates to All Actions       MEMORANDUM OPINION
                                                    AND ORDER

---

Charles S. Zimmerman, Brian Gudmundson and David M. Cialkowski, Zimmerman Reed, PLLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402; Bradley C. Buhrow and Hart L. Robinovitch, Zimmerman Reed, PLLP, 14646 North Kierland Boulevard, Suite 145, Scottsdale, Arizona 85254, for Plaintiffs

Stephen G. Grygiel, Steven D. Silverman and William N. Sinclair, Silverman, Thompson, Slutkin & White, LLC, 201 North Charles Street, Suite 2600, Baltimore, Maryland 21201, for Plaintiffs

Jeffrey D. Bores and Bryan L. Bleichner, Chestnut Cambronne PA, 17 Washington Avenue North, Suite 300, Minneapolis, Minnesota 55401, for Plaintiffs

Stuart Davidson, Mark J. Dearman, Janine D. Arno and Kathleen L. Douglas, Robbins, Geller, Rudman & Dowd, LLP, 120 East Palmetto Park Road, Boca Raton, Florida 33432; Leonard B. Simon, Robbins, Geller, Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, for Plaintiffs

Lewis A. Remele and Jeffrey D. Klobucar, Bassford Remele, 33 South Sixth Street, Minneapolis, Minnesota 55402, for Plaintiffs

Thomas A. Demetrio, William T. Gibbs and Katelyn I. Geoffrion, Corboy & Demetrio, 33 North Dearborn Street, Chicago, Illinois 60602, for Plaintiffs

Brian D. Penny and Mark S. Goldman, Goldman, Scarlato & Penny PC, 101 East Lancaster Avenue, Suite 204, Wayne, Pennsylvania 19087, for Plaintiffs

Vincent J. Esades and James W. Anderson, Heins Mills & Olson, PLC, 310 Clifton Avenue, Minneapolis, Minnesota 55403, for Plaintiffs

David I. Levine, The Levine Law Firm P.C., 1804 Intracoastal Drive, Fort Lauderdale, Florida 33305, for Plaintiffs

Daniel E. Gustafson, David A. Goodwin and Joshua J. Rissman, Gustafson Gluek, PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402, for Plaintiffs

Thomas J. Byrne, Namanny, Byrne, & Owens, APC, 2 South Pointe Drive, Lake Forest, California 92630, for Plaintiffs

Michael R. Cashman, Zelle Hofmann Voelbel & Mason LLP, 500 South Washington Avenue, Suite 4000, Minneapolis, Minnesota 55415, for Plaintiffs

Richard M. Hagstrom, Hagstrom Law Office, 310 Clifton Avenue, Minneapolis, Minnesota 55403, for Plaintiffs

Robert K. Shelquist, Lockridge, Grindal, Nauen, PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Plaintiffs

Daniel J. Connolly, Joseph M. Price, Linda S. Svitak, and Aaron D. Van Oort, Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for Defendant

John H. Beisner, Geoffrey M. Wyatt and Jessica D. Miller, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, Northwest, Washington, D.C. 20005-2111; Shepard Goldfein, James A. Keyte, Matthew M. Martino and Michael H. Menitove, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036;

James Baumgarten and Adam M. Lupion, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, for Defendant

Christopher J. Schmidt, Bryan Cave, LLP, One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, Missouri 63102, for Non-Party U.S. NHL Clubs

_____

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Plaintiffs' Motion to Enforce Subpoenas

Directed to U.S. NHL Clubs [Doc. No. 142] and related disputes concerning discovery that

contains medical and medical-related information of former NHL hockey players.  In

addition to filing memoranda in support of and in opposition to the instant motion, the

parties and non-party U.S. NHL Clubs ("U.S. Clubs") also filed position papers regarding

the de-identification of information contained in certain NHL electronic databases.  (See

Pls.' Position Paper [Doc. No. 185]; U.S. Clubs' Position Paper [Doc. No. 186]; and Def.'s

Position Paper [Doc. No. 187].)  For the reasons set forth herein, Plaintiffs' motion is

granted in part and denied in part.

## I.      BACKGROUND

Plaintiffs, former professional hockey players in the NHL, allege that they have

experienced long-term neurological problems stemming from concussions that they

sustained while playing for the Defendant NHL.  (See Master Admin. Long-Form Compl.

¶¶ 1-2 [Doc. No. 28].)  They contend that Defendant knew or should have known of a

growing body of scientific evidence purportedly showing a link between repetitive

concussive events, sub-concussive events and/or brain injuries and a greater risk for

chronic neuro-cognitive illness and disabilities.  (Id. ¶ 4.)  Plaintiffs assert that in 1997, the

NHL created a concussion program (the "Concussion Program") to ostensibly research and

study brain injuries affecting NHL players.  (Id. ¶ 9.)   Citing a Concussion Program

report, Plaintiffs contend that Defendant required team physicians to document all

concussions sustained during regular season games from 1997-1998 through 2003-2004

using standardized injury report forms.  (Id. ¶ 10.)  In addition, Plaintiffs allege that the

NHL initiated baseline brain testing for its players and required its team doctors and

trainers to maintain records of all players who were believed to have suffered concussions. (Id. ¶¶ 10-11.)  Defendant used this data, Plaintiffs assert, to study concussions in the NHL from 1997 through 2004.  (Id. ¶ 11.)  Plaintiffs contend that they are now entitled to full discovery of this data.

The Collective Bargaining Agreement ("CBA") between the NHL and the National Hockey League Players' Association ("NHLPA") for the period of September 16, 2012 through September 15, 2022 addresses the use of players' medical information.  (CBA, Art. 34.3, Ex. 3 to Penny Decl. [Doc. No. 145-6].)  The CBA provides that in connection with a player's annual pre-participation medical examination, players must execute the following forms, authorizing the release of medical information:  the NHL/NHLPA Authorization Form for Health Care Providers, the NHL/NHLPA Concussion Program Authorization, and the Authorization for Management and Release of Neuropsychological Test Results.  (Id., Art. 34.5(a).)   In addition, the CBA indicates that the U.S. Clubs are required to input certain types of medical records into the Athlete Health Management System ("AHMS.")  (Id., Art. 34.5(b)(i)).  While the CBA otherwise generally prohibits the disclosure of medical information absent "express, prior written consent of the Player or as required by law" (id., Art. 34.5(c)(ii)), it contains several exceptions for the disclosure of medical information.  Most relevant here are two exceptions, the first of which is the public relations exception:

> For public relations purposes, a Club, the League, and/or the NHLPA may disclose the following information: (A) for injuries sustained during the course of a Player's employment as a hockey Player with the Club,

4

including, but not limited to, travel with his team or on business requested by the Club: (I) the nature of a Player's injury, (II) the prognosis and the anticipated length of recovery from the injury, and (III) the treatment and surgical procedures undertaken or anticipated in regard to the injury; and (B) for any other medical and/or health condition that prevents a Player from renderings services to his Club: (I) the fact that a medical and/or health condition is preventing the Player from rendering services to the Club, and (II) the anticipated length of the Player's absence from the Club.

(Id., Art. 34.5(c)(iii).)

The second relevant exception, the "de-identified exception," is found in Article 34.5(c)(ii). In addition to permitting disclosure pursuant to an express release, this provision contains an exception, permitting disclosure where the disclosed information contains no player-identifying information:

Except with respect to uses, disclosures and redisclosures of Medical Information that are permitted under the CBA, the SPC, and the Authorizations, the Clubs, the NHLPA and the League shall not use, disclose or redisclose any Medical Information relating to a Player (unless stripped of all individual Player-identifying information) without the express, prior, written consent of the Player or as required by law.

(Id., Art. 34.5(c)(ii)) (emphasis added).

As part of Plaintiffs' discovery in this action, they served subpoenas on 23 U.S. Clubs in January 2015. (Penny Decl. ¶ 2 [Doc. No. 145].) Among the information that Plaintiffs requested was information concerning head trauma and brain disease, including diagnoses of head trauma and brain disease, studies or analyses of the incidence of players' brain disease, and communications between the U.S. Clubs and Defendant regarding head trauma and brain disease. (See Ex. 1 to Penny Decl. [Doc. No. 145-1].) At the time that Plaintiffs served the subpoenas, they provided the U.S. Clubs with a copy of

the December 19, 2014 Protective Order entered in this case, which applied to the disclosure of "information protected under privacy laws, including personal or medical information." (12/19/14 Protective Order at ¶¶ 1, 3 [Doc. No. 70].) When an Amended Protective Order [Doc. No. 140] was filed in this case, Plaintiffs provided the U.S. Clubs with a copy of that order as well.

The U.S. Clubs objected to the information requested in Plaintiffs' subpoenas, primarily on grounds of medical privacy and burden. (<u>See</u> U.S. Club's Opp'n Mem. at 2-3 [Doc. No. 156].) Instead, the U.S. Clubs offered to produce unredacted medical files only for any former or current NHL player who signed an authorization form. (<u>Id.</u> at 3.) Plaintiffs countered with a proposal that the U.S. Clubs produce a statistically significant sample of player medical records, which the U.S. Clubs rejected. (<u>Id.</u>) The U.S. Clubs contended that any such sample would still require them to disclose non-party medical information without player authorization, in violation of the law and the applicable CBA. (<u>Id.</u> at 4.)

The NHL also filed a response in opposition to Plaintiffs' motion to enforce the subpoenas, arguing that the subpoenas posed an invasion into the privacy rights of the players whom Plaintiffs purportedly represent. (NHL's Opp'n Mem. at 1 [Doc. No. 159].) Defendant further contended that Plaintiffs provided no justification for the need for players' pre-retirement information. (<u>Id.</u> at 6.)

While the Court did not rule on the merits of the motion to enforce the subpoenas, at the conclusion of the hearing on the motion, the Court offered guidance and directed the

parties and the U.S. Clubs to meet and confer on their disputes.  (See Tr. of 6/14/15 at 41-
44 [Doc. No. 176].)  In that guidance, the Court directed that: (1) medical information that
has already been publicly disclosed is not protected from disclosure and must be produced;
and (2) injury data obtained from players' medical records, including internal reports,
studies or analyses, must be de-identified and produced.  (Id. at 41-42.)

Thereafter, the parties and the U.S. Clubs continued to meet and confer.  While they
reached some consensus on certain matters, they nevertheless identified three areas in
which their medical information dispute continued to arise: (1) the production of database
discovery; (2) general document production; and (3) depositions.

In connection with the subpoenas directed to the U.S. Clubs, Plaintiffs, the NHL,
and the U.S. Clubs specifically disagree about the need to redact (as opposed to
anonymize) certain personal identifying and medical information found in electronic
databases used to compile concussion-related data about players, such as the AHMS.  It
appears that these databases are primarily in the custody and control of the NHL.  The
NHL maintains that these databases are permeated with personal, player-specific
information protected from disclosure by various statutes, common law, the general CBA
provisions against disclosure of medical information, and various authorization and
consent forms executed by the players.  (Letter of 6/25/15 at 2 from R. Bernardo to B.
Penny, submitted to the Court.)   The NHL groups the databases into two chronological
categories: (1) pre–2004-2005 season databases; and (2) post-2005-2006 season databases.
(Id.)

As to the earlier, pre-2004-2005 group, Defendant identifies the following databases: (1) the Concussion Program database; (2) neuropsychological testing data which includes both baseline data and post-injury testing data; (3) the Sports Injury Monitoring System ("SIMS") database; and (4) a merged database that includes data from the Concussion Program, post-injury neuropsychological testing data, and the SIMS database. (Id. at 2-6.)

For the more recent post-2006-2006 databases, Defendant identifies the following: (1) AHMS; (2) a data extraction spreadsheet; (3) video analysis data which consists of a Video Analysis Spreadsheet ("VAS") that includes video clips, or, since 2014, a cloud-based version of this information called the Video Reporting System; (4) the Immediate Post-Concussion Assessment and Cognitive Testing ("ImPACT") database; (5) modern paper-and-pencil test database; (6) longitudinally-coded neuropsychological file database; (7) X2 databases consisting of the NHL-Modified Sports Concussion Assessment Tool 2 ("SCAT2") and a subsequent version ("SCAT3"); (8) Axon Sports' Cogstate Computerized Cognitive Assessment Test ("CCAT"); and (9) the Denominator Project.

Plaintiffs contend that they are entitled to the requested discovery, which is relevant to the issues at the heart of their case, and that the Amended Protective Order safeguards against the disclosure of any private information. Accordingly, they seek to enforce the subpoenas served on the U.S. Clubs and to obtain discovery of the NHL's electronic databases. While Plaintiffs will agree to the de-identification of certain fields of player-identifying information, they believe that such steps are unnecessary given the safeguards

8

of the Amended Protective Order and the provisions of the CBA.

With respect to all of this discovery, the U.S. Clubs and Defendant generally object on the grounds of federal statutory protections including the Americans with Disabilities Act ("ADA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the physician-patient privilege, state privacy laws, and the terms of the CBA. They argue first that the requested information is privileged and need not be produced. However, to the extent that they are required to produce the requested discovery, they generally contend that de-identification and anonymization and the protections of the Amended Protective Order are insufficient. Thus, they argue that video images of players should not be produced and that information in multiple database fields should be redacted. Further, the U.S. Clubs contend that any disclosure may have a chilling effect on players' participation in the Concussion Program. Similarly, the NHL argues that public disclosure of this information will make players reluctant to disclose medical information to physicians or the U.S. Clubs. (See Daly Decl. ¶ 5 [Doc. No. 160].)

With respect to the invocation of privilege objections during depositions, the parties and U.S. Clubs should lay the appropriate foundational facts to determine if the privilege may properly be asserted. It appears that since the parties and U.S. Clubs initially raised this issue, they have agreed upon certain questions to which the privilege does not attach. With the general ruling herein as guidance, to the extent that disputes remain regarding depositions and general document production, the parties and U.S. Clubs may seek the Court's resolution on any specific, concise questions and requests to which they reach

impasse.  Because the Court does not consider any disputes in the deposition setting ripe for review at this time, this Order does not directly address any such disputes.

## II.    DISCUSSION

As a threshold matter, Rule 26 of the Federal Rules of Civil Procedure authorizes parties to obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Relevant information for purposes of discovery includes any information "reasonably calculated to lead to the discovery of admissible evidence."  Id.  While the federal rules contemplate liberal discovery, district courts possess considerable discretion in determining the need for, and form of, discovery; any such decisions are subject to an abuse-of-discretion standard of review.  See Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 898-99 (8th Cir. 1978).  District Courts are similarly granted considerable discretion in determining the necessity for and scope of discovery on issues related to class certification.  See Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1495 (5th Cir. 1993); Kamm v. California City Dev. Co., 509 F.2d 205, 209 (9th Cir. 1975).

The medical information at issue here is clearly relevant to the claims in this action, as it relates to what the NHL and U.S. Clubs knew about concussions and when they knew it.  Citing various authorities and doctrines, Defendant and the U.S. Clubs argue that the requested information is either privileged from discovery altogether or is confidential to a degree that requires significant redaction and de-identification.  Moreover, in terms of balancing the burden of producing the requested information, the U.S. Clubs contend that

10

they are entitled to special consideration given their status as third parties.

**A.    ADA**

Defendant and the U.S. Clubs contend that the ADA bars the disclosure of the requested medical information.  The ADA prohibits discrimination by employers based on an employee's or applicant's disability.  42 U.S.C. § 12112(a).  Section 12112(d)(4) of the ADA prohibits employers from requiring medical examinations and inquiries of employees and applicants as to the nature and severity of a disability, unless the examination or inquiry is job-related and consistent with business necessity.  The Court presumes that some of the medical information collected by the U.S. Clubs and NHL consists of at least medical "inquiries," and likely also "examinations" under § 12112(d). See Medlin v. Rome Strip Steel Co., Inc., 294 F. Supp. 2d 279, 293-94 (N.D.N.Y. 2003) (first determining that a functional capacity exam constituted an "inquiry" under the ADA, prior to analyzing whether a violation occurred).

Under the ADA, to the extent that an employer collects medical information, it must be treated as confidential, subject to the following three exceptions: (1) supervisors and managers may be informed regarding necessary work restrictions or employee duties in order to make necessary accommodations; (2) first aid and safety personnel may be informed, as appropriate, if the employee requires emergency treatment; and (3) government officials investigating compliance with the ADA may be provided the information on request.  42 U.S.C. § 12112(d)(3)(B)(i)-(iii).  The confidentiality requirement remains in effect regardless of whether an applicant is hired or the

employment relationship ends.  <u>Bennett v. Potter</u>, No. 0120073097, 2011 WL 244217, at

* 4 (E.E.O.C. Jan. 11, 2011).

Persons need not be disabled in order to state a claim for the unauthorized gathering

or disclosure of confidential medical information.  <u>Cossette v. Minn. Power & Light</u>, 188

F.3d 964, 970 (8th Cir. 1999) (citing <u>Fredenburg v. Contra Costa Cnty. Dep't of Health</u>

<u>Servs.</u>, 172 F.3d 1176, 1181-82 (9th Cir. 1999), <u>Griffin v. Steeltek, Inc.</u>, 160 F.3d 591,

593-94 (10th Cir. 1998)).  To state an unauthorized disclosure claim under the ADA, a

plaintiff "must also establish that [the employer's] violation of the ADA caused some sort

of tangible injury."  <u>Id.</u>; <u>see also</u> <u>Dillon v. Norfolk S. Rwy. Co.</u>, 35 F. Supp. 3d 896, 908

(E.D. Mich. 2014) ("There is nothing in the record indicating that . . . the information . . .

was used to take an adverse action against Plaintiff.").   For instance, in <u>Cossette</u>, the court

found that as to the disclosure of the plaintiff's back injury and lifting restriction to a

prospective employer, disputed issues of fact existed involving the question of tangible

injury to the plaintiff – specifically, whether the prospective employer decided not to hire

her because of the medical disclosure.  160 F.3d at 970-73.  Regarding the disclosure of

the plaintiff's back injury and alleged mental deficiencies to the employee's prospective

co-workers, the Court questioned whether the claimed injury of condescending and

patronizing treatment amounted to an adverse employment action and remanded the

matter.  <u>Id.</u>

As in <u>Cossette</u>, an ADA confidential disclosure claim is most typically asserted by

a plaintiff-employee as part of a more general disability discrimination lawsuit.  <u>See</u>, <u>e.g.</u>,

McPherson v. O'Reilly Auto., Inc., 491 F.3d 726, 732 (8th Cir. 2007) (involving ADA

claims based on disability discrimination resulting in termination, disclosure of

confidential medical records, and retaliation); Johnson v. Moundsvista, Inc., No. 01-CV-

915 DWF/AJB, 2002 WL 2007833, at *4-5 (D. Minn. Aug. 28, 2002) (including ADA

claims of reduction in hours and termination based on disability, disclosure of confidential

information, and retaliation).  This case, however, does not involve the typical scenario.

As another district court has observed, there are few cases "addressing whether the ADA

confidentiality provisions apply to the discovery of medical information and documents in

civil litigation."  Scott v. Leavenworth Unified Sch. Dist. No. 453, 190 F.R.D. 583, 586

(D. Kan. 1999).

The circumstances of Scott are more akin to the facts before this Court than the

typical ADA disclosure case.  In Scott, the plaintiff was a school official who asserted an

ADA discrimination claim against her former employer based on allegations of denial of

reasonable accommodation and termination as well as retaliatory discharge.  190 F.R.D. at

583.  She sought discovery of the personnel files and other records of three third-party co-

workers, to which the school district objected on grounds of confidentiality under the

ADA.  Id.  The court rejected the use of the ADA's confidentiality provisions as a

discovery shield, stating:

> the ADA's prohibitions against disclosure of medical information do not
> amount to a "privilege" that protects the requested documents from
> disclosure. The ADA was enacted "to provide a clear and comprehensive
> national mandate for the elimination of discrimination against individuals
> with disabilities," 42 U.S.C. § 12101(b)(1), and to assure equality of

opportunity in employment, full participation and economic self-sufficiency for individuals with disabilities. 42 U.S.C. § 12101(a)(8). One form of discrimination prohibited by the ADA is a medical examination or inquiry of an employee that is not job-related or consistent with business necessity. See 42 U.S.C. § 12112(d). Such an examination or inquiry could easily reveal the nature or severity of a disability and therefore lead to the segregation of, and/or discrimination against, the employee. The ADA's confidentiality provisions ensure that in those situations where a medical examination or inquiry is allowed under the ADA, i.e., when job-related or consistent with business necessity, the information is disclosed only to those with a legitimate need for the information. In other words, the confidentiality provisions further the purpose behind the ADA's goal of ensuring equal employment opportunities for the disabled.

Id. at 586. The court found that the disclosure of the confidential information actually effectuated the purpose of the ADA, by permitting the plaintiff to establish her failure-to-accommodate claim. Id. at 587. The ADA's confidentiality provisions state that the medical information in question can only be used consistent with the statute. 42 U.S.C. § 12112(d)(3)(C).

The U.S. Clubs, however, argue that the ADA's confidentiality provisions – specifically, the exception in 42 U.S.C. § 12112(d)(3)(B)(i) that permits disclosure to supervisors and managers – are designed to ensure a safe work environment and promote employee safety. (U.S. Clubs' Position Paper at 11 [Doc. No. 186].) However, as noted above in Scott, the purpose of the ADA is not to ensure a safe work environment, but to prevent employers from discriminating against employees who have perceived or actual disabilities. Scott, 190 F.R.D. at 587; see also Chao v. ConocoPhillips Co., No. 03-mc-0136, 2003 WL 22794705, at *9 (E.D. Pa. Nov. 5, 2003) ("The purpose of the ADA's confidentiality provision is to prevent employers from discriminating against employees

14

with perceived disabilities that do not affect job performance.").  Moreover, as Plaintiffs'

counsel argued at the July 14, 2015 status conference and hearing, the U.S. Clubs disclose

players' medical information to parties other than simply supervisors and managers,

whether those parties are retained by the U.S. Clubs or are true third parties, such as the

media.  (7/14/15 Tr. at 45-46 [Doc. No. 194].)  This redisclosure of players' medical

information by the U.S. Clubs themselves could arguably be violative of the ADA's

confidentiality provisions, applying the U.S. Clubs' reading of the statute.  This Court

declines to apply such an interpretation.

    In another case involving the medical information of third parties, the court

rejected the defendant's argument that the ADA precluded discovery, noting the

distinction between privilege and confidentiality.  McDonald v. Holder, No. 09-CV-0573-

CVE-TLW, 2010 WL 5387482, at *1, 5 (N.D. Okla Dec. 17, 2010) (approving the

magistrate judge's discovery ruling, stating, "confidentiality rights of third parties,

standing alone, do not create a privilege precluding discovery under Rule 26.").  The court

in McDonald therefore required the U.S. Attorney General to provide determination of

fitness reports for all court security officers ("CSOs") in the United States from 2005

forward – third parties – in a disability discrimination lawsuit brought by a former CSO.

Id. at *5.  Also in a litigation context, the court in Floyd v. SunTrust Banks, Inc., 878 F.

Supp. 2d 1316, 1325 (N.D. Ga. 2012), held that in-house counsel's actions in forwarding a

former employer's medical information held by the employer's third-party FMLA

administrator to outside counsel in order to defend against litigation brought by the former

employee did not violate § 12112(d). The court found that

> the proper concern is "ensuring that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee." Here, the Court finds that preserving and obtaining documents for the purpose of defending oneself in ongoing litigation is a legitimate purpose. And, that limiting the disclosure to the in-house counsel assigned to the litigation and the outside counsel defending the suit is no further than necessary.

Id. (quoting Doe v. U.S. Postal Service, 317 F.3d 339 (D.C. Cir. 2003)).

The U.S. Clubs cite the administrative agency decision Bennett, 2011 WL 244217, at *1, for the proposition that the issuance of a subpoena is not an exception to the ADA's confidentiality requirements. While courts generally must give deference to an agency's interpretation of its own regulations, Culpepper v. Schafer, 548 F.3d 1119, 1122 (8th Cir. 2008), the facts of Bennett are distinguishable. Bennett involved the disclosure of information by the U.S. Postal Service in response to a subpoena issued in a civil disability discrimination lawsuit brought by Bennett against his employer, Union Carbide. 2011 WL 244217, at *1. Specifically, the Postal Service provided Bennett's payroll and medical information to Union Carbide without a signed release. Id. Bennett had also filed an EEO complaint, alleging discrimination based on disability, age, and reprisal. Id. In Bennett's ADA disclosure lawsuit against the Postal Service, the E.E.O.C. rejected the Postal Service's defense that it was required to comply with the court-issued subpoena under the Privacy Act, 5 U.S.C. § 552(a), which essentially functioned as an exception to the ADA's disclosure prohibition. Id. at *5. The E.E.O.C. noted while the ADA permits an employer to comply with the requirements of another federal statute or rule, such as the Privacy Act,

even if it conflicts with the ADA, the Privacy Act was not properly invoked. Id. The

E.E.O.C. determined that the Privacy Act was inapplicable because the clerk-issued, state

court subpoena in question was not a qualified "order" for purposes of the Privacy Act. Id.

The Court finds the facts of Bennett distinguishable from those before the Court.

Because the discovery of medical information in this case is more like that in Scott,

McDonald, and Floyd, the Court finds those decisions persuasive. Accordingly, the Court

finds that the ADA does not create a privilege that wholesale bars the discovery of the

requested information under the circumstances of this case. In Section D herein, the Court

addresses certain information that must nevertheless be de-identified to account for the

highly sensitive and confidential nature of the information.

**B.     HIPAA**

Plaintiffs apparently anticipated that the U.S. Clubs would argue that the requested

information is protected from disclosure pursuant to HIPAA. (Pls.' Mem. Supp. Mot. to

Enforce Subpoenas at 7 [Doc. No. 144].) However, at some point in the course of this

dispute, the U.S. Clubs concluded that "HIPAA does not affect the outcome of this

dispute." (U.S. Clubs' Opp'n Mem. at 7 [Doc. No. 156].) The Court agrees.

This Court has noted that "HIPAA was enacted in order to assure an individual's

right to privacy in his or her medical records." United States v. Prentice, 683 F. Supp. 2d

991, 1001 (D.Minn. 2010). HIPAA's privacy requirements apply only to "covered

entities," which are defined as (1) a health plan; (2) a health care clearinghouse; or (3)

certain health care providers. 45 C.F.R. § 160.103. It is unclear whether the U.S. Clubs

are covered entities. Moreover, HIPAA contains a litigation-use exception pursuant to which disclosures may be permitted when a qualified protective order is in place. See 45 C.F.R. § 164.512(1)(e)(ii)(b). The Amended Protective Order in this litigation satisfies the HIPAA requirements of 45 C.F.R. § 164.512(e), because it (1) prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which the information was requested; and (2) requires the return of the protected material at the conclusion of the litigation. (Am. Protective Order, ¶¶ 13, 23 [Doc. No. 140].) Courts have found such protective orders to be adequate under HIPAA to protect the confidentiality of third-party medical records. Allen v. Woodford, No. CV-F005-1104 OWW LJO, 2007 WL 309485, at *5 (E.D. Cal. Jan. 30, 2007). Accordingly, the Court finds that HIPAA does not provide a blanket ban on the discovery of the requested information. Again, in Section D of this ruling, the Court addresses information that must be de-identified and anonymized due to its confidential nature.

### C. Physician-Patient Privilege

In federal diversity actions such as this, state law controls the existence and scope of the physician-patient privilege. In re Baycol Prods. Litig., 219 F.R.D. 468, 469 (D. Minn. 2003) (citing Filz v. Mayo Found., 136 F.R.D. 165, 167 (D. Minn. 1991)); Fed. R. Evid. 501 (noting that in a civil case, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.") While various state laws apply to the underlying actions, the Court refers here to Minnesota law simply for purposes of discussion.

Under Minn. Stat. § 595.02,

> A licensed physician or surgeon, . . . or chiropractor shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity.

subd. 1(d). The privilege also extends to certain other medical personnel involved in the patient's treatment – specifically, registered nurses, psychologists, consulting psychologists, or licensed social workers – as to information obtained or used for purposes of diagnosis or treatment of the patient. Id., subd. 1(g).

The purpose of the privilege is to encourage a patient's full disclosure of information to his or her physician, in order to obtain the best medical care possible. State v. Staat, 192 N.W.2d 192, 195 (Minn. 1971). "Because the privilege belongs to the patient, no person other than the patient has standing to invoke the privilege." State v. Gillespie, 710 N.W.2d 289, 297 (Minn. 2006) (citing State v. Rice, 411 N.W.2d 260, 262 (Minn. Ct. App. 1987)). For the privilege to apply, the patient must establish certain foundational facts: (1) that a confidential physician-patient relationship existed; (2) during which the physician acquired the type of information contemplated by the statute; (3) while attending the patient; and (4) that information was necessary for medical diagnosis and treatment. Staat, 192 N.W.2d at 197.

As with any privilege, it may be waived if the confidential communications are disclosed to a third party by the party asserting the privilege or the communications are otherwise put in issue. Gillespie, 710 N.W.2d at 298 ("Even if Gillespie had standing to

invoke the victim's privilege, the privilege was unavailable because the victim waived it by allowing her sister to be present during the examination and by voluntarily disclosing to a [third party] the information she gave the physician in the course of treatment.").

Defendant and the U.S. Clubs have invoked the physician-patient privilege on a wholesale basis to shield the requested information from discovery. In addressing this privilege, arguments concerning privilege and confidentiality sometimes become somewhat conflated. However, viewing these two different precepts separately, the Court finds that the blanket application of the physician-patient privilege – protecting all medical data from disclosure – is inapplicable here. Importantly, Plaintiffs are not specifically interested in players' actual medical files. (Pls.' Reply Mem. at 2 [Doc. No. 163].) Rather, they are interested in the data compiled by the NHL and the U.S. Clubs for purposes of studying concussions. (Id.) Additionally, Plaintiffs seek other related correspondence such as communications between Defendant or the U.S. Clubs and non-medical professionals about concussions, as well as studies, analyses, and reports regarding the same. (Id.) As a general proposition, such information is not covered by the physician-patient privilege, as it is disseminated beyond the confines of the physician-patient relationship and is not necessarily used for diagnosis and treatment.

Moreover, the CBA specifically contemplates the release of medical information for purposes of public relations – information concerning the nature of a player's injury, prognosis, and treatment. (CBA, Art. 34.3(c)(iii), Ex. 3 to Penny Decl. [Doc. No. 145-6].) In addition, where medical information is stripped of any player-specific identification, the

CBA expressly permits disclosure. (Id., Art. 34.3(c)(ii).) Players also sign authorizations that permit the Clubs to pool data for medical purposes. (See id., Art. 34.3(a).) Not only does the CBA contemplate the release of such information, such information is, in fact, routinely released to the media. See, e.g., CBS Sports, http://cbssports.com/nhl/injuries (last visited July 30, 2015.) Data collected for purposes of the Concussion Program has also appeared in scholarly publications. See Brian W. Benson et al., A Prospective Study of Concussions Among National Hockey League Players During Regular Season Games: the NHL-NHLPA Concussion Program, Canadian Medical Association Journal, May 2011, at 905, Ex. A to Penny Decl. [Doc. No. 164-1].) But the general data compiled by the NHL and U.S. Clubs for purposes of studying concussions and related communications with non-medical professionals are not properly shielded from discovery under the physician-patient privilege. This generalized data, while perhaps consisting of underlying individual medical information, was compiled with the players' consent.

However, the U.S. Clubs and Defendant correctly assert that a waiver of medical privilege does not constitute a wholesale waiver of the entire privilege. See Cerro Gordo Charity v. Fireman's Fund Ins. Co., 623 F. Supp. 877, 880 (D. Minn. 1985). Of course, medical records that reflect communications between physician and patient for purposes of diagnosis and treatment remain privileged. The Court here simply finds that the physician-patient privilege is not a blanket privilege to be applied to all of the discovery requested in Plaintiffs' subpoenas and document requests. As for discovery that does not fall within the confines of the physician-patient privilege, the Court addresses below the

21

information that must be properly de-identified.  Since the chief concern of the U.S. Clubs

and Defendant is that the requested information will somehow be connected to an

individual player, anonymizing information appropriately addresses this legitimate

concern.

### D.    Privacy and Confidentiality

The U.S. Clubs assert that state privacy laws in each Club's home state prohibit the

disclosure of non-party medical information.  (U.S. Clubs' Position Paper at 3 [Doc. No.

186].)   As the U.S. Clubs acknowledge, some state courts refuse to permit access to

private medical information of non-parties, regardless of redaction, while others permit

discovery into non-party medical information if it is de-identified.  (Id. at 4-5) (citations

omitted).  Here, however, Plaintiffs attest that they "are not arguing that NHL hockey

players have a decreased expectation of privacy in their medical records generally."  (Pls.'

Reply Mem. at 1 [Doc. No. 163]) (emphasis in original).  Nor do they seek wholesale

discovery of all of the former players' medical files.  (Id.)

In light of Plaintiffs' representations, the Court will not conduct a complex analysis

of individual states' privacy laws, but will instead consider how best to balance the

Plaintiffs' need for the highly-relevant requested information against the understandable,

serious concerns of the U.S. Clubs and Defendant about the confidential nature of the

requested information.  Addressing similar competing concerns, the court in United States

ex rel Roberts v. QHG of Ind., Inc., No. 1:97-CV-174, 1998 U.S. Dist. LEXIS 23512, at *

29-30 (N.D. Ind. Oct. 8, 1998), observed, "[T]he privacy interests of a patient in his or her

medical records is tied to identity information contained in the records. Once the identifying information is removed from the record, the patient's privacy interest is essentially eliminated." (citations omitted). The CBA itself embraces this very proposition, permitting the disclosure of players' medical information when stripped of all player-identifying information. (CBA, Art. 34.3(c)(ii), Ex. 3 to Penny Decl. [Doc. No. 145-6].) Given the ways in which the CBA permits disclosure of this information – particularly when stripped of player-specific information and when the information is provided for public relations purposes – the Court finds that ordering the production of discovery here in a de-identified form under the protection of a HIPAA-compliant protective order will not create a chilling effect on players' participation in the Concussion Program. Nor will it discourage players from disclosing medical information to the U.S. Clubs or their physicians, given these layers of protection. This is a very unique situation and, as the Court has noted on several occasions, the requested information will be equally relevant and important to the NHL's defense of this action. If the Court were to prohibit the wholesale disclosure of the requested discovery to Plaintiffs, its use would be equally unavailable to Defendant at trial.

The U.S. Clubs are correct in noting that courts give special weight to the intrusion that subpoenas impose upon third parties in determining the balance of competing needs for discovery. (U.S. Clubs' Opp'n Mem. at 28 [Doc. No. 156]) (citing Misc. Docket Matter No. 1 v. Misc. Docket Matter Nos. 2, 197 F.3d 922, 927 (8th Cir. 1999)). The Court finds that there is a compelling need for the requested information, as it goes to the

heart of Plaintiffs' claims concerning Defendant's knowledge about concussions.

However, to the extent that the requested information is in the possession of the NHL, the

U.S. Clubs shall indicate as such and the NHL shall produce the information. Any other

concerns regarding undue burden shall require an affidavit providing a detailed description

of the burden.

To the extent that individual players provide authorization for the release of the

requested information, confidentiality concerns are eliminated and the information shall be

produced in full, unredacted form.

Recognizing the confidential nature of the requested discovery, the Court affords

multiple layers of protection in order to safeguard and respect its confidentiality. First,

and foremost, the disclosure of the information is subject to the requirements of the

HIPAA-compliant Amended Protective Order [Doc. No. 140]. It may only be disclosed

pursuant to the terms of the Amended Protective Order for use in this litigation.

Second, the CBA permits disclosure of the information at issue here, in a de-

identified manner. The CBA expressly allows for the disclosure of information that is

"stripped of all individual Player-identifying information." (CBA, Art. 34.3(c)(ii), Ex. 3 to

Penny Decl. [Doc. No. 145-6].) In addition, it permits the disclosure of information

concerning injuries sustained over the course of a player's employment as a hockey player,

including: (1) the nature of the player's injury; (2) the prognosis and anticipated length of

recovery from the injury; (3) the treatment and surgical procedures undertaken or

anticipated in regard to the injury. (Id., Art. 34.3(c)(iii).) For any other medical or health

24

condition that prevents a player from performing his services to his Club, the CBA permits

the disclosure of the following: (1) the fact that a medical and/or health condition prevents

the player from rendering his services to his Club; and (2) the anticipated length of the

Player's absence from the Club. (Id.) Accordingly, any such information previously

disclosed pursuant to Article 34.3(c)(iii) of the CBA must be produced.

Third, the Court requires the de-identification of certain identifying fields of

information. In both Scott, 190 F.R.D. at 587, and McDonald, 2010 WL 5387482, at *5,

while the courts found that the ADA's confidentiality provisions did not give rise to a

privilege, the courts required that the requested discovery be produced in a manner to

protect confidential information from disclosure.

Fourth, regarding the de-identification of individual players, particularly in certain

databases, Plaintiffs have expressed their willingness to accept de-identified data.

Moreover, without waiving any arguments for full disclosure, they have represented that

they will not attempt to re-identify, or "reverse-engineer" the information produced in

response to their discovery requests, to identify individual players. (See Letter of 7/21/15

from B. Penny to J. Nelson at 1, submitted to the Court.) Plaintiffs have thus committed to

not taking de-identified data and attempting to identify the players to whom the data

attaches. Not only have Plaintiffs made such a commitment, but this Court orders that any

information found to have been re-identified or reverse engineered, by any party, may not

be used in this case in any deposition, motion, or at trial. No proof or defense shall

include a reference to a player's identity connected to medical data, with the exception of

players who have provided medical releases.

As noted, the Court previously provided guidance to the parties and the U.S. Clubs concerning the discovery disputes at issue, requiring the U.S. Clubs to produce any data they compiled for the purpose of studying concussions and to redact any personal identifying information included in such data.  (See Tr. of 6/4/14 at 41-44 [Doc. No. 176].) The Court now formally rules that the U.S. Clubs are to produce such information, with the personal identifying fields discussed herein produced in de-identified form.  The Clubs are ordered to produce any internal reports, studies, analyses and databases in their possession (whether initiated by the U.S. Clubs, NHL, or retained researchers) for the purpose of studying concussions in de-identified form.  The U.S. Clubs shall produce any responsive correspondence and/or emails between themselves, themselves and the NHL, or with any research or other professional about the study of concussions.  The Clubs shall also produce any responsive medical information that they disclosed pursuant to Article 34.3(c)(iii) of the CBA.  Again, to the extent that the U.S. Clubs are concerned about the re-identification of a player, the Clubs shall raise the issue with the Court in camera.

In Defendant's June 25, 2015 letter to the Court, the NHL described the various electronic databases containing NHL player concussion-related information and indicated whether certain fields of information in each database contain player-identifying data. (Letter of 6/25/15 from R. Bernardo to B. Penny, submitted to the Court.)  With respect to fields of information in the databases at issue, the parties have agreed to the following, and the Court so orders that: (1) "man number" and name will be de-identified, but given a

26

"dummy code" across databases to permit Plaintiffs to follow the data through the produced information; (2) jersey number will be de-identified, but given a "dummy code"; (3) team identification will be de-identified, but given a "dummy code"; (4) intervals of dates will be provided instead of exact dates; the specific intervals will be resolved by the parties; and (5) number of seasons played will be provided in ranges to be resolved by the parties. (See Tr. of 7/14/15 at 10-12 [Doc. No. 194]; Def.'s Position Paper at 18-23 [Doc. No. 187].)

The parties disagree as to whether a player's language and position should be disclosed or redacted. (See Def.'s Position Paper at 22-23 [Doc. No. 187].) Defendant argues that information about a player's position, combined with other data, will identify the player. (Id. at 22.) Regarding language, the NHL likewise argues that because English and French are the most common language spoken by the players, a player's identity could be determined by revealing a specific language other than English or French. (Id. at 23.) Defendant therefore proposes to de-identify language data as "other" for those languages in which there are fewer than 100 database entries. (Id.) The Court orders that a player's position is not sufficiently "identifying" to warrant redaction. With respect to language spoken, Defendant's proposal is acceptable.

In addition, Defendant seeks to redact 26 fields of data in a specific video spreadsheet, the VAS.[1] (Letter of 7/20/15 from R. Bernardo to J. Nelson at 1-2, submitted

---

[1] The 26 fields in question are: Season, Regular Season Man Games Lost ("MGL"), Season MGL, Total MGL, MGL to date cutoff, Days, Event Id, NHL Id, Age, Month, Diagnosis1, Exacerbation, Reinjury1, Diagnosis2, Diagnosis3, Cutoff for

to the Court.)  Some of the fields that Defendant proposes to redact in the VAS, such as First Name, Last Name, and Team, are fields to which Defendant has agreed to de-identify – as opposed to redact – in its production of other databases.  Defendant seeks the additional protection of redaction of these fields in the VAS because "the NHL believes that providing such information in the database will facilitate linkage of the VAS" to other databases, leading to the identification of individual players  (Id. at 2.)  In addition, Defendant seeks permission to re-order the rows of data in the VAS to further minimize linkage to the AHMS database.  Plaintiffs argue that the NHL fails to explain why such extensive redaction is required, since the vast majority of the 26 fields are not unique to any single player.  (Letter of 7/21/15 from B. Penny to J. Nelson at 1, submitted to the Court.)  Plaintiffs contend that the protections of the Amended Protective Order, coupled with Plaintiffs' representation not to reverse-engineer the data, sufficiently protect against the disclosure of this information.  (Id.)

As to these 26 fields in the VAS database, to the extent that these fields are not already encompassed by the de-identification agreement and order noted above (i.e., name, man number, jersey number, team, dates, number of seasons), the remaining fields shall be included and produced as they contain no express identifying information.  Moreover, the information is produced pursuant to the protection of the HIPAA-compliant protective

---

analysis, Event Time, Medical Clearance Date, Mechanism of Injury, Category, Category Detail, Category Other, Team Name, Game #, First Name, and Last Name.  In addition, Defendant proposes to redact from any "free text" fields any information that is also contained in the listed fields other than Age, Team Name, First Name, and Last Name.

order and neither party may use this information in this case to re-identify an individual

player.  Without further explanation from the NHL as to the purpose of the request,

Defendant's request to re-order the rows of data in the VAS is denied.

Defendants and the U.S. Clubs further object to the production of video clips that

are connected to the video spreadsheet in the VAS.  The video clips consist of video

footage of particular players sustaining head hits.  Defendants and the U.S. Clubs argue

that by virtue of showing a given player, the fact of the video clip in conjunction with the

database reveals a concussion diagnosis, rendering the videos privileged from production.

(See Def.'s Position Paper at 21 [Doc. No. 187].)  Defendant contends that it is not

possibly to modify the videos to anonymize the players depicted in them.  (Id.)

The Court disagrees that the video clips are privileged.  They are several steps

removed from the physician-patient privilege and statutory privileges.  Granted, Plaintiffs

may learn that an individual player has received a concussion diagnosis by the inclusion of

a video clip in Defendant's production.  But they will not be able to correlate that

knowledge to database fields in general.  The information contained in the clips – many of

which likely feature footage in the public domain – is simply too attenuated to be linked to

the mixture of de-identified and native form data produced in Defendant's databases.  The

Court also presumes that for many players in the video clips, the NHL has already

disclosed a concussion diagnosis pursuant to the CBA's public relations exception.  And

importantly, Plaintiffs do not seek to reverse-engineer this information and are precluded

from doing so by the Court.  Finally, the Amended Protective Order sufficiently

safeguards the information contained in the video clips.  The video clips shall be produced.

In conclusion, the Court fully appreciates that the players' medical information is highly confidential.  This Order provides several layers of protection from public disclosure of such material, including a mandate that absent express authorizations, or prior public disclosure, all identifying information associated with such medical information must be produced in anonymized form.  The Court also fully recognizes, however, that this data is highly relevant in this litigation – to both sides.  On balance, the Court finds that the players' medical information can be adequately anonymized and protected, while still providing Plaintiffs with basic discovery highly relevant to their claims.  The Court therefore orders the production of the requested material as set forth herein.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Plaintiffs' Motion to Enforce Subpoenas Directed to U.S. NHL Clubs [Doc. No. 142]  is **GRANTED in part** and **DENIED in part**, as set forth herein.

Dated:   July 31, 2015                          s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Court Judge