# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: National Hockey League Players' Concussion Injury Litigation | MDL No. 14-2551 (SRN/JSM) <br><br> **MEMORANDUM OPINION AND ORDER** <br><br> **[FILED UNDER SEAL]** |

Charles S. Zimmerman, Brian Gudmundson, and David M. Cialkowski, Zimmerman Reed, PLLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402; Bradley C. Buhrow and Hart L. Robinovitch, Zimmerman Reed PLLP, 14646 North Keirland Boulevard, Suite 145, Scottsdale, Arizona, 85254, for Plaintiffs.

Stephen G. Grygiel, Steven D. Silverman, and William Sinclair, Silverman, Thompson, Slutkin & White, LLC, 201 North Charles Street, Suite 2600, Baltimore, Maryland 21201, for Plaintiffs.

Jeffrey D. Bores and Bryan L. Bleichner, Chestnut Cambronne PA, 17 Washington Avenue North, Suite 300, Minneapolis, Minnesota 55401, for Plaintiffs.

Stuart A. Davidson, Janine D. Arno, Kathleen L. Douglas, and Mark J. Dearman, Robbins, Geller, Rudman & Dowd, LLP, 120 East Palmetto Park Road, Suite 500, Boca Raton, Florida 3343; Leonard B. Simon, Robbins, Geller, Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, for Plaintiffs.

Lewis A. Remele, Jr. and Jeffrey D. Klobucar, Bassford Remele, PA, 33 South Sixth Street, Minneapolis, Minnesota 55402, for Plaintiffs.

Katelyn I. Geoffrion, Thomas A. Demetrio, and William T. Gibbs, Corboy & Demetrio, 33 North Dearborn Street, Chicago, Illinois 60602, for Plaintiffs.

Brian D. Penny and Mark S. Goldman, Goldman, Scarlato & Penny PC, 101 East Lancaster Avenue, Suite 204, Wayne, Pennsylvania 19087, for Plaintiffs.

Vincent J. Esades and James W. Anderson, Heins Mills & Olson, PLC, 310 Clifton Avenue, Minneapolis, Minnesota 55403, for Plaintiffs.

David I. Levine, The Levine Law Firm P.C., 1804 Intracoastal Drive, Fort Lauderdale, Florida 33305, for Plaintiffs.

Daniel E. Gustafson, David. A. Goodwin, and Joshua J. Rissman, Gustafson Gluek, PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402, for Plaintiffs.

Thomas J. Byrne, Namanny, Byrne, & Owens, APC, 2 South Pointe Drive, Lake Forest, California 92630, for Plaintiffs.

Michael R. Cashman and Richard M. Hagstrom, Hellmuth & Johnson, PLLC, 8050 West 78th Street, Edina, Minnesota 55439, for Plaintiffs.

Robert K. Shelquist, Lockridge, Grindal, Nauen, PLLP, 100 Washington Ave South, Suite 2200, Minneapolis, Minnesota 55401-2179, for Plaintiffs.

Daniel J. Connolly, Joseph M. Price, Linda S. Svitak, and Aaron D. Van Oort, Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402; Geoffrey M. Wyatt, John H. Beisner, and Jessica D. Miller, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, Northwest, Washington, D.C. 20005-2111; Shepard Goldfein, James A. Keyte, Michael H. Menitove, and Matthew M. Martino, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036; Joseph Baumgarten and Adam M. Lupion, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant National Hockey League's Motion to Dismiss Master Complaint Based on Labor Law Preemption [Doc. No. 37][1] and Defendant's Motion to Stay Further Discovery Pending Resolution of Its Motion to Dismiss Master Complaint [Doc. No. 344].  In essence, Defendant asks this Court to find that labor law preemption entirely precludes this putative class action strictly on the face of the

---

[1]    At the time this Motion was filed, the operative complaint was the Master Administrative Long-Form and Class Action Complaint [Doc. No. 28].  Plaintiffs have since filed their First Amended Consolidated Class Action Complaint [Doc. No. 351] ("Amended Complaint"), which is described herein.  The parties stipulated to the application of Defendant's Motion to Dismiss Master Complaint Based on Labor Law Preemption to the Amended Complaint.  (See Stip. Regarding Filing of First Am. Master Class Action Compl. [Doc. No. 334] ¶ 3.)

Master Complaint.  In order to so find, Defendant asks this Court to consider numerous meeting minutes, letters, memoranda, and agreements that reflect four decades of collective bargaining between it and the National Hockey League Players Association ("Players' Union"), as well as documents that reflect the history of collective bargaining between the Players' Union and the NHL club teams before the NHL became a party to any collective bargaining agreement ("CBA"), as embraced by the pleadings.  This is so, even though not one of the eight CBAs in effect during that forty-year timeframe is mentioned in the Amended Complaint, and even though all Plaintiffs in this class action are retired and are no longer subject to any CBA.  According to Defendant, these documents that were neither attached to nor referenced in the pleadings demonstrate that any duties it may have owed to Plaintiffs regarding Plaintiffs' health and safety arise under the CBAs or would require interpretation of the CBAs in order to determine their scope.  But, at this stage of the proceedings, the Court must rely only on the pleadings, or documents fairly embraced by the pleadings, and not a cherry-picked record introduced solely to contradict Plaintiffs' allegations.

Furthermore, the pleadings do not support Defendant's argument.  Rather, discovery is necessary to shed light on the nature of Plaintiffs' claims, when those claims accrued, and which—if any—CBAs might be relevant.  If a full record ultimately reveals that Plaintiffs' claims accrued while they were subject to a CBA, and that those claims are substantially dependent on interpretation of the CBA, then the Court could properly determine that the claims are preempted by labor law preemption.  In the meantime,

however, Defendant's Motion to Dismiss is premature and must be denied, and,

therefore, Defendant's Motion to Stay is denied as moot.

## II.     BACKGROUND

### A.     The Parties and the Underlying Factual Allegations

This litigation was initiated as a class action by retired National Hockey League

players who allege that Defendant National Hockey League ("NHL") is responsible for "the

pathological and debilitating effects of brain injuries caused by concussive and sub-

concussive impacts sustained . . . during their professional careers."  (Pl.'s First Am.

Consolidated Class Action Compl. [Doc. No. 351] ("Am. Compl.") ¶ 1.)  The NHL is an

unincorporated association that operates the major professional hockey league in North

America and that consists of separately-owned member teams ("Club Teams") in various

States and Canada.  (Id. ¶ 161.)

There are now six named Plaintiffs who seek to represent retired NHL players.  (See

id. ¶¶ 27–85, 400–01.)  Dan LaCouture, Michael Peluso, Gary Leeman, Bernie Nicholls,

David Christian, and Reed Larson seek to represent Class 1:

> All living Retired NHL Hockey Players who have not been diagnosed with
> dementia, ALS, Alzheimer's, Parkinson's, CTE, or other neurodegenerative
> disease or conditions (collectively, "Brain Disease").

(Id. ¶ 400; see id. ¶¶ 27–79, 387.)  Although Stephen Ludzik was identified as the

representative of Class 2, he intends to withdraw from that capacity.  Class 2 constitutes:

> All living and deceased Retired NHL Hockey Players who have been
> diagnosed with a Brain Disease, and their Representative Claimants and
> Derivative Claimants, where such Brain Disease was not diagnosed at the
> time the player retired or otherwise permanently ceased playing professional
> hockey.

(Id. ¶ 401; see id. ¶¶ 80–85.)  Mr. LaCouture played in the NHL from 1998 through 2008 and suffered roughly twenty concussions and numerous sub-concussive injuries.  (Id. ¶¶ 28–29.)  Mr. Peluso played in the NHL from 1989 through 1998 and suffered at least five concussions.  (Id. ¶¶ 40–41.)  Mr. Leeman played in the NHL from 1983 through 1996 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 51, 53.)  Mr. Nichols played in the NHL from 1982 through 1999 and suffered at least three concussions and numerous sub-concussive hits to the head.  (Id. ¶¶ 56–57.)  Mr. Christian played in the NHL from 1979 through 1994 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 63, 65.)  Mr. Larson played in the NHL from 1977 through 1989 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 70, 72.)

According to Plaintiffs, former NHL players "signed up to play hockey knowing that they might get injured and dinged, but they did not sign up for avoidable brain damage."  (Id. ¶ 2.)  Plaintiffs allege that, unbeknownst to them, decades' worth of scientific evidence links brain trauma to long-term neurological problems, and that Defendant knew or should have known of this evidence but did not sufficiently protect the players or inform them of the dangers of repeated brain trauma.  (E.g., id. ¶¶ 4–6, 9; see id. ¶¶ 182–243.)  This inaction persisted, Plaintiffs claim, despite Defendant's assumption of "a duty as a guardian against head-trauma in players" by virtue of instituting a helmet requirement in 1979 and creating a Concussion Program in 1997 to research and study brain injuries in players.  (Id. ¶ 10; see, e.g., id. ¶¶ 13–14.)  Plaintiffs claim that they and their families looked to Defendant for guidance on issues regarding player health and safety because of Defendant's vastly

superior resources, knowledge, and access to medical and health-related information;
because Defendant's fortune depended on Plaintiffs; and because Plaintiffs were brought up
and trained to trust their coaches and teams' medical personnel.  (E.g., id. ¶¶ 15, 89, 91, 94–
95, 98–100, 103, 129–30, 133, 135–36, 138, 141, 148–49, 151–54, 156, 336–37, 342–49,
351–54, 358–62, 364.)  Plaintiffs also allege that Defendant has caused injuries and
increased risks to Plaintiffs by refusing to cease its glorification of fist-fighting and
violence in the NHL.  (See, e.g., id. ¶¶ 20, 296, 306, 309–11.)

B.     **Plaintiffs' Claims**

In their First Amended Consolidated Class Action Complaint ("Amended
Complaint"), Plaintiffs assert eight counts against the NHL.  (See id. ¶¶ 412–477.)  In
Count I, Plaintiffs seek a declaratory judgment that the NHL knew, or reasonably should
have known, that the head impacts Plaintiffs and class members endured were likely to
expose them to substantially-increased risks of developing neurodegenerative diseases and
conditions; that the NHL had a duty to advise Plaintiffs and class members of that risk, but
willfully and intentionally concealed material information from, and misled, Plaintiffs
concerning that risk; and that the NHL recklessly endangered Plaintiffs and class members.
(Id. ¶ 414.)  In Count II, Plaintiffs allege that, as a result of the NHL's misconduct, they
experienced injuries that have increased their risk of developing neurodegenerative
disorders, and that costly medical monitoring procedures are necessary to enable Plaintiffs
and class members to obtain early detection and diagnosis of those conditions and to enable
effective treatment.  (See id. ¶¶ 421–29.)  Accordingly, Plaintiffs "seek the creation and
funding of a Court-supervised, NHL-funded medical monitoring regime."  (Id. ¶ 430.)

6

Counts III and IV assert claims for negligence and negligent misrepresentation by omission, respectively.  In Count III, Plaintiffs allege that the NHL has "historically and voluntarily assumed an independent tort duty of reasonable care regarding player safety and head trauma"; has assumed a duty "to manage player safety, particularly with regard to head injuries and concussions"; and has "a duty of reasonable care to act in the best interests of the health and safety of NHL players[,] to provide truthful information to NHL players regarding risks to their health[,] and to take all reasonable steps necessary to ensure the safety of players."  (Id. ¶¶ 434–35.)  Plaintiffs further allege that, as a part of its duty of reasonable care, the NHL was required to inform NHL players of neurological risks of head injuries suffered while playing hockey in the NHL, and not to omit material information about the risks.  (Id. ¶ 436.)  Plaintiffs claim that Defendant breached that duty by, for example, promoting a culture of violence and failing to inform or warn players of the potential negative effects of such head injuries.  (Id. ¶¶ 437.)  Plaintiffs allege that, as a result of these breaches, they have suffered long-term neurological damage and the risk of developing long-term neurological damage.  (Id. ¶¶ 438–39.)

In Count IV, Plaintiffs allege that a special relationship existed between the NHL and Plaintiffs by virtue of the NHL's superior knowledge of material medical information that was not readily available to players and by virtue of the NHL's undertaking to communicate some safety information to players and the public, such that the NHL had a duty to disclose accurate information to Plaintiffs.  (Id. ¶ 442.)  According to Plaintiffs, the NHL breached its duty by negligently and actively omitting material information regarding the link between the type of head injuries sustained while playing in the NHL and the resulting

negative neurological effects.  (See id. ¶¶ 443–44, 448.)  Plaintiffs assert that they justifiably and reasonably relied to their detriment on these negligent misrepresentations by omission. (See id. ¶¶ 445–46, 449.)

Counts V and VI assert fraud-based causes of action.  In Count V, Plaintiffs assert a claim for fraudulent concealment based on the NHL's alleged knowing concealment of material information regarding the risks of brain trauma suffered while playing in the NHL, the NHL's alleged intent and expectation that Plaintiffs would rely on its silence and fraudulent concealment, and Plaintiffs' alleged reasonable reliance on that silence to their detriment.  (See id. ¶¶ 451–58.)  And, in Count VI, Plaintiffs assert a claim for fraud by omission and failure to warn.  (See id. ¶¶ 459–67.)  Specifically, Plaintiffs allege that "[t]he NHL had a duty to promptly disclose and speak the full truth regarding the health risks caused by concussive and subconcussive impacts."  (Id. ¶ 460.)  Plaintiffs assert that this duty arose by virtue of the NHL's superior knowledge of material medical information that was not readily available to players and by virtue of the NHL's undertaking to communicate some safety information to players and the public.  (Id.)  According to Plaintiffs, the NHL breached this duty by fraudulently and intentionally failing to disclose material information regarding the link between the type of head injuries sustained while playing in the NHL and the resulting negative neurological effects, and that Plaintiffs justifiably and reasonably relied on these fraudulent omissions to their detriment.  (See id. ¶¶ 461–64, 466.)[2]

_____

[2]     Members of Class 2 also asserted claims for loss of consortium and wrongful death in Counts VII and VIII, respectively.  (See Compl. ¶¶ 468–77.)  On March 11, 2016, Plaintiffs voluntarily dismissed those claims without prejudice.  (Pls.' Notice of Voluntary

### C.    Procedural Posture

The NHL originally filed two motions to dismiss, based on two distinct grounds. First, the NHL filed a Motion to Dismiss Master Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), seeking dismissal of Plaintiffs' claims as time-barred. (See Mem. Opinion and Order dated Mar. 25, 2015 [Doc. No. 126], at 8.)[3]  The Court denied that motion because it could not determine, from the face of the Master Complaint, when Plaintiffs' causes of action accrued and, therefore, whether those claims are barred by the applicable statute of limitations.  (See id. at 13, 33.)  In particular, the Court explained that when the alleged injuries (e.g., "an increased risk of developing serious latent neurodegenerative disorders and diseases" and "latent or manifest neuro-degenerative disorders and diseases") "occurred" or "resulted," and when Plaintiffs discovered or should have discovered the link between the type of injuries they suffered and the increased risk of developing neurodegenerative disorders, are matters that are proper subjects of discovery. (Id. at 13–14.)[4]  Only after additional discovery is completed can it be determined within which of (at least) four potential categories each Plaintiff-retiree belongs:  (1) retirees whose

---

Dismissal of Counts VII and VIII of the First Am. Compl. Without Prejudice [Doc. No. 413].)

[3]    At the time that Motion was filed, the operative complaint was the Master Administrative Long-Form and Class Action Complaint [Doc. No. 28].

[4]    Defendant also argued that Plaintiffs had not pled their fraud claims with particularity, and that medical monitoring is not a stand-alone cause of action.  (See Mem. Opinion and Order dated Mar. 25, 2015 [Doc. No. 126], at 8–9.)  This Court found those arguments to be insufficient to warrant dismissal because Plaintiffs' claims are adequately pled, and because it was not possible to determine from the face of the Complaint which jurisdictions' laws apply to Plaintiffs' medical monitoring claim.  (See id. at 9.)

cause of action arose while they were active players, and who filed a lawsuit as retired

players within the statute of limitations; (2) retirees whose cause of action arose while they

were active players, and who filed a lawsuit as retired players outside of the statute of

limitations; (3) retirees whose cause of action arose after they retired, and who filed a

lawsuit within the statute of limitations; and (4) retirees whose cause of action arose after

they retired, but who filed a lawsuit outside of the applicable statute of limitations.

Second, the NHL filed a Motion to Dismiss Master Complaint Based on Labor Law

Preemption, seeking dismissal of Plaintiffs' claims under Federal Rule of Civil Procedure

12(b)(6). That Motion is now before the Court.

## III.   DISCUSSION

When evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, for failure to state a claim upon which relief can be granted, the Court

assumes the facts in the complaint to be true and construes all reasonable inferences from

those facts in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187

(8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations,

see Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal

conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d

1486, 1488 (8th Cir. 1990). In addition, the Court ordinarily does not consider matters

outside the pleadings on a motion to dismiss. See Fed. R. Civ. P. 12(d). "Matters outside

the pleadings"—and, thus, matters that should be excluded—"include any written or oral

evidence in support of or in opposition to the pleading that provides some substantiation for

and does not merely reiterate what is said in the pleadings." Hamm v. Rhone-Poulenc Rorer

Pharms., Inc., 187 F.3d 941, 948 (8th Cir. 1999) (citation and internal quotation marks omitted).  The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).

In its Motion, Defendant argues that Plaintiffs have failed to state a claim for relief because their claims are preempted by § 301 of the Labor Management Relations Act ("LMRA").  Section 301 governs "[s]uits for violation of contracts between an employer and a labor organization."  29 U.S.C. § 185(a).  This provision "not only provides the federal courts with jurisdiction over controversies involving collective-bargaining agreements but also authorizes the courts to fashion a body of federal law for the enforcement of these collective bargaining agreements."  United Steelworkers of Am. v. Rawson, 495 U.S. 362, 368 (1990) (citation and internal quotation marks omitted).  Before analyzing whether the Court can rule on the face of the Complaint that Plaintiffs' claims are preempted, however, the Court must first determine which type of preemption—"complete" or "ordinary"—is being asserted.

## A.    Complete Preemption vs. Ordinary Preemption

"Sometimes there is confusion between complete preemption and what has been termed 'ordinary' preemption."  Johnson v. MFA Petroleum Co., 701 F.3d 243, 248 (8th Cir. 2012); see Williams v. Nat'l Football League, 598 F.3d 932, 935–36 (8th Cir. 2009) (Colloton, J. dissent from denial of rehearing en banc) (expressing concern about the Eighth Circuit's cases confusing "ordinary preemption" with "complete preemption").

11

Complete preemption is a corollary of the well-pleaded complaint rule, both of which concern subject matter jurisdiction, and the proper forum—federal or state—in which a plaintiff's claim should be litigated. See Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63–64 (1987). "Complete preemption only applies where a federal statute 'so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal.'" Johnson, 701 F.3d at 247 (quoting Metro. Life Ins. Co., 481 U.S. at 65). If the plaintiff's claim is not preempted, then the case remains in state court or is remanded to state court. See Meyer v. Schnucks Markets, Inc., 163 F.3d 1048, 1052 (8th Cir. 1998) (holding that the plaintiff's claim for intentional infliction of emotional distress was not preempted by § 301, and therefore, was not removable to federal court). If the plaintiff's claim is preempted, then the case either remains in federal court or is removed to federal court. See Duerson v. Nat'l Football League, Inc., No. 12 C 2513, 2012 WL 1658353, *1, *6 (N.D. Ill. May 11, 2012) (holding that the case was properly removed to federal court because the plaintiff's claim was completely preempted and, therefore, arose under federal law).

In contrast, "[o]rdinary preemption is a federal defense that exists where a federal law has superseded a state law claim." Johnson, 701 F.3d at 248; see Trustees of the Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 329 & n.3 (8th Cir. 2006) (stating that the defendant's ordinary preemption defense was "distinct from the jurisdictional doctrine of complete preemption used to remove state claims to federal court"). Ordinary preemption may be invoked in both state and federal court as an affirmative defense to a plaintiff's claims. See, e.g., Superior

Waterproofing, Inc., 450 F.3d 329 & n.3 (analyzing whether the plaintiff's state common law claims, which it raised in federal district court, were preempted under the doctrine of ordinary preemption); Roddy v. Grand Trunk W. R.R., Inc., No. 271208, 2007 WL 258310, at *1–2 (Mich. Ct. App. Jan. 30, 2007) (explaining that the Sixth Circuit had properly remanded the case to state court because the plaintiff's claim was not completely preempted, but stating that the issue of ordinary preemption properly remained before the state court). Because ordinary preemption is a defense to a plaintiff's claim, the doctrine does not authorize removal to federal court. See Metro. Life Ins. Co., 481 U.S. at 63. If the plaintiff's claim is not preempted, then the case may remain in whichever court has original jurisdiction. See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 402, 407 (1988) (holding that the employee's state tort claim was not preempted by § 301 and permitting the case to continue in federal district court because that court had diversity jurisdiction). If the plaintiff's claim is preempted, then it must be dismissed. See Allis–Chalmers Corp. v. Lueck, 471 U.S. 202, 220–21 (1985).

Relevant to the present matter, the U.S. Supreme Court has recognized that certain claims may be completely preempted by § 301 of the LMRA, and thus are claims that arise under federal law for purposes of federal courts' exercise of original jurisdiction. See Rawson, 495 U.S. at 368 (explaining that § 301 provides federal courts with jurisdiction over controversies involving CBAs and that "[s]tate law is . . . 'pre-empted' under § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective-bargaining agreements"); Allis–Chalmers, 471 U.S. at 211, 213 (holding that a state-law tort action against an employer may be

13

preempted by § 301 if the employer's alleged duty is created by a CBA and does not exist

independently of the agreement).  Likewise, the LMRA may supersede a plaintiff's

claims under ordinary preemption principles, in which case those claims must be

construed as § 301 claims, or dismissed and pursued through the grievance procedure set

out in the controlling CBA.  See Allis-Chalmers, 471 U.S. at 219–20 (explaining that

claims which are preempted under the doctrine of ordinary preemption must be resolved

through the grievance and arbitration procedure set out in a CBA).

   "[T]he question whether a certain state action is pre-empted by federal law is one

of congressional intent.  The purpose of Congress is the ultimate touchstone."  Allis-

Chalmers, 471 U.S. at 208 (citation and internal quotation marks omitted).  Here,

Congress expressly stated that the purpose of the LMRA is:

> to promote the full flow of commerce, to prescribe the legitimate rights of
> both employees and employers in their relations affecting commerce, to
> provide orderly and peaceful procedures for preventing the interference by
> either with the legitimate rights of the other, to protect the rights of
> individual employees in their relations with labor organizations whose
> activities affect commerce, to define and proscribe practices on the part of
> labor and management which affect commerce and are inimical to the
> general welfare, and to protect the rights of the public in connection with
> labor disputes affecting commerce.

29 U.S.C. § 141(b).  Thus, Congress through § 301 intended to provide federal

jurisdiction over law suits for violations of contracts between employers and labor

organizations "in order to fashion a body of federal common law for the purpose of

resolving labor disputes in a uniform manner across the country," Superior

Waterproofing, Inc., 450 F.3d at 330 (citing Allis-Chalmers, 471 U.S. at 209), and "to

preserve[] the central role of arbitration in our system of industrial self-government,

Allis-Chalmers, 471 U.S. at 219 (citation and internal quotation marks omitted).

Accordingly, the two forms of preemption, complete and ordinary, each align with one of the dual purposes of the LMRA.  Complete preemption necessarily transforms a state-law claim that is based upon a CBA or is inextricably intertwined with a CBA into a federal claim and provides federal courts with jurisdiction.  Thus, complete preemption aligns with § 301's congressional mandate to fashion a body of federal common law for disputes arising out of labor contracts.  In contrast, ordinary preemption prevents either a state or federal court from hearing a claim that should initially have been taken through the arbitration procedure established in the controlling CBA.  Thus, the ordinary preemption doctrine aligns with the second purpose of § 301—i.e., the need to preserve the effectiveness of arbitration.

### B.      Defendant's Motion—Ordinary Preemption

Neither Defendant nor Plaintiffs directly address whether the principles of complete preemption or ordinary preemption apply in this case.  However, Defendant does not dispute that this Court has original jurisdiction because this case fits the contours of class actions identified in 28 U.S.C. § 1332(d)(2).  (See Am. Compl. ¶ 24.)  Therefore, complete preemption is not at issue.  Rather, Defendant's preemption arguments are simply defenses to Plaintiffs' state common law claims.  Thus, the ordinary preemption doctrine guides the Court's analysis of the issues in this case.

In order to determine if a plaintiff's claim is preempted, a court must determine "if the resolution of [the] state-law claim depends upon the meaning of a collective-

bargaining agreement." Lingle, 486 U.S. at 405–06.[5]  The Supreme Court has stated that "a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law," and, therefore, "[a] state rule that purports to define the meaning or scope of a term in a contract suit . . . is pre-empted by federal labor law." Allis-Chalmers, 471 U.S. at 210.  However, the Court explained, "the pre-emptive effect of § 301 must extend beyond suits alleging contract violations," id., to suits alleging liability in tort where the "state-law rights and obligations . . . do not exist independently of private agreements" and "the tort claim is inextricably intertwined with consideration of the terms of the labor contract," id. at 213. In other words, § 301 preemption applies in two situations:

> First, a "state-law claim is preempted if it is 'based on' [a] . . . provision of the CBA[,]" meaning that "[t]he CBA provision at issue" actually sets forth the right upon which the claim is based.  Second, section 301 preemption applies where a state-law claim "is 'dependent upon an analysis' of the relevant CBA," meaning that the plaintiff's state-law claim requires interpretation of a provision of the CBA.

Williams v. Nat'l Football League, 582 F.3d 863, 874 (8th Cir. 2009) (internal citations omitted); see Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements,

---

[5]      Although the Supreme Court and the Eighth Circuit have clarified that ordinary preemption and complete preemption are two different doctrines, the analysis that the Court must apply to determine if a plaintiff's state law claims are preempted by § 301 is seemingly identical.  Compare Lingle, 486 U.S. at 405–10 & n.10 (ordinary preemption analysis), with Caterpillar Inc. v. Williams, 482 U.S. 386, 388, 394 (1987) (complete preemption analysis).  The only distinguishing factor is how the analysis affects the disposition of the case.

and also claims substantially dependent on analysis of a collective-bargaining agreement.") (citation and internal quotation marks omitted).

In interpreting this Supreme Court precedent, the Eighth Circuit has adopted a "narrow[] approach." Meyer, 163 F.3d at 1051; see Graham v. Contract Transp., Inc., 220 F.3d 910, 9914 (8th Cir. 2000) (noting that the Eighth Circuit "applies federal [§ 301] preemption more narrowly"). "[T]he crucial inquiry is whether resolution of a state-law claim depends upon the meaning of a [CBA]." Williams, 582 F.3d at 877. "An otherwise independent claim will not be preempted if the CBA need only be consulted during its adjudication." Id. at 876 (citation and internal quotation marks omitted). Likewise, mere reference to the CBA is not enough for a court to hold that preemption applies. See Meyer, 163 F.3d at 1051. Additionally, a state-law claim is not preempted simply because it involves an event in the workplace that may be subject to grievance procedures under the CBA, or because a CBA creates rights and duties that are similar to those on which the state-law claim is based. See Allis-Chalmers, 471 U.S. at 220; Graham, 220 F.3d at 913; Meyer, 163 F.3d at 1051. In other words, the mere fact that the state law analysis "parallels" the contractual CBA analysis, does not render the state law claim preempted. As the Supreme Court explained in Lingle v. Norge Division of Magic Chef, Inc.:

> We agree with the [court of appeals'] explanation that the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether [the plaintiff] was fired for just cause. But we disagree with the court's conclusion that such parallelism renders the state-law analysis dependent upon the contractual analysis. For while there may be instances in which the National Labor Relations Act pre-empts state law on the basis of the subject matter of the law in question, §

301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements. In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

486 U.S. at 408–10 (footnotes omitted).

Here, Defendant argues that all of Plaintiffs' claims are preempted because they are based on duties that arise under, or depend on an interpretation of, the CBAs. (See Def.'s Mem. of Law in Supp. of Mot. to Dismiss Master Compl. Based on Labor Law Preemption [Doc. No. 39] ("Def.'s Mem."), at 7–9, 15, 18, 31–32.)

### 1. Negligence (Count III)

As discussed above, Plaintiffs assert a claim for negligence in Count III of their Amended Complaint. To succeed, Plaintiffs must establish that Defendant owed them a duty, Defendant breached that duty, they were injured, and Defendant's breach of duty was the proximate cause of the injury. See Louis v. Louis, 636 N.W.2d 314, 318 (Minn. 2001). Plaintiffs' claim is premised on Defendant's alleged duties to exercise reasonable care regarding player safety and head trauma (i.e., to manage NHL player safety—in particular, with regard to head injuries and concussions; to act in the best interests of the health and safety of the players; to provide truthful information to the players regarding risks to their health; and to take all reasonable steps necessary to ensure the players' safety).

Defendant argues that Count III is preempted, first, because these alleged duties arose, if at all, under the CBAs entered into on their behalf by the Players' Union, and,

18

second, because an evaluation of the existence and extent of those duties would require interpretation of the terms of the CBAs.  (See Def.'s Mem. at 8–31.)  In opposition, Plaintiffs point out that the Amended Complaint does not reference any provision of a CBA.  (Pls.' Mem. of Law in Opp. to Def.'s Mot. to Dismiss Master Compl. Based on Labor Law Preemption [Doc. No. 53] ("Pls.' Opp."), at 1, 6 n.5.)  Moreover, they argue, not only are Plaintiffs not alleging any CBA breaches, but none of the CBAs addresses a duty imposed on Defendant to warn players of the long-term neurological damage of head trauma—let alone a duty to warn "retirees," who are indisputably not covered by the CBAs.  (See id. at 5, 20, 24, 41–45.)  Instead, Plaintiffs assert that they allege general duties of care that arose independently of any CBA provision.  (Id. at 13.)  Plaintiffs point to allegations in the Amended Complaint regarding:  "the NHL's relationship to the players, without whom the NHL would be nothing"; the foreseeability of harm to the players resulting from Defendant's conduct; Defendant's special relationship to the players by virtue of its superior resources and knowledge; and Defendant's assumption of a "special duty of care" by conducting the Concussion Study.  (Id. at 13–14.)  According to Plaintiffs, even if these duties are tangentially related to subject matter covered in the CBAs, "[m]ere 'parallelism' between a 'state-law analysis' and a CBA is insufficient for preemption."  (Id. at 9 (quoting Lingle, 486 U.S. at 408).)  The Court will address each prong of the preemption analysis in turn.

### a.    Duties purportedly arising under the CBAs

According to Defendant, Plaintiffs allege three bases for their contention that Defendant voluntarily assumed any duties toward them:  (1) the institution of a helmet

requirement, (2) the undertaking of a study of concussions in the Concussion Program,

and (3) the maintenance of unilateral authority to promulgate and enforce rules of play.

(Def.'s Mem. at 10.)  First, citing to a document titled "Owner-Player Council Minutes of

Meeting—August 6 and 7, 1979," Defendant argues that the helmet requirement was

implemented pursuant to a CBA between the NHL and Player's Union and is thus

"necessarily" based on a CBA.  (Id. at 11 (citing Daly Decl. [Doc. No. 40], Ex. 15).)

Second, Defendant asserts that the Concussion Program, Concussion Program Report,

and Concussion Evaluation and Management Protocol and revisions thereto, were all

"created by agreement with the [Players' Union]" and so are "squarely" based on the

CBAs.  (Id. at 12–14.)  In support, Defendant cites to a September 1997 memorandum

from the NHL Neuropsychological Assessment Advisory Board to the NHL Consulting

Neuropsychologists, an unsigned October 1997 letter to "Player," a January 2010

memorandum to Club Team personnel attaching the Concussion Evaluation and

Management Protocol, memoranda notifying players and Club Team personnel of

changes to the Protocol, and the Concussion Program Report.  (Id. (citing Daly Decl.,

Exs. 9–11, 13–14, 16).)  Third, Defendant argues that playing rules and disciplinary

procedures are part of the players' terms and conditions of employment as set forth in

Articles 18, 22, and 30 of the CBA (which purportedly state that players are bound by the

NHL's playing rules, amendments can only be made with the Union's consent, and a

Competition Committee has the authority to recommend changes to the rules).  (Id. at 14–

15.)  Although Defendant cites to the current CBA, it states that similar provisions may

be found in some predecessor CBAs.  (See id. at 14 n.10, 15 n.11–13.)

Defendant argues that each of these bases of their allegedly voluntarily-assumed duties is "rooted in obligations that arise (if at all) under the [CBAs]." (Id. at 10.) As such, Defendant asserts, Plaintiffs' negligence claims are preempted by § 301. (See id. at 15–18.) In support of its argument, Defendant relies heavily on the Supreme Court's opinions in Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985), and United Steelworkers of America v. Rawson, 495 U.S. 362 (1990). (See id.)

Drawing all reasonable inferences in favor of Plaintiffs, as the Court must on a motion to dismiss, the Court cannot find from the face of the Amended Complaint, or any documents properly embraced by the pleadings, that Plaintiffs' negligence claims are preempted on the grounds that the allegedly breached duties arose out of a CBA. Not only does the Amended Complaint not reference any CBAs, but—notably—in arguing that Plaintiffs' claims are preempted to the extent that they relate to the helmet requirement and Concussion Program, Defendant does not cite to any CBA provisions that purportedly imposed a duty upon which Plaintiffs' claims are based. Instead, Defendant relies on numerous other documents—meeting minutes, letters, memoranda, and reports dated between 1979 and 2013. But, these documents constitute cherry-picked evidence in opposition to the Amended Complaint that "[do] not merely reiterate what is said in the pleadings." Hamm, 187 F.3d at 948. Accordingly, those documents are outside the pleadings, and the Court may not rely on them as a basis for dismissing Plaintiffs' claims at this stage of the proceedings.

While Defendant does point to various CBA provisions in support of its argument that its authority to promulgate and enforce the rules of play is rooted in the CBAs, it is

21

questionable whether those CBAs are embraced by the pleadings or even relevant, given that they are not referenced in or attached to the Amended Complaint and given that Plaintiffs are underlined retired players who are no longer subject to collective bargaining.  In order for the Court to determine whether the retired players are subject to any CBAs,[6] the

---

[6]    Defendant argues preemption applies even though Plaintiffs are retirees and even if their claims are not subject to arbitration pursuant to the CBAs.  (See Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss Master Compl. Based on Labor Law Preemption [Doc. No. 75] ("Def.'s Reply"), at 17–19.)  The Court is inclined to disagree. First, the Players' Union represents only current and future NHL players.  So, Plaintiffs are not currently members of the Union, and each of the seven CBAs that were in effect while various Plaintiffs were active players includes provisions stating that the grievance procedure and arbitration process are only binding upon the "Player(s) and Club(s) involved and the parties to this Agreement."  (See Daly Aff., Ex. 1 (1975–1980 CBA), § 4.01; id., Ex. 2 (1981–1984 CBA), § 4.01; id., Ex. 3 (1984–1988 CBA), § 4.01; id., Ex. 4 (1988–1991 CBA), § 4.01; id., Ex. 5 (1991–1993 CBA), § 4.01; id., Ex. 6 (1995–2004 CBA), §§ 17.1, 17.5, 17.8; id., Ex. 7 (2005–2011 CBA), §§ Preamble, 17.13.)  Therefore, the language of the CBAs "does not require that retirees even initiate the grievance procedure, let alone reach the last step of arbitration."  See Anderson v. Alpha Portland Indus., Inc., 752 F.2d 1293, 1300 (8th Cir. 1985); cf. Eller v. Nat'l Football League Players Ass'n, 731 F.3d 752, 755, 759 (8th Cir. 2013) (explaining that although current NFL players could bargain for retirees' benefits, retired NFL players were not members of the collective bargaining unit).

Second, Defendant's reliance on Caterpillar, Inc. is misplaced.  (See Def.'s Reply at 18.)  In Caterpillar Inc., the Supreme Court analyzed whether the plaintiffs' state-law claims for breach of individual employment contracts were completely preempted by § 301 and, therefore, were removable to federal court.  See 482 U.S. at 388.  The Court emphasized that its complete-preemption analysis did not depend on whether the plaintiff could obtain a underlined remedy under federal law because the question of whether relief is available is separate from the question of whether jurisdiction attaches.  See id. at 391 n.4.  But, there was no question that the plaintiff would have a underlined forum in which to adjudicate his claim.  See also Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp., 977 F.2d 895, 900 (4th Cir. 1992) ("Because an adequate forum exists for resolution of the [plaintiff's] claims, we discern no injustice in the finding that section 301 of the LMRA serves both to bar a federal cause of action for tortious interference with a [CBA] against a non-signatory of that agreement, and to preempt a similar cause of action premised on state law.").  Here, however, Plaintiffs, as retirees, would likely be unable to access the arbitration forum and would not have another forum in which to seek

parties would have to demonstrate when the causes of action accrued for each player in this class action, a matter which this Court has previously stated cannot be decided on the pleadings and must be the subject of further discovery. And, even if some or all of Plaintiffs were subject to a CBA at the time their cause of action accrued, Defendant acknowledges that different versions of the CBAs may not contain the language upon which it relies. In other words, even if the Court considers the evidence that Defendant insists is embraced by the pleadings, there are major fact questions that cannot be resolved until a fuller record is developed.

Allis-Chalmers and Rawson do not mandate a different result. In Allis-Chalmers, the plaintiff was a member of a union that had a CBA with the defendant employer. 471 U.S. at 203–04. The CBA incorporated contract grievance procedures and a disability plan that provided benefits for union member employees. Id. at 204. According to the plaintiff, after he was injured and his disability claim was approved, his employer interfered with his receipt of benefits. Id. at 205. Instead of seeking to resolve the issue through the CBA's grievance procedures, the employee filed a lawsuit against the

---

relief. (See Pls.' Opp. at 50–51.) Moreover, contrary to Defendant's contentions, it is possible that some or all of Plaintiffs' claims accrued when they were no longer subject to a CBA. Given that the intent of Congress "is the 'ultimate touchstone' guiding preemption analysis," and that one of the primary purposes of the ordinary preemption doctrine is to preserve arbitration as a central forum for resolving labor disputes, Allis-Chalmers, 471 U.S. at 208, 219, preemption of a retiree's claim that did not arise while the retiree was subject to a CBA would be improper.

Finally, preemption of the claims of retired NHL players would not further the Congressional goals of the LMRA, which include promotion of the efficient flow of commerce and the peaceful resolution of labor disputes between employers and their employees, see 29 U.S.C. § 141(b), because Plaintiffs can neither strike nor threaten to strike. (See Pls.' Opp. at 48–50.)

employer in state court for bad-faith handling of his claim under the disability plan included in the CBA. Id. at 206. The trial court granted summary judgment in favor of the employer, holding that the claim was preempted by federal labor law. Id. The court of appeals affirmed, but the Wisconsin Supreme Court reversed on the grounds that the alleged breach of duty was independent of any contractual obligations. Id. at 206–07.

The U.S. Supreme Court disagreed, finding that whether the CBA's express recitation of the duty to pay benefits created an implied right to make those payments in a timely manner was a question of federal contract interpretation because "the extent of either duty ultimately depend[ed] upon the terms of the agreement between the parties." Id. at 216. The Court also determined that the tort of bad-faith handling of a claim under a disability plan "intrinsically relates to the nature and existence of the contract": "[T]he tort exists for breach of a 'duty devolve[ed] upon the insurer by reasonable implication from the express terms of the contract,' the scope of which, crucially, is 'ascertained from a consideration of the contract itself.'" Id. (quoting Hilker v. W. Auto. Ins. Co., 235 N.W. 413, 414–15 (Wis. 1931)). In other words, "[t]he duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the contract," id. at 217, and will, therefore, involve contract interpretation, id. at 218. Accordingly, the Court held that the state-law cause of action was preempted by § 301 of the LMRA. Id. at 220–21.

In Rawson, the survivors of four deceased miners filed a lawsuit against the miners' union, alleging that the miners' deaths were caused by the union's negligent enforcement of the CBA's accident prevention clause. 495 U.S. at 364–65. More

specifically, the plaintiffs alleged that, under the CBA, the union had caused a labor safety committee to be established and that the committee was inadequately trained and negligently performed inspections that it had promised to conduct.  Id. at 365.  After the trial court granted summary judgment in favor of the union, the Idaho Supreme Court reversed, with three of the five justices stating that a decision on preemption could not be made until there was "'full factual development'" because the precise nature of the plaintiffs' claims was unclear.  Id. (quoting Dunbar v. United Steelworkers of Am., 602 P.2d 21, 25 (Idaho 1979)).  On remand, and "[a]fter extensive discovery," the trial court again granted summary judgment in favor of the union, finding that the negligence claim was preempted because it was based on the plaintiffs' complaints about the manner in which the union carried out the CBA.  Id. at 366.  The Idaho Supreme Court disagreed, holding that the standard of care regarding the activity undertaken by the union was imposed by state law without reference to the CBA.  Id. at 367.

On review, the U.S. Supreme Court found that "the only possible interpretation" of the plaintiffs' allegations was that the duty that formed the basis of the tort action was one allegedly assumed by the union in the CBA, and, therefore, the tort claim was not "independent" of the CBA.  Id. at 370–71.  According to the Court:

> If the Union failed to perform a duty in connection with inspection, it was a duty arising out of the [CBA] signed by the Union as the bargaining agent for the miners. . . . Pre-emption by federal law cannot be avoided by characterizing the Union's negligent performance of what it does on behalf of the members of the bargaining unit pursuant to the terms of the [CBA] as a state-law tort.

Id. at 371–72.  Thus, the Court held that the state law claim was preempted.  Id. at 372.

These cases are readily distinguishable from the present matter. First, both <u>Allis-Chalmers</u> and <u>Rawson</u> were decided on summary judgment at the trial-court level. Notably, <u>Rawson</u> was decided on a second motion for summary judgment after the state supreme court remanded the matter for "full factual development." Accordingly, the courts' decisions were based on consideration of a full record. Here, however, Defendant seeks dismissal of Plaintiffs' negligence claims based solely on the Amended Complaint and a handful of cherry-picked documents that are not embraced by the pleadings. This record is insufficient to form the basis of the Court's opinion on this matter.

Second, at the time the claims of the plaintiffs in <u>Allis-Chalmers</u> and <u>Rawson</u> arose, the injured parties were current employees and union members subject to the one CBA that the defendants asserted served to preempt the plaintiffs' claims. In contrast, Plaintiffs in this case are retired and are no longer subject to any CBA. Moreover, Defendant was not a party to any CBA until 1995. (<u>See</u> Daly Aff., Ex. 1 (1975–1980 CBA), Introduction; <u>id.</u>, Ex. 2 (1981–1984 CBA), Introduction; <u>id.</u>, Ex. 3 (1984–1988 CBA), Introduction; <u>id.</u>, Ex. 4 (1988–1991 CBA), Introduction; <u>id.</u>, Ex. 5 (1991–1993 CBA), Preamble; <u>id.</u>, Ex. 6 (1995–2004 CBA), Preamble; <u>id.</u>, Ex. 7 (2005–2011 CBA), Preamble; <u>id.</u>, Ex. 8 (2012–2022 CBA), Preamble.) Because, as discussed above, it is not clear from the current record when Plaintiffs' claims accrued, it cannot be determined at this stage which—if any—CBAs might be relevant to those claims.

Third, the plaintiffs in <u>Allis-Chalmers</u> and <u>Rawson</u> specifically alleged that their claims were based on the defendants' negligent performance of a provision in the relevant CBA: in <u>Allis-Chalmers</u>, the payment of disability benefits required by the

disability plan incorporated in the CBA; and, in <u>Rawson</u>, the negligent performance of

mine inspections by the labor safety committee established pursuant to the CBA.  Here,

however, Plaintiffs have not specifically referenced any provisions of—or requirements

imposed by—any CBA in their Amended Complaint.  Neither, for the most part, has

Defendant pointed to any such provisions or requirements, instead relying on various

letters and memoranda.[7]

Finally, the tort of bad-faith handling of a disability benefits claim alleged in <u>Allis-</u>

<u>Chalmers</u> could <u>only</u> be asserted if there was a contractual basis to support it—i.e., the

requirement that such benefits be paid.  In contrast, a general negligence claim, as alleged

in this case, is not dependent upon the existence of any contractual provision or

requirement.  For these reasons, Defendant has not convinced the Court at this stage of

the proceedings that Plaintiffs' negligence claims are preempted on the grounds that any

allegedly-assumed duties arose under a CBA.

### b.    Duties purportedly requiring interpretation of a CBA

Defendant next argues that Plaintiffs' negligence claims are preempted because

they are inextricably intertwined with the CBAs' provisions governing health and safety,

rules and discipline, and management rights, and because they would require

---

[7]    <u>International Brotherhood of Electrical Workers v. Hechler,</u> 481 U.S. 851 (1987),
which Defendant also references in passing on this point, is equally distinguishable.  (<u>See</u>
Def.'s Mem. at 18.)  In that case, the plaintiff had alleged that the union, pursuant to
contracts entered into between the union and the plaintiff's employer, owed her a duty of
care to ensure a safe working environment, but had breached that duty by allowing her to
be assigned to work in a dangerous location.  <u>Hechler</u>, 481 U.S. at 861.  As in the cases
discussed above, the Supreme Court concluded in <u>Hechler</u> that the allegations of
negligence were based on the union having assumed a duty through the CBA, and that the
CBA would have to be examined to determine the extent of that duty.  <u>Id.</u> at 861–62.

interpretation of the collectively-bargained Concussion Program.  (See Def.'s Mem. at 21–31.)  As for health and safety provisions, Defendant points to the CBAs' purported allocation of responsibilities among the players and Club Teams for reporting and treating injuries and making fitness-to-play determinations, as well as provisions addressing the players' right to receive their medical records.  (Id. at 21–22.)  Defendant contends that the extent of any alleged duty that it had to protect players' safety would have to be evaluated in light of the express delegation of responsibility in the CBAs to the Club Teams.  (Id. at 22–23.)

Regarding rules and discipline, Defendant argues that Plaintiffs' claims rely heavily on the proposition that fighting should be eliminated from the NHL, but that resolution of those claims would require analysis of the playing rules and disciplinary procedures that are incorporated into the CBAs.  (Id. at 26–27.)  For example, according to Defendant, the success of Plaintiffs' claims would depend on an analysis of the CBAs' limitations on Defendant's authority to change rules and impose discipline.  (See id. at 27–29.)  Similarly, Defendant asserts that resolution of Plaintiffs' claims that Defendant should have, for example, taken action to reduce the occurrence of concussions and implement better treatment protocol, is dependent upon an interpretation of the management rights clause in the CBAs to determine whether the Union waived its rights to bargain over these subjects.  (See id. at 29–30.)

Finally, Defendant argues that the Amended Complaint's repeated references to Defendant's conduct related to the Concussion Program demonstrate that Plaintiffs' negligence claims are substantially dependent upon an analysis of the Program.  (Id. at

23.)  More specifically, Defendant asserts that the Court would have to determine

whether the Concussion Program imposed any unilateral obligations on Defendant (such

as to make the game of hockey safer for the players and to inform the players of safety

information) and whether Defendant's actions were reasonable in light of the Program.

(See id. at 23–26.)

In opposition, Plaintiffs contend that § 301 preemption is applied much more

narrowly than Defendant suggests, and that mere subject matter congruence between a

CBA's provisions and a state law cause of action is insufficient to compel preemption.

(Pls.' Opp. at 7–8.)  Along those lines, Plaintiffs assert that the health and safety

provisions in the CBAs are only tangentially connected to Plaintiffs' claims against

Defendant because whether, for example, a Club Team was required to provide its

players with a doctor does not erase Defendant's duty to inform players of the danger

they were in.  (Id. at 15–16.)  Relatedly, Plaintiffs argue that those health and safety

provisions are duties of the Club Teams—not the NHL itself—and that reliance on those

provisions merely raises a defense to liability and is not a basis for preemption.  (Id. at

15–16.)

As for player rules and discipline, Plaintiffs note that preemption is not triggered

simply because facts that are relevant to a CBA grievance are also relevant to an

independent state law claim.  (Id. at 24.)  Instead, resolution of the state law claim must

require interpretation of the CBA and, here, none of the provisions regarding player rules

and discipline need to be interpreted.  (Id.)  Rather, Plaintiffs contend that the simple fact

of the helmet requirement demonstrates that Defendant was aware of the dangers it

concealed from them, and that the Competition Committee's ability to make

"recommendations" regarding rule changes does not eviscerate Defendant's duties where

there is no simultaneous obligation imposed on Defendant to accept those

recommendations.  (Id. at 25–26.)  Similarly, Plaintiffs assert that their allegations

concerning the Concussion Program merely serve to provide an example of Defendant's

long-standing, self-proclaimed, voluntarily-assumed duty of care toward Plaintiffs.  (See

id. at 21–22.)  Finally, Plaintiffs argue that the management rights clause is not relevant

because they are not claiming that Defendant breached that clause and because whether

the Union waived any rights to bargain over certain subjects is not at issue.  (Id. at 19–

20.)

In addition to these arguments, Plaintiffs point to numerous documents that they

claim show Defendant's long-standing recognition of a "non-CBA-based independent

duty of care to players."  (Pl.'s Resp. to Def.'s Notice of Supplemental Authority in Supp.

of Mot. to Dismiss Master Compl. Based on Labor Law Preemption [Doc. No. 354]

("Pl.'s Boogaard Resp."), at 3.)  For example, Plaintiffs cite to a September 2013

presentation made by the NHL Department of Player Safety at a Board of Governors

Meeting, which states that "[t]he NHL has always assumed the responsibility of making

the game safer through rule changes, medical treatment policies, equipment analysis,

enhancements to the playing environment, and supplemental discipline."  (Zimmerman

Decl. [Doc. No. 353], Ex. A, at 3.)  They also cite to a September 2013 NHL document

showing a Concussion Program timeline that describes Defendant's formation of the

Concussion Committee and the NHL-imposed "mandate" that the Clubs install more

flexible arena shielding glass and boards, (id., Ex. D, at 1, 3), as well as an October 1997

letter from the NHL to the Players' Union in which the NHL states:

> The NHL does not believe it was or is required to negotiate this topic with
> the [Players' Union].  In our view, requiring players to wear safe helmets
> does not constitute a change which affects the 'terms or conditions or
> employment' pursuant to Article 30 of the CBA, and that if requiring safe
> helmets were found to constitute a change in the 'terms or conditions of
> employment,' we feel the [Players' Union's] refusal to consent to such a
> policy would clearly be removable pursuant to Article 30.
>
> . . . .
>
> Without any involvement whatsoever of the [Players' Union], . . .
> comprehensive guidelines [regarding baseline neurological testing and
> review of hits resulting in concussions] were developed and adopted. . . .

(Id., Ex. B, at 1, 3.)  Similarly, in an email to NHL personnel, NHL Deputy

Commissioner Bill Daly stated in regard to concussion video analysis: ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ (Id., Ex. C, at 1.)  Mr. Daly also commented in a news article and in

an email to the Players' Union that the NHL Board of Governors can enact rule changes

without the Players' Union's approval.  (See id., Ex. E, at 1 ("'Our board can enact rule

changes at any time with or without competition committee (players' association)

approval[.]'"); id., Ex. F, at 1 ("[A]s we have previously and repeatedly stated both

publicly and privately, nothing in the CBA precludes the NHL Board of Governors from

enacting rule changes with or without the approval of the Competition

Committee . . . .").)  According to Plaintiffs, these documents show that "a duty of care

exists outside the CBA."  (Pl.'s Boogaard Resp. at 4.)

Again, drawing all reasonable inferences in favor of Plaintiffs, as the Court must at this stage of the proceedings, the Court cannot find from the face of the Amended Complaint, or any documents properly embraced by the pleadings, that Plaintiffs' negligence claims are preempted on the grounds that they are inextricably intertwined with the CBAs.  As the Supreme Court and Eighth Circuit have held, § 301 preemption only applies if resolution of the claim "must require the interpretation of some specific provision of a CBA."  Meyer, 163 F.3d at 1051 (emphases added); see Lingle, 486 U.S. at 408–10.  But, the mere fact that a CBA creates rights or duties similar to those on which a state-law claim is based, or that the parties involved in the dispute are subject to a CBA, or that the event giving rise to the dispute may be subject to a CBA's grievance procedures, is not sufficient to trigger preemption.  See Lingle, 486 U.S. at 408–10; Meyer, 163 F.3d at 1051; Graham, 220 F.3d at 913.

Here, as discussed above, the Amended Complaint does not reference any CBAs, and to the extent that Defendant has identified particular provisions that purportedly must be interpreted in order to resolve Plaintiffs' claims, it is questionable whether those CBAs are embraced by the pleadings or are even relevant given that Plaintiffs are retired players who are no longer subject to collective bargaining.  Again, in order for the Court to determine whether the retired players are subject to any CBAs, the parties would have to demonstrate when the causes of action accrued for each player, a matter which this Court has previously stated cannot be decided on the pleadings and must be the subject of further discovery.  And, even if some or all of Plaintiffs were subject to a CBA at the time their cause of action accrued, Defendant acknowledges that different versions of the

CBAs contain different language.  In other words, even if the Court considers the evidence that Defendant insists is embraced by the pleadings, there are major fact questions that cannot be resolved until a fuller record is developed.

Moreover, Plaintiffs have identified several documents—a presentation, a letter, emails, and a news article that seem to demonstrate even Defendant's belief that it was not bound by the CBA when dealing with certain matters of player safety.  Again, however, these documents constitute cherry-picked evidence that are outside of the pleadings and do not necessarily reflect the full record.  Accordingly, the Court finds that it is premature to decide the preemption issue on a motion to dismiss.

The cases relied upon most heavily by Defendant—Williams v. National Football League, 582 F.3d 863 (8th Cir. 2009); Stringer v. National Football League, 474 F. Supp. 2d 894 (S.D. Ohio 2007); Boogaard v. National Hockey League, 126 F. Supp. 3d 1010 (N.D. Ill. 2015); and Duerson v. National Football League, Inc., No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012)—are not to the contrary.  (See Def.'s Mem. at 18–21; Def.'s Reply to Pls.' Resp. to Notice of Supplemental Authority in Supp. of Mot. to Dismiss Master Compl. Based on Labor Law Preemption [Doc. No. 369] ("Def.'s Boogaard Reply"), at 1–4.)[8]  For example, in Williams, which is the only Eighth Circuit

---

[8]     Defendant also points to two out-of-Circuit cases for the proposition that its alleged failure to implement policies to protect Plaintiffs' health could be considered unreasonable only if the management rights clause in the CBA allowed Defendant to implement such policies and procedures unilaterally and, accordingly, resolution of Plaintiffs' claim would require interpretation of that clause.  (See Def.'s Mem. at 30–31.) But, in Bogan v. General Motors Corp., 500 F.3d 828, 833 (8th Cir. 2007), the Eighth Circuit rejected a similar argument.  In that case, the district court found that the plaintiff's intentional infliction of emotional distress claim was preempted by § 301

case cited by Defendant on this issue, several NFL players were suspended after testing

positive for a substance banned by their CBA's expressly-incorporated Policy on

Anabolic Steroids and Related Substances.  582 F.3d at 868–70.  That Policy adopted a

rule of strict liability for use of a prohibited substance and addressed the consequences

stemming therefrom, warning players that any use of dietary supplements was at their

own risk.  Id. at 868–69.  The CBA also noted that both the players and NFL were bound

by the CBA.  Id. at 868.  After appealing their suspensions through the CBA's grievance

procedure, the players filed a lawsuit against the NFL, asserting Minnesota statutory and

common law claims based on the NFL's failure to inform them that a certain dietary

supplement contained the banned substance.  See id. at 870–72.  The NFL argued on

summary judgment that the players' claims were preempted, and the district court granted

that motion in part, finding that the common law claims were preempted by § 301.  Id. at

872–73.  The Eighth Circuit agreed on appeal.  Id. at 881.  As for the negligence claims

in particular, the court held that whether the NFL owed the plaintiffs a duty to provide a

warning could not be determined without examining the parties' relationship and

expectations as established by the CBA and Policy.  Id.  However, unlike the present

---

because its resolution would require the interpretation of a provision of the CBA giving
her employer the right to hire, promote, discharge, or discipline for cause.  Id. at 832.
The court of appeals disagreed, concluding that those topics were not relevant to whether
the plaintiff had been recklessly and falsely accused of selling drugs or whether she
suffered severe emotional distress, and so her state-law claim was not inextricably
intertwined with the terms of the CBA.  Id. at 832–33.  Similarly, here, whether
Defendant had the unilateral right "'to determine the manner and the rules by which its
team shall play hockey,'" (Def.'s Mem. at 30 n.16 (citing 2012 CBA, Art. 5)), need not
be interpreted to resolve whether Defendant was negligent in failing to provide
information in its possession regarding head trauma to Plaintiffs.

matter, <u>Williams</u> was decided after the parties had engaged in discovery and developed a

factual record; the players were members of the bargaining unit—and parties to the

relevant CBA—at the time their claims arose; the players <u>and</u> the NFL were indisputably

bound by that CBA; and the CBA contained specific provisions dealing with the issues

raised by the players.

The other cases are no more on point.  In <u>Stringer</u>, the plaintiff brought a lawsuit

against the NFL on behalf of her deceased husband, who died from complications of

heatstroke suffered during practice, and a class of similarly-situated persons.  474 F.

Supp. 2d at 898.  In Count I, she alleged that the NFL breached its duty to players to use

ordinary care in overseeing the NFL teams to minimize the risk of heat-related illness and

to provide competent information to NFL team personnel regarding heat-related illness.

<u>See</u> <u>id.</u> at 898–99.  According to the plaintiff, this duty arose from the NFL's decision to

voluntarily publish "Hot Weather Guidelines" in its Game Operations Manual.  <u>Id.</u> at

905.  In Count IV, the plaintiff alleged that the NFL breached its duty to ensure that the

players had safe equipment.  <u>Id.</u> at 899.

The NFL moved for summary judgment, arguing that the claims were preempted

by the CBA entered into between the players' union and the NFL's teams.  <u>Id.</u> at 900–01.

The U.S. District Court for the Southern District of Ohio determined that the plaintiff's

negligence claim in Count I did not "arise from" the CBA because neither the Hot

Weather Guidelines nor Game Operations Manual was incorporated into the CBA, the

NFL was not a party to the CBA, and the NFL was not contractually obligated to take any

action to protect players from illness.  <u>See</u> <u>id.</u> at 905–07.  However, the court did find that

resolution of the claim was inextricably intertwined with an analysis of the CBA.  Id. at

911.  In that regard, the court determined that the plaintiff's claim was "predicated on the

theory that because the NFL failed to use reasonable care in publishing the guidelines, the

[team]'s athletic trainers, team physicians, and other staff members were not adequately

prepared to diagnose [the decedent's] symptoms, or to treat him when he fell ill."  Id. at

909–10 (emphasis added).  Thus, the degree of care owed by the NFL was dependent

upon, and had to be considered in light of, the contractual duties imposed by the CBA on

the teams concerning player health and safety.  Id.  For example, the court explained, a

CBA provision requiring that team athletic trainers be certified by the National Athletic

Trainers Association could diminish or increase the degree of care owed by the NFL

depending on whether the certification process independently prepared the trainers to

handle heat-related illnesses.  Id. at 910.  As for Count IV, the court determined that the

claim neither arose out of the CBA (for the same reasons stated in regard to Count I) nor

required interpretation of the CBA, which was mostly silent on the issue of equipment

safety.  Id. at 912.

In Boogaard, the plaintiff brought a lawsuit against the NHL on behalf of Derek

Boogaard, an NHL player who died of an accidental drug overdose after being

temporarily released from a rehab facility without a chaperone.  126 F. Supp. 3d at 1014–

15.  Mr. Boogaard had been placed in the rehab facility pursuant to the Substance Abuse

and Behavioral Health Program ("SABHP") that was negotiated between the NHL and

the players' union.  Id. at 1015.  In addition to the SABHP, the NHL and players' union

had negotiated a CBA that governed the relationship between the NHL, the NHL players,

36

and the teams.  Id.  The plaintiff alleged, among other things, that the NHL negligently failed to prevent the decedent from becoming addicted to painkillers and breached its voluntarily-assumed duties to protect his health (including protecting him from brain trauma during his NHL career, which allegedly caused him to develop CTE and impacted his judgment and behavior).  Id. at 1015–16.  After the case was removed to federal court, the NHL sought dismissal on grounds of § 301 preemption.  Id. at 1014, 1016.

The U.S. District Court for the Northern District of Illinois converted the motion to summary judgment and permitted the parties to engage in discovery for over a year before fully briefing the motion.  Id. at 1014.  Thereafter, the court determined that the plaintiff's claims were preempted because resolution of those claims would require the court to interpret the CBA to determine the scope of any duty owed by the NHL.  Id. at 1018.  More specifically, the court concluded that whether the NHL owed Mr. Boogaard a duty to keep him safe by preventing his painkiller addiction depended upon whether the NHL and Mr. Boogaard had a special custodian-protectee relationship, which would be determined largely by the NHL's ability to control Mr. Boogaard's behavior.  Id. at 1022–23.  According to the court, an interpretation of the CBA's Prescription Medication Program would be necessary to make this determination because it could be read to divest the NHL of authority to control the players' medical treatment.  Id. at 1023.  In addition, the court found that whether the NHL voluntarily undertook a general duty to keep players safe from brain trauma by taking the actions referenced in the complaint (e.g., penalizing high-sticking and instituting a helmet requirement) would depend upon a comparison to the "hyper-specific commitments" made by the NHL in the CBA.  Id. at

37

1019.  Likewise, the court determined that whether the NHL was negligent for failing to impose a bench concussion assessment protocol or changing the rules to discourage fighting, as was alleged, would require an interpretation of the articles in the CBA that addressed the procedures for diagnosing injuries and amending rules of play.  Id. at 1019–20.

Unlike the present matter, both Stringer and Boogaard were decided on summary judgment, there apparently was no dispute as to when the players' claims arose, and the players were members of a bargaining unit that was a party to a specific CBA at the time the claims arose.  Even more notably, the duties alleged to have been breached by the defendants in those cases were significantly different than the duties alleged to have been breached by the NHL in this case.  For example, the plaintiff in Stringer alleged that the NFL failed to use reasonable care in providing information to its member teams' personnel who were, therefore, inadequately prepared to treat the decedent.  By definition, then, the extent of any duty the NFL owed to the players, or breach of that duty, would have been tempered by any contractual duties concerning player health and safety that were imposed by the CBA on the teams' personnel.  Because the relevant CBA in that case clearly imposed contractual duties regarding player health and safety on the team personnel, those provisions had to be interpreted in order to resolve the plaintiff's claim.[9]  And, in Boogaard, the alleged duties had relevant and direct

---

[9]      Dent v. National Football League, No. C 14-02324 WHA, 2014 WL 7205048 (N.D. Cal. Dec. 17, 2014), raised by Defendant in its reply brief, (see Def.'s Reply at 1, 12–13), is directly analogous to Stringer.  In Dent, retired NFL players brought a lawsuit against the NFL based on allegations that club doctors and trainers supplied them with

counterparts in the CBA—i.e., the duty to prevent painkiller addiction versus the CBA's

Prescription Medication Program, and the duty to keep players safe by imposing a bench

concussion assessment protocol or changing the rules to discourage fighting versus

specific CBA articles addressing the procedures for diagnosing injuries and amending

rules of play.  Here, however, the duties alleged to have been breached include <u>the NHL's</u>

---

pain medications without prescriptions and without explaining the side effects of the
medications, which ultimately caused plaintiffs to suffer from health issues.  2014 WL
7205048, at *1.  As the court explained, "[t]he essence of plaintiffs' claim for relief is
that the individual clubs mistreated their players and the league was negligent in failing to
intervene and stop their alleged mistreatment."  <u>Id.</u> at *3; <u>see also</u> <u>id.</u> at *8 ("The nub of
plaintiffs' claims is that the NFL is responsible for, and acts through, the clubs' medical
staffs.").  The NFL moved to dismiss the claims on grounds of preemption.  <u>Id.</u> at *1.  In
granting the motion as to the plaintiffs' negligence-based claims, the court concluded
that, to determine the scope of any duty owed by the NFL, it would be necessary to take
into account the imposition by the NFL through the CBAs of medical duties on the clubs.
<u>See id.</u> at *4–8.  Likewise, the court concluded that it would be necessary to consult those
provisions of the CBAs to resolve the plaintiffs' fraud-based claims—i.e., to determine
the scope of any duty owed by the NFL to disclose medical information to the plaintiffs
in light of the clubs' duties, and to determine whether the players' reliance on the lack of
a warning was reasonable.  <u>Id.</u> at *12.

    In other words, as in <u>Stringer</u>, the plaintiffs in <u>Dent</u> alleged that the NFL failed to
use reasonable care in monitoring <u>its member teams' personnel</u> who, as a result, caused
injury to the plaintiffs.  By definition, then, the extent of any duty the NFL owed to the
players, or breach of that duty, would have been tempered by any contractual duties
concerning player health and safety that were imposed by the CBA <u>on the teams'
personnel</u>.  Because the relevant CBAs clearly imposed contractual duties regarding
player health and safety on the team personnel, those provisions had to be interpreted in
order to resolve the plaintiffs' claims.  Here, however, the duties alleged to have been
breached include <u>the NHL's</u> duty of reasonable care to act in the best interests of the health
and safety of NHL players by providing truthful information to the players regarding the
neurological risks of head injuries suffered while playing hockey in the NHL.  In other
words, contrary to <u>Dent</u>, this case involves an alleged duty that runs straight from Defendant
to the players (without involvement of Club Team personnel), and for which Defendant has
articulated no directly relevant CBA counterpart that is necessarily consistent among all
potentially-applicable CBAs or that necessarily applies to any specific Plaintiff.

duty of reasonable care to act in the best interests of the health and safety of NHL players by

providing truthful information to the players regarding the neurological risks of head

injuries suffered while playing hockey in the NHL.  In other words, this case involves an

alleged duty that runs straight from Defendant to the players (without involvement of Club

Team personnel).  And, Defendant has articulated no directly relevant CBA counterparts to

the alleged duties that are necessarily consistent among all potentially-applicable CBAs or

that necessarily apply to any specific Plaintiff.

Finally, in Duerson, the plaintiff brought a wrongful death action on behalf of David

Duerson, a former NFL player who committed suicide allegedly as a result of CTE caused

by injuries he sustained during his football career.  2012 WL 1658353, at *1.  The plaintiff

asserted a negligence claim against the NFL based on the NFL's alleged failure to educate

players about the risks of concussions, failure to ensure rapid diagnosis and treatment of Mr.

Duerson's condition, and failure to implement policies to prevent Mr. Duerson from

returning to play while injured.  Id.  The NFL removed the case to federal court, and then,

asserting § 301 preemption, opposed the plaintiff's motion to remand.  Id. at *1–2.

According to the NFL, resolution of the plaintiff's claims was substantially dependent upon

the interpretation of two CBAs that were in effect during Mr. Duerson's NFL career.  Id. at

*2.  The NFL was not a party to either agreement.  Id.

The U.S. District Court for the Northern District of Illinois agreed, finding that the

following CBA provision would require interpretation in order to resolve the plaintiff's

negligence claim:

> "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity."

Id. at *4 (quoting 1993 CBA art. XLIV, § 1.) The court reasoned that it would be necessary to determine whether Mr. Duerson's concussive brain trauma was "significantly aggravated" by continuing to play, and if it was, then the club would have had a duty to warn Mr. Duerson. Id. In that case, the court stated, the NFL's failure to protect Mr. Duerson could be deemed reasonable. Id. The court similarly found that CBA provisions requiring clubs to have board-certified surgeons as club physicians, to ensure that their athletic trainers were certified, to pay the cost of medical care, and to perform pre- and post-season physicals, could be interpreted to impose a duty on the clubs to monitor the players' health. Id. According to the court, the NFL could reasonably rely on the clubs to diagnose health problems and itself exercise a lower standard of care in that area. Id.

Not only is Duerson distinguishable from the present matter, but this Court also respectfully disagrees with its reasoning. Unlike the claims in the present case, the claims in Duerson were brought on behalf of one professional sports player, there apparently was no dispute as to when the claims arose, and it was known which CBAs were relevant. Even if these distinguishing factors were not present, however, this Court is not persuaded by the reasoning set forth in Duerson. In particular, this Court disagrees with the conclusion (reached without any citation to the CBA or case law) that the extent of any duty the NFL owed to the players would be tempered by the CBA's imposition of

41

duties on the teams.  Not only did the CBA provisions deemed necessary to elucidate the

NFL's duties all pertain solely to the NFL <u>clubs</u>, but the claims as summarized by the

court did not contain any link to the clubs' actions (as in <u>Stringer</u>) and the NFL was not a

party to the CBAs.  This Court would have found, as it does in this case, that it was

premature to find the plaintiff's claims preempted where it appeared from the pleadings

that the allegedly breached duties included duties that ran directly from the NFL to the

NFL players without involvement of NFL team personnel.

For these reasons, on the face of the pleadings alone, at this stage of the

proceedings, and without a record to establish when these causes of action accrued and

the terms of the applicable CBAs, it is premature to determine whether Plaintiffs'

negligence claims are preempted on the grounds that resolution of those claims would be

substantially dependent upon the interpretation of the terms of any CBA.  Accordingly,

the Court denies Defendant's Motion to Dismiss as it pertains to Count III of the

Amended Complaint.

**2.     Negligent Misrepresentation (Count IV) and
the Fraud-Based Claims (Counts V and VI)**

Defendant next argues that Plaintiffs' claims for negligent misrepresentation,

fraudulent concealment, and fraud by omission/failure to warn are preempted under both

prongs of the preemption analysis.  (Def.'s Mem. at 31–35.)  First, Defendant asserts that

the negligent misrepresentation and fraud-related claims are premised on Defendant's

purported voluntarily-assumed duty to disclose information and are "inseparable from

[Plaintiffs' negligence] allegations concerning the voluntarily assumed duty of care."  (<u>Id.</u>

42

at 32.)  Therefore, Defendant contends, those claims are preempted as "arising under"

agreements collectively bargained with the Players' Union to the same extent that

Plaintiffs' negligence claims are preempted under that prong of the analysis.  (Id.)  The

Court has addressed those arguments above and, for the same reasons stated therein,

rejects those arguments as insufficient to warrant dismissal of Plaintiffs' negligent

misrepresentation and fraud-related claims as alleging duties "arising under" the CBAs at

this stage of the proceedings.

Second, Defendant argues that the negligent misrepresentation and fraud-related

claims are substantially dependent on interpretation of the CBAs' health and safety

provisions.  (Id. at 33–35.)  In particular, Defendant asserts that the CBAs' and

Concussion Program's allocation of responsibilities to the Club Teams to treat players,

make fitness-to-play decisions, and provide medical records must be examined to

determine both the scope of Defendant's alleged duty to disclose information and

whether Plaintiffs' reliance on any alleged omissions or misrepresentations was

justifiable.  (Id. at 33–35.)  Defendant again relies on Williams, as well as Trustees of the

Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d

324 (8th Cir. 2006), in support of its argument.  Williams and Superior Waterproofing,

Inc. note that, under Minnesota law, claims for negligent and fraudulent

misrepresentation "require proof that the plaintiff justifiably relied on the defendant's

misleading statements," and that "[w]hether a plaintiff's reliance was justifiable is

determined in light of the specific information and experience it had."  Superior

Waterproofing, Inc., 450 F.3d at 331; accord Williams, 582 F.3d at 881–82.  However, those cases are inapposite.

As discussed above, Williams involved claims brought by several NFL players who were suspended after testing positive for a substance banned by their CBA's expressly-incorporated Policy on Anabolic Steroids and Related Substances.  582 F.3d at 868–70.  The players asserted several Minnesota statutory and common law claims—including fraud, constructive fraud, and negligent misrepresentation—based on the NFL's failure to inform them that a certain dietary supplement contained the banned substance.  See id. at 880–82.  The district court concluded on summary judgment that these claims were preempted, id. at 873, and the Eighth Circuit affirmed, id. at 882. More specifically, the court of appeals concluded that whether the plaintiffs could demonstrate that their reliance on the lack of a warning was reasonable could not be resolved without interpreting the CBA's and Policy's provisions regarding "supplements" to determine what information they did have.  See id. at 881–82.  Unlike the present matter, however, Williams was decided on summary judgment, the players were members of the bargaining unit—and parties to the relevant CBA—at the time their claims arose, the players and the NFL were indisputably bound by that CBA, and the CBA contained specific provisions dealing with the issues raised by the players.

And, in Superior Waterproofing, Inc., the plaintiff benefit fund trustees brought a lawsuit against the defendant employer for violation of the CBA it had entered into with the workers' union.  450 F.3d at 326.  The plaintiffs alleged that the employer had failed to make certain required contributions to the benefit fund.  Id. at 327.  The employer then

filed a third-party complaint against the union, alleging that the union had fraudulently and negligently misrepresented the nature of the employer's obligations under the CBA. Id. at 328.  In granting the union's motion to dismiss, the district court concluded that the employer's claims were preempted under § 301 because they could not be resolved without interpreting the article of the CBA that required the employer to contribute to the fringe benefit plan.  Id. at 328–39.  Although the Eighth Circuit determined that the fraudulent concealment claim simply was not adequately pled, it agreed that the negligent and fraudulent misrepresentation claims were preempted because "[a]djudication of the dispute and resolution of the third party claims will necessarily involve interpretation of the CBA":

> To determine whether [the employer] justifiably relied on the oral assurances allegedly made by the Union, the trier of fact would have to determine whether the contractual language in the CBA was ambiguous enough for a layman reasonably to believe that it was not contrary to the representations on which [the employer] claims it relied. . . . This would require the trier of fact to examine the provisions in [the CBA] requiring monthly fringe benefit contributions . . . .

Id. at 332.  The court went on to note that the lack of reference to the CBA in the employer's third-party complaint was not dispositive because that complaint was meant to hold the union liable for the employer's violations of the CBA as alleged in the original lawsuit.  Id. at 334.  In the present case, however, there is no alleged violation of a CBA, and it is not even known which of several CBAs might be relevant to this Court's

analysis.[10]  Accordingly, the Court is not persuaded by Defendant's arguments and denies

its Motion to Dismiss as it relates to Counts IV through VI of the Amended Complaint.

### 3.      Declaratory Relief (Count I) and Medical Monitoring (Count II)

Finally, Defendant argues that Plaintiffs' claims for declaratory relief and medical

monitoring are preempted for the same reasons that Plaintiffs' other claims are preempted

because they rely on the same theories of negligence, fraud, and misrepresentation.  (See

Def.'s Mem. at 8, 31 n.18.)  Accordingly, for the same reasons that this Court determined

it would be premature to dismiss Plaintiffs' negligence, fraud, and misrepresentation

claims at this stage of the proceedings, it also finds that it would be premature to dismiss

Plaintiffs' claims for declaratory relief and medical monitoring.  Defendant's Motion to

Dismiss is, therefore, denied with respect to Counts I and II.

---

[10]      Defendant also points to Aguilera v. Pirelli Armstrong Tire Corp., 223 F.3d 1010
(9th Cir. 2000), and Sherwin v. Indianapolis Colts, Inc., 752 F. Supp. 1172 (N.D.N.Y.
1990), as examples of cases in which the courts found negligent or fraudulent
misrepresentation claims to be preempted by § 301.  As in Williams—and unlike the
present matter—there was no question that the plaintiffs in Aguilera were parties to a
CBA at the time their claims arose, the CBAs contained provisions expressly governing
the subject matter of their claims (layoff guidelines), and the matter was resolved on
summary judgment.  Aguilera, 223 F.3d at 1012, 1015–17.  And, in Sherwin, the fraud
and negligent misrepresentation claims were asserted by a former NFL player against the
club team he played for and with which he had entered into a player agreement as
required by the CBA between the players' union and the NFL Management Council.  752
F. Supp. at 1173–74.  He alleged that he suffered an injury while playing for the club
team, and that the team personnel failed to provide adequate medical care and withheld
information regarding his injury.  Id. at 1173.  Because the player agreement and CBA
both contained provisions governing the club team's obligations to provide medical care
and medical information to the player, the court determined that it could not resolve the
plaintiff's claims without reference to those agreements.  See id. at 1178.  Here, on the
contrary, Plaintiffs' claims are not against the Club Teams, but instead are against the
NHL, which was not a party to many of the CBAs potentially at issue.  And, there is a
dispute as to when Plaintiffs' claims arose and, therefore, whether any of the CBAs are
relevant.  Accordingly, neither Aguilera nor Sherwin is on point.

## IV.     ORDER TO SHOW CAUSE

Various submissions of the parties were filed under seal.  If the parties believe that any portion of this Order warrants redaction, the Court orders the parties to show cause ten days from the date of this Order, stating why the Order should not be unsealed and specifying any portion of the order warranting redaction.

## V.      ORDER

Based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.      Defendant's Motion to Dismiss Master Complaint Based on Labor Law Preemption [Doc. No. 37] is **DENIED**, as detailed herein;

2.      Defendant's Motion to Stay Further Discovery Pending Resolution of Its Motion to Dismiss Master Complaint [Doc. No. 344] is **DENIED AS MOOT**; and

3.      The parties must show cause ten days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.

Dated:  May 16, 2016                                s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge