# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: National Hockey League Players' Concussion Injury Litigation<br><br>This Document Relates to All Actions | MDL No. 14-2551 (SRN/BRT)<br><br>**MEMORANDUM OPINION AND ORDER** |

Charles S. Zimmerman, Brian Gudmundson, David Cialkowski, and Wm Dane DeKrey, Zimmerman Reed, PLLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402; Bradley C. Buhrow and Hart L. Robinovitch, Zimmerman Reed, PLLP, 14646 North Kierland Boulevard, Suite 145, Scottsdale, Arizona 85254, for Plaintiffs

Stephen G. Grygiel, Steven D. Silverman, and William Sinclair, Silverman, Thompson, Slutkin & White, LLC, 201 North Charles Street, Suite 2600, Baltimore, Maryland 21201, for Plaintiffs

Jeffrey D. Bores, Bryan L. Bleichner, and Christopher P. Renz, Chestnut Cambronne PA, 17 Washington Avenue North, Suite 300, Minneapolis, Minnesota 55401, for Plaintiffs

Janine D. Arno, Kathleen L. Douglas, Stuart A. Davidson, and Mark J. Dearman, Robbins, Geller, Rudman & Dowd, LLP, 120 East Palmetto Park Road, Boca Raton, Florida 33432, and Leonard B. Simon, Robbins, Geller, Rudman & Dowd, LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, for Plaintiffs

Lewis A. Remele, Jr., Jeffrey D. Klobucar, and J. Scott Andresen, Bassford Remele, 33 South Sixth Street, Minneapolis, Minnesota 55402, for Plaintiffs

Thomas Demetrio, William T. Gibbs, and Katelyn I. Geoffrion, Corboy & Demetrio, 33 North Dearborn Street, Chicago, Illinois 60602, for Plaintiffs

Brian D. Penny, Goldman, Scarlato & Karon PC, 101 East Lancaster Avenue, Suite 204, Wayne, Pennsylvania 19087, and Mark S. Goldman, Goldman, Scarlato & Karon, PC, 101 West Elm Street, Suite 360, Conshohocken, Pennsylvania 19428, for Plaintiffs

Vincent J. Esades and James W. Anderson, Heins Mills & Olson, PLC, 310 Clifton Avenue, Minneapolis, Minnesota 55403, for Plaintiffs

David I. Levine, The Levine Law Firm P.C., 1804 Intracoastal Drive, Fort Lauderdale, Florida 33305, for Plaintiffs

Daniel E. Gustafson, David A. Goodwin, and Joshua J. Rissman, Gustafson Gluek, PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402, for Plaintiffs

Thomas J. Byrne, Namanny, Byrne, & Owens, APC, 2 South Pointe Drive, Lake Forest, California 92630, for Plaintiffs

Michael R. Cashman and Richard M. Hagstrom, Hellmuth & Johnson, PLLC, 8050 West 78th Street, Edina, Minnesota 55439, for Plaintiffs

Robert K. Shelquist, Lockridge, Grindal, Nauen, PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Plaintiffs

Shawn M. Raiter, Larson King, LLP, 30 East Seventh Street, Suite 2800, St. Paul, Minnesota 55101, for Plaintiffs

Charles J. LaDuca, Cuneo, Gilbert & LaDuca, LLP, 8120 Woodmont Avenue, Suite 810, Bethesda, Maryland 20814, for Plaintiffs

Daniel J. Connolly, Joseph M. Price, Linda S. Svitak, and Aaron D. Van Oort, Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402; John H. Beisner, Jessica D. Miller, and Geoffrey M. Wyatt, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, Northwest, Washington, D.C. 20005-2111; Shepard Goldfein, James A. Keyte, Matthew M. Martino, and Michael H. Menitove, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036; Matthew Stein, Skadden, Arps, Slate, Meagher & Flom, LLP, 500 Boylston Street, Boston, Massachusetts 02116; Joseph Baumgarten and Adam M. Lupion, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, for Defendant

SUSAN RICHARD NELSON, United States District Judge.

## I.    INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Class Certification and for Appointment of Class Representatives and Class Counsel. (Doc. No. 638.) The Court held a hearing on this motion on March 16, 2018. (*See* Doc. Nos. 969, 973.) For the reasons set forth

herein, Plaintiffs' Motion for Class Certification is denied.

## II.    BACKGROUND

### A.    Plaintiff's Allegations

This action, brought on behalf of a proposed class of former National Hockey League ("NHL") players, arises from what Plaintiffs describe as the "pathological and debilitating effects of brain injuries caused by concussive and subconcussive impacts sustained by former NHL players during their professional careers." (Doc. No. 615, Second Am. Class Action Compl. ("SAC") ¶ 2.) The NHL, according to Plaintiffs, knew or should have known of the growing body of scientific evidence linking repetitive concussive events to long-term neurological problems, such as dementia, Alzheimer's, and Chronic Traumatic Encephalopathy ("CTE"). (*Id.* ¶¶ 4–5.) The NHL did not, however, warn Plaintiffs or any other member of the proposed class about the dangers of repeated brain trauma. (*Id.* ¶ 6.)

### 1.    Promotion of Violence

Plaintiffs assert that the NHL has permitted, and even promoted, violence in its sport since the League was formed in 1917. (*See* SAC ¶¶ 274–90.) For "nearly a century," the NHL has "developed and promoted a culture of gratuitous violence within NHL hockey." (*Id.* ¶ 303.) Part of the NHL's strategy, Plaintiffs allege, has been to promote brutality and violence by glorifying the violent aspects of the game, including, but not limited to, the brutal and ferocious head-snapping checks and the vicious bare-knuckle fights that occur on the ice. (*Id.* ¶ 304.) The "continued growth" of violence through the NHL's history is best-exemplified by the "enforcers" or "goons" of the 1970s, 1980s, and 1990s—"players known

for using intimidating force to protect marquee teammates and respond aggressively to physical or foul play." (*Id.* ¶ 278.) The NHL continues to promote violence, Plaintiffs allege, by featuring violent hits and fights in commercials for the game, producing a weekly program segment called "Top 10 Hits of the Week" on the NHL Network, and sponsoring video games that include fighting and vicious body checking. (*Id.* ¶¶ 315, 320, 323.)

The growth of violence drew attention from outside observers. (*Id.* ¶ 280.) In 1974, the Ontario Cabinet appointed Canadian lawyer William McMurtry to issue a report on violence in amateur hockey. (*Id.*) McMurtry interviewed numerous NHL players as part of his research. (*Id.*) His report stated:

> In talking to numerous players in the NHL and WHA, they all feel that most advertising and selling of the game is over-emphasizing the fighting and brawling at the expense of educating the crowds about the skill and finesse. This past season the advertising for the NBC Game of the Week, showed a film clip of a hockey fight. Can you conceive of any other sport promoting itself in this fashion?

(*Id.*) In the report, then NHL President Clarence Campbell was quoted as saying: "it is the business of conducting the sport in a manner that will induce or be conducive to the support of it at the box office . . . . Show business, we are in the entertainment business and that can never be ignored. We must put on a spectacle that will attract people." (*Id.* ¶ 307.)

In 1988, then NHL President John Ziegler was quoted in *The Miami Herald* as stating, "Violence will always be with us in hockey . . . . Anytime you get a situation of high anxiety and frustration in any walk of life, you get violence." (*Id.* ¶ 309.) A year later in the Wall Street Journal, Ziegler stated that he would not rid the NHL of fighting because if "you did that, you wouldn't be commissioner for long . . . The view of the 21 people who own the

teams, and employ me, is that fighting is an acceptable outlet for the emotions that build up during play. Until they agree otherwise, it's here to stay . . . The main question about fighting is, 'Does the customer accept it?' The answer, at present, seems to be yes." (*Id.* ¶ 310.)

Current NHL Commissioner Gary Bettman holds a similar view. In a 2007 press conference, Bettman explained that the NHL is "not looking to have a debate on whether fighting is good or bad or should be part of the game," and continued, "fighting has always had a role in the game." (*Id.* ¶ 311.) In 2011, Bettman highlighted fan support as a reason not to ban fighting: "Our fans tell us that they like the level of physicality in our game, and for some people it's an issue but it's not as big an issue in terms of fans and people in the game to the extent that other people suggest it is." (*Id.* ¶ 312.) Bettman later called fighting a "thermostat" that helps cool things down when tensions run high. (*Id.* ¶ 313.)

In contrast to the NHL, other elite and professional ice hockey leagues successfully promote a completely different style of play, including Olympic and European ice hockey, in which finesse, speed and skill, and power without violence dominate, and fighting is almost nonexistent. (*Id.* ¶ 290.) For example, fighting is prohibited by the International Ice Hockey Federation ("IIHF"), which governs Olympic hockey and most international leagues. (*Id.* ¶ 291.) IIHF Rule 141 penalizes any player who "punches an opponent during game action, after a whistle, or any time during the regular course of a game during a prolonged player confrontation." (*Id.*) Instigators of fights are penalized with immediate ejection from the game, and IIHF authorities are given discretion to issue further suspensions. (*Id.*) Amateur hockey leagues such as the National Collegiate Athletic

Association ("NCAA") similarly punish fighting much more harshly than the NHL. (*Id.* ¶ 292.) The National Basketball Association ("NBA") and the National Football League ("NFL") also prohibit fighting. (*Id.* ¶¶ 295–97.)

### 2. Knowledge and Failure to Warn

Despite "mounting evidence" establishing the "link between brain injuries and subconcussive impacts suffered by, among others, hockey players," Plaintiffs allege that "for decades" the NHL "either took no steps to protect and educate its players or took insufficient steps to make players aware of the real risks of playing in the NHL, which would have protected players from unnecessary long term effects of brain trauma." (SAC ¶¶ 7–9.)

In 1928, for example, pathologist Harrison Martland published a study of boxers[1] that was the first to link subconcussive impacts and "mild concussions" to degenerative brain disease. (*Id.* ¶¶ 178–79.) Another study of boxers in 1973 outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles. (*Id.* ¶ 190.)[2] Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and sports-

---

[1] Martland, H., *Punch Drunk*, Journal of American Medicine (1928). (*See* Doc. No. 789-3.)

[2] Corsellis, J.A. et al., *The Aftermath of Boxing*, Psychol Med (1973) (*See* Doc. No. 789-7.)

related head trauma from multiple concussions. (*Id.* ¶ 196.) In 1982, the *Canadian Medical Association Journal* published an article titled "Return to athletic competition following concussion," which concluded that "return to training and competition should be deferred until all associated symptoms such as headaches have completely resolved. The decision to return must take into account the nature of the sport, the athlete's level of participation and the cumulative effect of previous concussions. Some athletes will have to avoid any further participation in their sport." (*Id.* ¶ 193.) In 1986, the *Physician and Sportsmedicine* Journal published an article by Dr. Robert Cantu[3] titled "Guidelines for return to contact sports after cerebral concussion." (*Id.* ¶ 194.) Dr. Cantu established a system to grade the severity of concussions based on clear and obvious symptoms and corresponding guidelines for when players should return to play. (*Id.*) Dr. Cantu added to the concussion grading scale in 2001. (*Id.*)

Plaintiffs allege that in the last decade, numerous published peer-reviewed scientific studies have demonstrated that playing professional sports is associated with significant risk for numerous negative long-term effects, including depression, cognitive disorders, and brain injuries such as dementia, Alzheimer's and CTE. (*Id.* ¶ 200.) This includes multiple published studies regarding the negative long-term effects of head impacts on current and former football players. (*Id.*) Plaintiffs assert that NHL players are five times more likely to

---

[3]     Dr. Cantu is one of Plaintiffs' experts in this case. (*See* Doc. No. 646.) The NHL moved to exclude the testimony of Dr. Cantu and Plaintiffs' other four experts—D'Arcy Jenish, Dr. Stephen T. Casper, Dr. R. Dawn Comstock, and Dr. Thomas Blaine Hoshizaki. (*See* Doc. Nos. 755, 761, 767, 772, 781.) None of these motions are addressed in this Order.

suffer a concussion than NFL players, which according to Plaintiffs is not surprising since NFL players play on average four pre-season games, a sixteen-game regular season, and engage in only 11-15 minutes of actual playing time per game, while NHL players on average play six pre-season games and an 82-game season, and except for fourth-liners and spare defensemen, play an average of 18-25 minutes per game. (*Id.* ¶ 214.) Head injuries can also occur in practice and in the training camps leading up to the regular season. (*Id.* ¶¶ 270–73.)

Rather than take immediate measures to protect its players from these known dangers, Plaintiffs allege that the NHL for decades failed to disclose to its players relevant and highly material health information it possessed regarding the significant risks associated with concussions. (*Id.* ¶ 237.) At the same time, the NHL promoted and encouraged violent blows to the head as a routine part of the game. (*Id.*)

### 3. Medical Monitoring Relief

Plaintiffs assert that by virtue of playing in the NHL, all retired players have sustained concussive or subconcussive impacts, resulting in cellular and subcellular neurological injury. (SAC ¶ 388.) The unresolved accumulation of such cellular and subcellular injuries places players at an increased risk of developing neurodegenerative diseases and conditions that occur earlier, and with greater severity, than they otherwise would occur. (*Id.*) This cellular and subcellular damage often does not result in any concurrent symptoms. (*Id.* ¶ 389.) Thus, some players had no reason to suspect or investigate their cellular and subcellular injury until very recently, when news about the root causes of neurodegenerative diseases and conditions in professional athletes became

widespread. (*Id.*)

Plaintiffs therefore seek medical monitoring relief on behalf of a class of all living retired NHL players. (*See* SAC ¶ 1; Doc. No. 665, 1/19/17 Ltr. from C. Zimmerman to Hon. S. Nelson ("Zimmerman Ltr.") 1.) Plaintiffs claim that medical monitoring would provide "immense relief to retired players" because "[e]ven when neurodegenerative diseases and conditions are timely diagnosed and the patient is fortunate enough to be in a supportive environment, the diseases have a profound impact on patients and their families." (SAC ¶ 391.) If left undiagnosed, neurodegenerative diseases and conditions "can lead to severe consequences, including debilitating depression, the breakdown of family and employment relationships, and suicide, not to mention the devastating physical impact of the diseases." (*Id.*) Plaintiffs request medical monitoring of present cellular and subcellular injuries allegedly caused by the NHL's negligence, fraudulent concealment, fraud by omission, and failure to warn of the enhanced, long-term risk of contracting a Neurological Disease, Disorder, or Condition ("NDDC"),[4] or the symptoms thereof, from concussive and subconcussive impacts that occurred when they played in the NHL. (*Id.* ¶ 1.) Plaintiffs allege that "[s]erial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction and serial brain imaging for signs of injury or disease is medically necessary to assure early diagnosis and effective treatment of brain

---

[4] As used by Plaintiffs, "NDDC" includes ALS, Alzheimer's, Parkinson's, CTE, Frontotemporal Dementia, Lewy Body Dementia, Parkinson's Dementia, and other neurodegenerative diseases or conditions, as well as any cognitive, mood, or behavioral conditions where such conditions arose after retirement from the NHL. (Doc. No. 640, Pls.' Mem. 1 n.2; SAC ¶ 399.)

disease," and that "[m]onitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the neurodegenerative diseases and conditions that Plaintiffs and members of the Class are at increased risks of developing or have developed." (*Id.* ¶¶ 420–21.)

### B. NHL's Response to Class Action Allegations

The NHL disputes the assertion of Plaintiffs and their experts and argues that there is no definitive causal link between players sustaining concussions and later developing NDDCs such as CTE. (Doc. No. 787, Def.'s Mem. 6–20.) The NHL also explains that it and the NHLPA "have always had a strong commitment to player safety within the context of a physical, contact sport," and "their approaches to improving player safety with respect to head injuries have changed over time as information regarding the potential risks of head hits has evolved." (Def.'s Mem. 20.) To support its opposition to class certification, the NHL offered twenty-three expert opinions on a variety of topics. (*See* Doc. No. 732, Declaration of John Beisner ("Beisner Decl."), Attached Exhibits; *see also* Doc. Nos. 733–49.)

The NHL asserts that the scientific community's understanding of CTE is still in its "infancy." (Def.'s Mem. 6 (citing Doc. No. 789-1, Stern R. et al., *Long-term Consequences of Repetitive Brain Trauma: Chronic Traumatic Encephalopathy*, Physical Medicine and Rehabilitation Journal (2011).) As stated by one of the NHL's experts, there is "much more to learn about the potential cause and effect relationships of repetitive head impact exposure, concussions, and long-term brain health . . . . More research on the long-term sequelae is needed to better understand the incidence and prevalence of CTE or other

neurodegenerative conditions among former athletes." (Doc. No. 732-7, Declaration of Paul McCrory ("McCrory Decl.") ¶ 96.) Plaintiffs' expert Dr. Cantu testified at his deposition that "'a cause-and-effect relationship has not as yet been demonstrated between CTE and concussions or exposure to contact sports.'" (Doc. No. 773, Cantu Dep. 335:8–16 (citation omitted).) Thus, the NHL strongly disputes Plaintiffs' theory that "there has been a clear association . . . between repeated blows to the head in sports" and CTE since 1928. (Doc. No. 787, Def.'s Mem. 7 (quoting Doc. No. 644, Casper Decl. ¶ 19; *see also* Doc. No. 646, Cantu Decl. ¶ 95; Doc. No. 642, Comstock Decl. ¶ 119; SAC ¶¶ 178–79).)[5]

The NHL also contests the relationship between mild Traumatic Brain Injury ("mTBI")[6] and other NDDCs, such as ALS, Alzheimers, and Parkinson's. (Def.'s Mem. 16.) "While the scientific research related to these diseases has similarly progressed over distinct timelines, there is no consensus in the medical literature that mTBI increases the risk of any of the NDDCs specified by plaintiffs, and research concerning any relationship between mTBI and some of these diseases is nonexistent." (*Id.* (citing Doc. No. 749,

---

[5] For example, the NHL argues that the boxer study findings should not apply to other sports. (Def.'s Mem. 8; *see also* Doc. No. 732-1, Declaration of Lisa Brenner ("Brenner Decl.") ¶ 50 (because the blows sustained by boxers in the Martland study were "'severe'" and, in some cases, resulting in a loss of "'consciousness . . . for a considerable period of time[,]" its "[i]mplications for milder and less frequent trauma that might be associated with contact sports are not evidence"); Doc. No. 789-12, Critchley, M., *Medical Aspects of Boxing, Particularly from a Neurological Standpoint*, Br Med J (1957) ("One important distinction . . . distinguishes boxing from most other forms of athleticism. Injuries are coincidental in other sports, but in boxing the aim and object . . . is to render the opponent *hors de combat*.").)

[6] The term mTBI is used interchangeably with concussion. (SAC ¶ 160; Cantu Decl. ¶ 23.)

Declaration of Kristine Yaffe ("Yaffe Decl.") ¶¶ 14, 42–61).) NHL expert Dr. Yaffe explains that the diseases identified by Plaintiffs have numerous risk factors, including age, education level, family history of neurodegenerative disease, cardiovascular disease, stroke, diabetes, high blood pressure, obesity, substance abuse, depression and sleep conditions. (Yaffe Decl. ¶ 39.) The potential causes of "cognitive, mood, or behavioral conditions," they argue, are even more varied. Depression, for example, is associated with alcoholism, drug abuse, traumatic or stressful life events, negligent/traumatic childhood, and financial and psychological stressors. (Doc. No. 736, Supplemental Declaration of Jennifer Finkel ("Finkel Suppl. Decl.") ¶ 17.) Dr. Finkel, another NHL expert, performed a comprehensive psychiatric evaluation and medical record review of three of the named Plaintiffs and determined that "the psychological symptoms experienced by these individuals are likely attributable to other psychosocial causes" unrelated to head injuries. (Finkel Suppl. Decl. ¶ 18.)

Finally, the NHL maintains that there is "no consensus in the medical or scientific community about the definition of 'subconcussive' blows, impacts, or injuries." (Doc. No. 732-5, Declaration of Grant Iverson ("Iverson Decl.") ¶ 151.) The few studies that have been conducted, they argue, are inconclusive regarding the clinical effects of such impacts in humans. (*See* Doc. No. 732-4, Declaration of Kevin Guskiewicz ("Guskiewicz Decl.") ¶ 66 ("to date, there is not a published paper that can answer the question about the association between subconcussive impacts and [long term neurodegenerative diseases], let alone a cause and effect explanation.").)

## C.     Proposed Class Representatives

Dan LaCouture played forward for the Edmonton Oilers from 1998–2001, the Pittsburgh Penguins from 2001–03, the New York Rangers from 2003–04, the Boston Bruins from 2005–06, the New Jersey Devils from 2006–07, and the Carolina Hurricanes in 2008. (SAC ¶ 28.) LaCouture alleges that he suffered close to twenty concussions while playing in the NHL, and numerous subconcussive injuries and hits to the head. (*Id.* ¶ 29.) He alleges to suffer on a daily basis from headaches, irritability, sensitivity to light, change of personality, sleeping problems, and severe depression. (*Id.* ¶ 38.) LaCouture additionally reports problems that include impulsivity, issues with self-regulation, and worsening self-esteem. (Doc. No. 732, Declaration of John H. Beisner ("Beisner Decl."), Ex. E; Doc. No. 737 at 57.) According to LaCouture, his family has expressed "a great deal of concern" about his anger and irritability. (*Id.* at 58.) LaCouture is a resident and citizen of Massachusetts. (SAC ¶ 27.)

Gary Leeman played defense and then forward for the Toronto Maple Leafs from 1983–1992, the Calgary Flames from 1992–93, the Montreal Canadians from 1993–94, the Vancouver Canucks from 1994–95, and the St. Louis Blues in 1996. (SAC ¶ 40.) Leeman alleges that during his career, he suffered a fractured skull with an accompanying severe concussion, as well as numerous other concussions and subconcussive hits to the head. (*Id.* ¶ 42.) On an ongoing basis, Plaintiff alleges that he experiences headaches, memory loss, inability to concentrate, irritability, balance problems, sensitivity to light, mood swings, anxiety, dizziness, problems managing stress, fainting sensations, blurred vision, ringing in his ears, change of personality, sleeping problems, and moderately severe depression. (*Id.* ¶

13

44.) At his deposition, Leeman testified that he previously experienced occasional panic attacks brought on by his anxiety, but that it has "been awhile" since his last panic attack. (Doc. No. 641, Declaration of Charles S. Zimmerman ("Zimmerman Decl."), Ex. 147 at 115.) He primarily complains of increased irritability, in addition to a propensity for distractibility and impulsivity. (Doc. No. 737 at 177.) Leeman identifies memory impairment as the "most frightening" of his symptoms. (*Id.* at 178.) Leeman is a resident and citizen of Ontario, Canada. (SAC ¶ 39.)

Bernie Nicholls played center for the Los Angeles Kings from 1982–1990, the New York Rangers from 1991–92, the Edmonton Oilers in 1993, the New Jersey Devils from 1993–94, the Chicago Blackhawks from 1994–95, and the San Jose Sharks from 1996–99. (SAC ¶ 46.) Nicholls alleges that he suffered a broken jaw while playing for the Kings and a concussion playing for the Sharks in 1997. (*Id.* ¶¶ 48–49.) On October 29, 1998, he took a violent hit to the head when a stick hit him in the eye, leaving him disoriented and necessitating twenty-five stitches. (*Id.* ¶ 50.) Nicholls alleges that he suffers on a daily basis from dizziness, disorientation, memory loss, tinnitus, post-traumatic headaches, concentration difficulties, sleep disorder, and cognitive deficit. (*Id.* ¶ 51.) At his deposition, Nicholls testified that he also suffers from periodic depression and bouts of irrational anger. (Zimmerman Decl., Ex. 144 at 19–20.) Nicholls also indicates that both he and his family have noticed increasing problems with his memory over the last few years. (Doc. No. 737 at 109.) Nicholls states that his primary mood symptom is intermittent irritability. (*Id.* at 110.) Nicholls is a resident and citizen of Ontario, Canada. (SAC ¶ 45.)

David Christian played forward for the Winnipeg Jets from 1979–83, the

Washington Capitols from 1983–90, the Boston Bruins from 1990–91, the St. Louis Blues from 1991–92, and the Chicago Blackhawks from 1992–94. (SAC ¶ 53.) Christian alleges that during his career, he suffered numerous undiagnosed concussions and subconcussive hits to the head that were not properly treated. (*Id.* ¶ 55.) In one incident while playing for the Winnipeg Jets, Christian was struck in the head and knocked unconscious. (*Id.* ¶ 56.) In another incident while playing for the Washington Capitols, Christian was struck so hard in the head that he immediately saw flashing lights and stars and fell to the ice. (*Id.* ¶ 57.) Christian is a resident and citizen of Minnesota. (*Id.* ¶ 52.)[7]

Reed Larson played defense for the Detroit Red Wings from 1977–87, the Boston Bruins from 1987–89, the Edmonton Oilers, New York Islanders, and Minnesota North Stars from 1988–89, and in 1989 for the Buffalo Sabres. (SAC ¶ 60.) Larson alleges that he suffered numerous undiagnosed concussions and subconcussive hits to the head that were not properly treated during his career. (*Id.* ¶ 62.) In one incident while playing for the Detroit Red Wings in 1977, Larson was involved in a fight on the ice resulting in numerous blows to the head and a broken nasal cavity. (*Id.* ¶ 63.) In another incident while playing for the New York Islanders, Larson was struck in the head by a slap shot during practice. (*Id.* ¶ 66.) The blow was so severe that it required fifty stitches and plastic surgery to correct the

---

[7] Christian does not allege that he is currently suffering from any concussion-related symptoms. (SAC ¶¶ 52–58.) At his deposition, Christian answered "no" when asked if he suffers from or has depression, forgetfulness, balance problems, difficulty concentrating, light sensitivity, mood swings, anxiety, problems managing stress, dizziness, fainting sensations or light-headedness, blurred vision, or ringing in his ears. (Zimmerman Decl., Ex. 145 at 100–01.) Christian also denied that his personality has changed in the last ten years. (*Id.* at 101.)

damage to Larson's face. (*Id.*) Larson suffers from depression, irritability, short-term memory loss, fatigue, sleep disorder, and occasional dizziness upon standing. (*See* Zimmerman Decl., Ex. 143; Doc. No. 737 at 15–20.) He denies that his memory or somatic complaints are noticeable, but admits that people "notice other things" about him, such as his impatience and irritability. (Doc. No. 737 at 16.) According to Larson, his irritability negatively affects his relationships, and he admits to having had six behavioral outbursts since retiring from hockey. (*Id.* at 17.) Larson is a resident and citizen of Minnesota. (SAC ¶ 59.)

Lawrence Zeidel, who passed away in 2014, played defense for the Detroit Red Wings from 1951–53, the Chicago Blackhawks from 1953–54, and the Philadelphia Flyers from 1967–69. (SAC ¶¶ 70, 72.) Zeidel's representative George M. Bradley alleges that Zeidel suffered numerous undiagnosed concussions and subconcussive hits to the head that were not properly treated, including head injuries from stick fights and being speared in the head with sticks. (*Id.* ¶¶ 74, 77.) After Zeidel's death, an expert panel of neurologists, neuropsychologists, and researchers examined Zeidel's case and concluded Zeidel suffered from CTE. (*Id.* ¶ 79; Zimmerman Decl., Ex. 149.) Zeidel was characterized as having a longstanding history of an extremely violent and explosive temper. (Zimmerman Decl, Ex. 149.) In his forties, he began having difficulty managing his financial affairs, displayed "seemingly manic behavior," and was involved in several altercations with co-workers. (*Id.*) In his fifties and sixties, Zeidel experienced cognitive deterioration resulting in unusual behavior and difficulty caring for himself and living independently. (*Id.*) He was diagnosed with dementia in his eighties and passed away due to multiple organ failure. (*Id.*) Zeidel's

representative is a resident and citizen of Pennsylvania. (SAC ¶ 70.)

### D. Plaintiffs' Proposed Classes

#### 1. Class 1: All Living Retired NHL Hockey Players

Plaintiffs Christian and Larson move for Rule 23(b)(2) certification and for appointment as representatives of a class of all living retired NHL hockey players. (Pls.' Mem. 29; Zimmerman Ltr. 1.) Plaintiffs assert that under Minnesota choice-of-law rules, the Court should apply New York law to the issue of liability (duty and breach), and Minnesota law to the issue of the remedy sought (medical monitoring). (Pls.' Mem. 29; Zimmerman Ltr. 2.) Alternatively, Plaintiffs Christian, Larson, Nicholls, and LaCouture move for certification under a grouping of state laws. (Pls.' Mem. 30 (requesting certification under a "state-law grouping theory because very few conflicts of substantive law are relevant to the claims and common evidence"); Zimmerman Ltr. 3 ("[I]f the Court determines that it would be improper to apply the law of a single state for the predicate tort duties, and the elements of medical monitoring relief of a single state (the choice-of-law approach), the medical monitoring and general negligence duties of all states are still sufficiently similar for the court to certify class 1.").)

#### 2. Class 2: All Retired NHL Hockey Players (or representative claimants if they are deceased) who have been clinically diagnosed with a NDDC

Plaintiffs Leeman and the Ziedel Estate move for certification of a class of all retired NHL hockey players (or representative claimants if they are deceased) who have been clinically diagnosed with a NDDC as to the legal issues of duty of care and breach of duty, including the failure to warn, and factual issues relevant to whether the head

impacts that class members experienced can cause latently-developed NDDCs. (Pls.'
Mem. 29; Zimmerman Ltr. 4.)

## III. DISCUSSION

### A. Rule 23 Requirements for Class Certification

Class actions are governed by Federal Rule of Civil Procedure 23. They are "an
exception to the usual rule that litigation is conducted by and on behalf of the individual
named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). In *Dukes*,
the Supreme Court emphasized that the standard for obtaining class certification is an
onerous one. The Court explained that Rule 23 "does not set forth a mere pleading
standard. A party seeking class certification must affirmatively demonstrate his
compliance with the Rule—that is, he must be prepared to prove that there are *in fact*
sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 350
(emphasis in original). Class certification is proper only if the Court is satisfied, after a
"rigorous analysis," that the prerequisites of the Rule have been satisfied. *Id.* at 350–51. It
might be necessary for a court to look beyond the pleadings before deciding the
certification question. *Dukes*, 564 U.S. at 351 ("Frequently that 'rigorous analysis' will
entail some overlap with the merits of the plaintiff's underlying claim. That cannot be
helped. 'The class determination generally involves considerations that are enmeshed in
the factual and legal issues comprising the plaintiff's cause of action.'") (quoting *Gen.
Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)).

To be certified as a class, Plaintiffs "must meet all of the Rule 23(a) requirements
and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*,

425 F.3d 1116, 1119 (8th Cir. 2005) ("*St. Jude I*"). It is not necessary to discuss the Rule 23(a) requirements—numerosity, commonality, typicality, and adequacy—because Plaintiffs' Motion for Class Certification can be resolved on the requirements set forth in Rule 23(b). *See In re Prempro*, 230 F.R.D. 555, 573 (E.D. Ark. 2005) ("[A] full analysis of FRCP 23(a) is unnecessary since Plaintiffs failed to meet any of the FRCP 23(b) requirements, which precludes certification."). The "rigorous analysis" described in *Dukes* applies to Rule 23(b). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (explaining that the "same analytical principles" established by *Dukes* "govern Rule 23(b)").

Plaintiffs argue for certification under Rule 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). (*See* Doc. No. 964, Pls.' Reply 7–10.) The NHL argues that Plaintiffs' motion should be addressed under Rule 23(b)(3), which allows for certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). (*See* Def.'s Mem. 28–31.)

Rule 23(b)(3)'s requirement that common questions predominate over individual questions "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.

2005). The predominance requirement "is not satisfied if individual questions . . . overwhelm the questions common to the class." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478–79 (8th Cir. 2016). Rule 23(b)(2), on the other hand, "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. A (b)(2) class need not meet (b)(3)'s predominance requirement, but at the same time, "'the class claims must be cohesive.'" *Ebert*, 823 F.3d at 480 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)). Rule 23(b)(2)'s cohesiveness requirement is "more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)." *Id.*; *see also Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010); *St. Jude I*, 425 F.3d at 1121–22. This is because a (b)(2) class is mandatory and does not include an opt-out provision. *See Ebert*, 823 F.3d at 480 ("Because a (b)(2) class is mandatory, the rule provides no opportunity for (b)(2) class members to opt out, and does not oblige the district court to afford them notice of the action, both of which are prescribed for (b)(3) classes.").

The Court will analyze Plaintiffs' motion under Rule 23(b)(3) because the relief that they seek—medical monitoring—is predominantly monetary in nature, not declaratory or injunctive. *See Dukes*, 564 U.S. at 360 (holding that claims for monetary relief cannot be certified under Rule 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief"); *see also Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1196 (9th Cir. 2001) (reasoning that plaintiffs "seek the establishment of a reserve fund for past and future damages, compensation for future medical treatment,

plus other compensatory and punitive damages. Although the complaint also seeks 'full and proper research into alternative methodologies for remedying the condition of each patient/class member,' this injunctive relief is merely incidental to the primary claim for money damages"); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) (affirming rejection of medical monitoring class under Rule 23(b)(2) because "the relief sought was primarily money damages"); *Duncan v. Nw. Airlines, Inc.*, 203 F.R.D. 601, 611 (W.D. Wash. 2001) ("Although the plaintiff now characterizes the relief as a program rather than a fund, the bottom line is money."). As stated below, Plaintiffs cannot meet the predominance requirement set forth in Rule 23(b)(3) because of the significant variance in legal standards governing medical monitoring claims. Even if Plaintiffs are correct that their motion should be analyzed under Rule 23(b)(2), certification would be denied for the same reasons. *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) ("[A] (b)(2) class may require more cohesiveness than a (b)(3) class."); *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 607 (D. Minn. 2005) ("[T]he issues that defeat the predominance and superiority requirements of Rule 23(b)(3) also preclude certification under Rule 23(b)(2).").

Plaintiffs also move for certification as to particular issues. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). The Eighth Circuit has recognized that "there is a conflict in authority on whether [an issue] may be certified under Rule 23." *In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) ("*St. Jude II*"). While not rejecting the possibility of issue certification, the court stressed that "[e]ven courts that have approved

'issue certification' have declined to certify such classes when the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation." *Id.*; *see also Ebert*, 823 F.3d at 479 (holding that the "deliberate limiting of issues" may be "problematic"). The predominance of individual legal issues also precludes issue certification in this case.

### B. Rule 23(b)(3)

As noted above, Rule 23(b)(3) allows for certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "matters pertinent to these findings" include "the class members' interests in individually controlling the prosecution or defense of separate actions;" "the extent and nature of any litigation concerning the controversy already begun by or against class members;" "the desirability or undesirability of concentrating the litigation of the claims in a particular forum;" and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

District courts "must perform a rigorous analysis before determining that issues common to the class predominate over issues that differ among the individual class members." *Ebert*, 823 F.3d at 478. The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 377 (8th Cir. 2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). This inquiry is more demanding than

the otherwise rather similar commonality requirement under Rule 23(a) in that, "'[w]hen determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.'" *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)); *see also Behrend*, 569 U.S. at 34 ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a). Rule 23(b)(3), as an 'adventuresome innovation,' is designed for situations 'in which class-action treatment is not as clearly called for.'") (quoting *Dukes*, 564 U.S. at 362). Where the resolution of a common issue "breaks down into an unmanageable variety of individual legal and factual issues," the predominance requirement is not satisfied. *Nobles v. State Farm Mut. Auto Ins. Co.*, No. 10–04175–CV–C–NKL, 2013 WL 12153517, at *2 (W.D. Mo. June 5, 2013) (citing *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

### C.    Choice-of-Law Principles

The Court first considers whether common legal issues predominate. Plaintiffs argue that they do because choice-of-law principles dictate that New York law applies on a classwide basis to the issues of duty and breach, and Minnesota law applies on a classwide basis to the issue of medical monitoring. (Pls.' Mem. 41–52.) In the alternative, Plaintiffs argue that the Court may certify a class including states with laws similar to Minnesota. (*Id.* at 52–56.) The NHL strenuously disagrees, arguing that different states'

laws will govern the proposed class members' claims depending on where the class member lived and played during most of his career. (Def.'s Mem. 31–39.)

To decide the applicable law, the Court must conduct a choice-of-law analysis for each proposed class member. *See St. Jude I*, 425 F.3d at 1120 ("The Supreme Court has held an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action.") (citing *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 822–23 (1985)). "A district court sitting in diversity must apply the conflict of law rules for the state in which it sits." *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001). Minnesota uses a three-step choice of law analysis. The first two steps "inquire whether differing state laws present an outcome-determinative conflict and whether each law constitutionally may be applied to the case at hand." *Blake Marine Grp. v. CarVal Investors LLC*, 829 F.3d 592, 595 (8th Cir. 2016). At the third step, the Court decides whether the rule of law at issue is substantive or procedural. *Glover v. Merck & Co., Inc.*, 345 F. Supp. 2d 994, 998 (D. Minn. 2004) (citing *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 5 (Minn. Ct. App. 2003)). If the issue is substantive, the Court applies a "'multi-step choice-of-law analysis, which includes application of five choice-influencing considerations, to determine which state's law applies.'" *Id.* at 998 (quoting *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994)). However, if the issue is procedural, then Minnesota applies its own law. *Id.* (citing *Jepson*, 513 N.W.2d at 469); *see also Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007) ("Minnesota courts apply Minnesota law regarding matters of procedure and remedies.").

### 1.    Application of New York Tort Law

Plaintiffs argue that the Court should apply New York tort law on a classwide basis because that is where the NHL is currently headquartered and incorporated. (Pls.' Mem. 45, 50.) Outcome-determinative conflicts exist between the laws of New York and the other forty-nine states, the District of Columbia, and the Canadian provinces with respect to negligence and negligent misrepresentation.[8] (*See* Doc. No. 789-39, Def.'s Ex. 58, Survey of Variations in State Laws With Respect to Negligence); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) (stating that "[t]he law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause" differs among the states in "important" ways). Therefore, the Court must apply the choice-influencing factors to determine the applicable law. Those factors are: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Blake Marine Grp.*, 829 F.3d at 595.

The first factor (predictability of results) is used to "'fulfill the parties' justified expectations.'" *Dryer v. NFL*, Civil No. 09-2182 (PAM/AJB), 2013 WL 5888231, at *6 (D. Minn. Nov. 1, 2013) (quoting *Jepson*, 513 N.W.2d at 470). This factor is typically not relevant in tort cases because "the parties in such cases are not alleged to have acted in reliance on any state's laws." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1125 (8th Cir. 2012); *see also In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003). Even so,

---

[8] *See* Zimmerman Ltr. 1 (explaining that Plaintiffs seek class treatment for negligence and negligent misrepresentation claims).)

Plaintiffs argue that the NHL's control over the style of play and its decisions to withhold information from players occurred in New York, indicating that New York law would apply more predictably. (Pls.' Reply 13.) In *Dryer*, however, a class action brought by former NFL players for violation of common-law and statutory publicity rights, the court explained that where plaintiffs "played in various locations, for teams located throughout the United States, it is likely that they would have expected that the vindication of their . . . rights would be subject to the law where their team was located or where they themselves lived." 2013 WL 5888231, at *6. To the extent that this factor may be considered relevant to the Court's choice-of-law analysis, it finds favor in applying the law where each member of the proposed class played during his career or currently lives.

The second factor (maintenance of interstate order) "weighs in favor of the state which has the most significant contacts with the facts relevant to the litigation." *In re Baycol Prods. Litig.*, 218 F.R.D. at 207 (citing *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 621 (8th Cir. 2001)). At times, this factor "favors the application of the law of states closely connected to Plaintiffs, such as the home state of their team(s) or their own homes." *Dryer*, 2013 WL 5888231, at *6. The NHL's home state also has significant contacts with the facts at issue, however, so this factor either favors the state of the player's team or is neutral.

The third factor (simplification of judicial task), while normally neutral, highlights the "unmanageability of the class action apparatus" where, as here, "it is possible that the law of many different states may apply to Plaintiffs' claims." *Id.*

Applying the fourth factor (advancements of the forum's governmental interest), courts must "determine which state's law to apply based on 'the relative policy interests of the two states.'" *Blake Marine Grp.*, 829 F.3d at 596. Once again, this factor points to the state where the former player currently resides,[9] not where the NHL is incorporated. "Our court has . . . explained . . . that a state's 'interest in protecting nonresidents from tortious acts committed within the state . . . is only slight and does not support application of its law to the litigation.'" *Id.* (quoting *Hughes*, 250 F.3d at 621). By contrast, "'[c]ompensation of an injured plaintiff is primarily a concern of the state in which [the] plaintiff is domiciled.'" *Id.* (quoting *Kenna v. So-Fro Fabrics, Inc.*, 18 F.3d 623, 627 (8th Cir. 1994)); *see also In re Baycol Prods. Litig.*, 218 F.R.D. at 207 ("The Eighth Circuit . . . has not given the [domicile] of the corporate defendant much weight in tort cases.").[10]

Application of the choice-influencing factors therefore favors the place where each class member lived and played during most of his career, or, for players whose career was not focused on a particular team, where they now live in retirement.[11] As a result,

---

[9]     In a significant number of cases, this will be the same state where the player spent the majority of his career.

[10]     It is not necessary to discuss the fifth factor (better rule of law) because it "applies only if the first four factors do not resolve the choice-of-law question." *Dryer*, 2013 WL 5888231, at *6 (citing *Myers v. Gov't Empl. Ins. Co.*, 225 N.W.2d 238, 244 (Minn. 1974)).

[11]     Even if the NHL's location pointed towards the applicable law, the NHL was headquartered in Montreal before moving to New York in 1977. As a result, Plaintiffs' own theory would not result in the uniform application of a single body of law to the entire class. At oral argument, counsel for the NHL explained that 1,000 retired, living players in Proposed Class 1 played part of their career when the NHL was headquartered

(Footnote Continued on Next Page)

this Court finds that New York tort law cannot be applied on a classwide basis, and therefore, that the application of widely varying tort laws precludes a finding that common legal issues predominate.

### 2. Medical Monitoring Law Varies Widely Across the U.S. and Canada

Medical monitoring claims seek to "'recover the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure.'" *Foster*, 229 F.R.D. at 602 (quoting *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 429 (W. Va. 1999)). These types of claims evolved from the realization that "widely recognized tort law concepts premised upon a present physical injury are ill-equipped to deal with cases involving latent injury." *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 716 (Mo. 2007). Medical monitoring claims are considered a "'non-traditional tort.'" *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 552 (D. Minn. 1999) (quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 849 (3d Cir. 1990)).

Plaintiffs argue that Minnesota law governs their request for medical monitoring. Minnesota courts have allowed the recovery of medical monitoring expenses where the elements of a tort claim are proven and evidence of a present injury is established. *See*

---

(Footnote Continued From Previous Page)
in Montreal, and 600 retired, living players played their entire career when the NHL was headquartered in Montreal. (Doc. No. 973, 3/16/18 Hr'g Tr. 37.) Plaintiffs attempt to rectify this oversight by offering to "limit the Class definition to those who played from 1977 onward." (Pls.' Reply 14.) This proposal would raise adequacy issues with respect to the Estate of Zeidel, whose playing career ended in 1969.

*Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 721 (Minn. Ct. App. 1998) (finding genuine fact issues concerning "emotional distress damages and medical monitoring expenses" due to "alleged chromosome damage"); *see also Werlein v. United States*, 746 F. Supp. 887, 904 (D. Minn. 1990) ("Assuming that a given plaintiff can prove that he has present injuries that increases his risk of future harm, medically appropriate monitoring is simply a future medical cost, which is certainly recoverable"), *vacated on other grounds*, 793 F. Supp. 898 (D. Minn. 1992).

Medical monitoring law in other jurisdictions, however, is greatly varied, resulting in significant outcome-determinative conflicts between Minnesota law and the other forty-nine states, the District of Columbia, and the Canadian provinces. *See Myers*, 225 N.W.2d at 241 ("[I]t first must be determined that a conflict exists, i.e., will the choice of one law as compared to another determine the outcome?").

Several states, for example, recognize medical monitoring only if the plaintiff has a manifest physical injury.[12] One state has held that plaintiffs can recover medical monitoring upon a showing that the plaintiff has suffered a subcellular or subclinical

---

[12] *See Hous. Cty. Health Care Auth. v. Williams*, 961 So. 2d 795, 811 (Ala. 2007); *Wood v. Wyeth-Ayerst Lab., Div. of Am. Home Products*, 82 S.W.3d 849, 859 (Ky. 2002); La. Civ. Code Ann. Art. 2315(B); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 686 (Mich. 2005); *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 3 (Miss. 2007); *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 18 (N.Y. 2013); *Curl v. Am. Multimedia, Inc.*, 654 S.E.2d 76, 81 (N.C. Ct. App. 2007); *Lowe v. Philip Morris USA, Inc.*, 183 P.3d 181, 183 (Or. 2008); *Ball v. Joy Techs, Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (applying Virginia law); *Alsteen v. Wauleco, Inc.*, 802 N.W.2d 212, 218–19 (Wis. Ct. App. 2011).

injury.[13] Five states allow medical monitoring awards as a form of damages for certain potentially harmful exposures without proof of present injury or cellular or subcellular harm.[14] Four states recognize medical monitoring as an independent cause of action that does not require proof of present injury or cellular or subcellular harm.[15] Another state has held that plaintiffs can recover medical monitoring without a showing of manifest physical injury, but it is unclear whether medical monitoring is an independent claim or a form of damages.[16] In most of the remaining states and the District of Columbia, the courts have either not addressed the issue or the state of the law is unclear.[17]

In the first category of states, the Michigan Supreme Court has rejected any independent claim for medical monitoring. *See Henry*, 701 N.W.2d at 686. The plaintiffs

---

[13] *See Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 901–02 (Mass. 2009).

[14] *See Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 823–24 (Cal. 1993); *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 75–76 (Md. 2013); *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 716 (Mo. 2007); *Sadler v. PacifiCare of Nev., Inc.*, 340 P.3d 1264, 1270 (Nev. 2014); *Ayers v. Twp. of Jackson*, 525 A.2d 287, 298 (N.J. 1987).

[15] *See Petito v. A.H. Robins Co.*, 750 So. 2d 103, 105–07 (Fla. Dist. Ct. Ap. 2000); *Redland Soccer Club, Inc. v. Dep't of the Army*, 696 A.2d 137, 145–46 (Pa. 1997); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993); *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 432 (W. Va. 1999).

[16] *See Burns v. Jacquays Mining Corp.*, 752 P.2d 28, 33–34 (Ariz. Ct. App. 1987).

[17] No Canadian court has recognized the validity of medical monitoring claims, and a number of those courts have expressed skepticism of such claims due to Canada's publicly-funded healthcare system. (*See* Doc. No. 789-37, Def.'s Ex. 56, Decl. of John B. Laskin ("Laskin Decl.") ¶¶ 12–33; Doc. No. 789-38, Def.'s Ex. 57, Decl. of Sylvie Rodrigue ("Rodrigue Decl.") ¶¶ 8–9.) One third of the proposed class members live in Canada. (3/16/18 Hr'g Tr. 41.) Five of the six Proposed Class Representatives played for a Canadian team at some point in their career, and Plaintiffs Leeman and Nicholls are Canadian residents.

in that case did not claim to have "suffered any present physical harm because of defendant's allegedly negligent contamination." *Id.* at 689. The court emphasized that determining eligibility for participation in a medical monitoring program "involves the consideration of a number of practical questions and the balancing of a host of competing interests – a task more appropriate for the legislative branch than the judiciary." *Id.* at 698. The New York Court of Appeals also rejected medical monitoring as an independent cause of action absent proof of present physical injury. *See Caronia*, 5 N.E.3d at 18 (N.Y. 2013) ("We conclude that the policy reasons set forth above militate against a judicially-created independent cause of action for medical monitoring. Allowance of such a claim, absent any evidence of present physical injury or damage to property, would constitute a significant deviation from our tort jurisprudence.").[18]

In Massachusetts, plaintiffs may recover the costs of medical monitoring as a form of future medical expense damages, upon a showing of subcellular injuries. *See Donovan*, 914 N.E.2d at 901–02. Such a claim includes seven elements: (1) the defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious

---

[18]   Plaintiffs argue that New York law does not restrict medical monitoring to those manifesting physical symptoms of a disease. (Pls.' Reply 18 (citing *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D.N.Y. 2017).) The court in *Baker* interpreted *Caronia* to allow medical monitoring where the underlying injury is the accumulation of a toxic substance within the plaintiff's body. 232 F. Supp. 3d at 250. *Baker* also allowed an interlocutory appeal and suggested that the Second Circuit should "certify these issues to the New York Court of Appeals," which could "assist the lower courts by clarifying *Caronia*." *Id.* at 254. Even if *Baker*'s interpretation of *Caronia* is correct, the Court's conclusion that there are outcome-determinative conflicts between the various states' laws on medical monitoring would not be altered.

disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, in conformance with the standard of care, and (7) the present value of the reasonable cost of such tests and care as of the date of the filing of the complaint must be established. *Id.* at 902.

Five other states allow medical monitoring awards as damages without proof of present injury or cellular or subcellular harm, such as California, where "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable." *Potter*, 863 P.2d at 824. The following factors are relevant in determining the reasonableness and necessity of monitoring there: (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to the plaintiff's chances of developing the disease had he or she not been exposed and the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis. *Id.* at 824–25.

Some states, such as Florida, recognize medical monitoring as an independent cause of action that does not require proof of present injury or cellular or subcellular

harm. *See Petito*, 750 So. 2d at 105–07. In *Petito*, the court explained that an "action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm, proportionately reduced to reflect the chance that it will not occur . . . ." *Id.* at 105–06. The following elements must be proven to establish an equitable claim for medical monitoring in Florida: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Id.* at 106–07.

In Arizona, plaintiffs may recover medical monitoring where the plaintiff is at risk of developing an injury in the future. *Burns*, 752 P.2d at 33–34. The court concluded that medical surveillance costs are a "compensable item of damages" despite "the absence of physical manifestation of any asbestos-related diseases." *Id.* at 33. Subsequent decisions make it unclear as to whether medical monitoring is a form of damages or a stand-alone cause of action in Arizona. *Compare Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 481 (E.D. Pa. 1997) (stating that "[i]n *Burns*, the court described medical monitoring as a compensable item of damages," not a distinct cause of action), *with In re St. Jude*, No. MDL 01-1396 JRT/FLN, 2004 WL 45504, at *7 (D. Minn. Jan. 5, 2004) (stating that

Arizona is a jurisdiction that "recognize[es] a stand alone claim for medical monitoring"); *Quiroz v. ALCOA Inc.*, 382 P.3d 75, 79 (Ariz. Ct. App. 2016) (discussing the "claim" of medical monitoring).

Some of the remaining states, such as Alaska, Idaho, and Hawaii, do not have any court decisions that clearly address the issues related to medical monitoring. In other states, courts have addressed the issue, but there is no definitive guidance on whether such a claim is viable. *See, e.g.*, *Mehr v. Federation Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1070 (N.D. Cal. 2015) ("Lower courts in Illinois have suggested that the Illinois Supreme Court might recognize an independent claim for medical monitoring even in cases where there is no present physical injury. However, to date, it does not appear that the Illinois Supreme Court has done so.").

Plaintiffs argue that the conflicts between these states are not outcome-determinative because all NHL players present evidence of cellular damage or injury. (Pls.' Reply 17; 3/16/18 Hr'g Tr. 32.) Cellular damage, however, is not enough to allow recovery in states that require a present physical injury. As the Eleventh Circuit explained in a case applying Georgia law:

> Plaintiffs rest their personal injury claims on the contention that their allegations of subclinical and cellular damage are sufficient to allege a current physical injury under Georgia law; because we reject this argument, Plaintiffs' claims for personal injury and emotional distress must fail. And because Plaintiffs' allegations of subclinical damage are insufficient to state a current physical injury, Plaintiffs are not entitled to recover the 'quantifiable costs of periodic medical examinations' as future medical expenses. Plaintiffs have failed to point us to any Georgia authority that allows recovery of medical monitoring costs in the absence of a current physical injury.

*Parker v. Wellman*, 230 F. App'x 878, 882–83 (11th Cir. 2007); *see also Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1296  (N.D. Ga. 2005) (explaining that an "overarching issue in this litigation is whether Plaintiffs who have endured only 'sub-clinical, cellular, and sub-cellular' damages from alleged beryllium exposure may rely on such effects as a physical 'injury' sustaining tort recovery").[19] Thus, the conflicts between states that require physical injury and those that do not are outcome-determinative and cannot be ignored in a choice-of-law analysis. *Compare Williams*, 961 So. 2d at 811 (Ala.) ("A person exposed to a known hazardous substance but not claiming a present physical injury or illness as a result may not recover as damages the costs of medical monitoring."), *and Wood*, 82 S.W.3d at 859 (Ky.) ("[H]aving weighed the few potential benefits against the many almost-certain problems of medical monitoring, we are convinced that this Court has little reason to allow such a remedy without a showing of present physical injury."), *with Meyer*, 220 S.W.3d at 717 (Mo.) ("[A] present physical injury requirement is inconsistent with th[is] theory of recovery."), *and Sadler*, 340 P.3d at 1270 (Nev.) ("[A] plaintiff may state a cause of action for negligence with medical monitoring without asserting that he or she has suffered a present *physical* injury.") (emphasis in original).[20]

---

[19]     The status of medical monitoring claims in Georgia can be characterized as unclear due to the lack of state court authority on the topic. *See Parker*, 377 F. Supp. 2d at 1302 ("[I]t is not the function of a federal court to expand state court doctrine in novel directions absent clear state authority suggesting the propriety of such an extension.").

[20]     Even if proof of cellular damage was sufficient to establish a basis for liability on a classwide basis, the presence of cellular damage would need to be established in each

(Footnote Continued on Next Page)

Other conflicts in state law are also apparent. Missouri, for example, requires a "'significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure.'" *Meyer*, 220 S.W.3d at 718 (quoting *Bower*, 522 S.E.2d at 433 (W. Va.)). Utah, on the other hand, requires only an increased risk. *See Hansen*, 858 P.2d at 979. Also in Utah, unlike in some other states, a plaintiff must show that a treatment exists that can alter the course of the illness. *Compare id.*, *with Redland Soccer Club*, 696 A.2d at 145–46 (Penn.), *and Bower*, 522 S.E.2d at 432–33 (W. Va.). And some states require a plaintiff to prove the existence of a procedure that can result in early detection, but others do not. *Compare Petito*, 750 So. 2d at 106–07 (Fla.), *and Donovan*, 914 N.E.2d at 902 (Mass.), *with Meyer*, 220 S.W.3d at 717–18 (Mo.), *and Burns*, 752 P.2d at 33–34 (Ariz.).

Plaintiffs maintain that a number of states can be grouped together based on the way they treat medical monitoring claims. (Pls. Mem. 35; Doc. No. 641-12, Ex. 141.) For example, Plaintiffs identify twenty-eight jurisdictions that permit medical monitoring relief where there is "a showing of exposure plus increased probability" of developing a future disease.[21] As discussed above, the laws of many of those jurisdictions are varied

---

(Footnote Continued From Previous Page)
player and that the cellular damage was caused by exposure to the hazard of playing hockey in the NHL (as opposed to playing hockey somewhere else or as a result of another cause). Thus, causation in this context would require individualized proof.

[21] The jurisdictions identified by Plaintiffs are: Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah,

(Footnote Continued on Next Page)

and complex. Plaintiffs' grouping theory cannot be used to sidestep the widespread divergence among the states in the requirements for medical monitoring. *Compare Donovan*, 914 N.E.2d at 901–02 (holding that plaintiffs in Massachusetts may recover the costs of medical monitoring as a form of future medical expense damages in cases involving subcellular injuries), *with Potter*, 863 P.2d at 824 (allowing medical monitoring awards in California without proof of present injury or cellular or subcellular harm). Thus, there are significant outcome-determinative conflicts between the states' legal requirements for medical monitoring relief.

Plaintiffs maintain, however, that Minnesota law on medical monitoring can still be applied on a classwide basis because medical monitoring is procedural or remedial under Minnesota law. (Pls.' Mem. 47–48; Pls.' Reply 11–13.) The NHL counters that the issue is substantive, not procedural. (Def.'s Mem. 39–42.)

"'[S]ubstantive law is that part of law which creates, defines, and regulates rights, as opposed to 'adjective or remedial' law, which prescribes [a] method of enforcing the rights or obtaining redress for their invasion.'" *Stern v. Dill*, 442 N.W.2d 322, 324 (Minn. 1989) (quoting *Meagher v. Kavli*, 88 N.W.2d 871, 879–80 (Minn. 1958)). Plaintiffs argue nonetheless that "Exposure + Causation of Cell Damage + Increased Risk" are "Remedial Elements" that should be controlled by Minnesota law. (Zimmerman Ltr. 2.)

---

(Footnote Continued From Previous Page)
Vermont, and Washington. (*See* Doc. No. 641-12, Pls.' Ex. 141, Chart A.)

To succeed on their medical monitoring claim under Minnesota law, Plaintiffs must prove that they incurred cell damage (injury) as a result of being exposed to the hazard of playing hockey in the NHL (causation), and the consequent increased risk of developing NDDCs (increased risk). Exposure, causation and increased risks, however, are essential elements of tort liability, not damages and hence are not remedial. Entitlement to medical monitoring requires substantive proof; it is not merely a procedural or remedial issue.

The cases cited by Plaintiffs are not to the contrary. (Pls.' Reply 11 (citing *Bryson*, 573 N.W.2d at 721; *Palmer v. 3M Co.*, No. C2-04-6309, 2005 WL 5891911 (Minn. Dist. Ct. Apr. 6, 2005); *Thompson*, 189 F.R.D. at 552; *Werlein*, 746 F. Supp. at 904). In *Werlein*, the court found that plaintiffs could be "entitled to recover the costs of future medical monitoring as tort damages under the common law" because if "a given plaintiff can prove that he has present injuries that increases his risk of future harm, medically appropriate monitoring is simply a future medical cost, which is certainly recoverable." 746 F. Supp. at 904. Despite the description of medical monitoring as "simply a future medical cost," *Werlein* supports the characterization of medical monitoring as substantive, not procedural, because the court's reasoning presumes that plaintiffs would not be entitled to medical monitoring as a "future medical cost" in the absence of "present injuries that increase[] . . . risk of future harm." *Id.*

Then in *Bryson*, the Minnesota Court of Appeals followed the reasoning in *Werlein* and held that it "could not 'rule as a matter of law that plaintiffs' alleged injuries are not 'real' simply because they are subcellular. The effect of volatile organic

compounds on the human body is a subtle, complex matter. It is for the trier of fact, aided by expert testimony, to determine whether plaintiffs have suffered present harm.'" 573 N.W.2d at 721 (quoting *Werlein*, 746 F. Supp. at 901). The court therefore held, as in *Werlein*, that the plaintiff could recover "medical monitoring expenses *because of her alleged chromosome damage*." *Id.* (citing *Werlein*, 746 F. Supp. at 901, 905) (emphasis added). *Bryson* therefore considered the existence of a subcellular injury (chromosome damage) to be a prerequisite to the recovery of medical monitoring costs, suggesting as in *Werlein* that medical monitoring should be characterized as substantive, not procedural.[22]

Ultimately, and perhaps most importantly, none of the cases cited by Plaintiffs discuss whether medical monitoring is substantive or procedural under the applicable standard set forth by the Minnesota Supreme Court. Plaintiffs do not cite a single case from Minnesota or any other jurisdiction holding that entitlement to medical monitoring is a procedural issue controlled by the law of the forum for choice-of-law purposes. To the contrary, courts have treated medical monitoring as substantive, not procedural or remedial.

---

[22]    The other two cases cited by Plaintiffs do not support their argument. In *Thompson*, the court was "not inclined" to find that the tort of medical monitoring exists under Minnesota law given its "novelty . . . and that the Minnesota Supreme Court has yet to recognize it as an independent theory of recovery." 189 F.R.D. at 552. Even if the claim did exist under Minnesota law, the court found that the issue "would not be proper for determination on a class-wide basis." *Id.* In *Palmer*, the court dismissed a claim for medical monitoring because it is "not recognized as an independent cause of action by Minnesota courts." 2005 WL 5891911 (citing *Thompson*, 189 F.R.D. at 552). The court also noted that "Minnesota courts allow *recovery* for the cost of medical monitoring as tort *damages only if the elements for future damages are met*." *Id.* (citing *Bryson*, 573 N.W.2d at 721) (emphasis in original).

In the *St. Jude* cases, for example, the Eighth Circuit considered certification of a medical monitoring class in a products liability suit involving prosthetic heart valves. *See St. Jude I*, 425 F.3d at 1121–23; *St. Jude II*, 522 F.3d at 840–42. After "reviewing the laws of different states with regard to medical monitoring, the [district] court observed it would apply the medical monitoring law of different states, conditionally certifying the class only as to 'those plaintiffs whose valves were implanted in states that recognize a stand-alone cause of action for medical monitoring, absent proof of injury.'" *St. Jude I*, 425 F.3d at 1118. The Eighth Circuit reversed because "diverse legal and factual issues preclude class certification." *Id.* at 1121. The court reasoned that "[p]roposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes." *Id.* at 1122. According to the court, there were "individual variations" among the class members because "exposure-only plaintiffs" would "'incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). Moreover, "[d]ifferences in state laws on medical monitoring further compound these disparities." *Id.* As the court then explained, "states recognizing medical monitoring claims as a separate cause of action have *different elements triggering culpability*." *Id.* (emphasis added). Thus, the Eighth Circuit in *St. Jude I* recognized that medical monitoring is a substantive issue requiring a choice-of-law analysis for each class member,[23] not a

---

[23] Plaintiffs argue that *St. Jude I* does not stand for the proposition that medical

(Footnote Continued on Next Page)

procedural or remedial issue that can be applied uniformly to an entire class.[24] *See also Foster*, 229 F.R.D. at 605–06 ("[C]laims for medical monitoring are not treated uniformly among the states, and this divergence creates a 'myriad of individual legal issues that defeat the predominance requirement' and makes certification 'totally unmanageable and inefficient.' Many states have not recognized medical monitoring claims, and those which have done so have adopted widely varying criteria for recovery."); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 212 (D. Minn. 2003) (rejecting

---

(Footnote Continued From Previous Page)

monitoring is substantive because the court did not "pause to consider" whether the issue is substantive or remedial. (3/16/18 Hr'g Tr. 27; Pls.' Reply 12.) In support, Plaintiffs cite *In re Levaquin Prods. Liab. Litig.*, MDL No. 08-1943 (JRT), 2010 WL 7852346 (D. Minn. Nov. 9, 2010), which held that Minnesota's punitive damages law is remedial, not substantive. *Id.* at *6–10. In conducting its choice-of-law analysis, the court noted that the defendants did not cite "a single case in which a court has characterized Minnesota's punitive damages statute as substantive. Instead, they have cited cases in which courts engaged in a conflict of law analysis regarding conflicts between states' punitive damages statutes without *pausing to consider* whether such statutes are substantive or procedural." *Id.* at *8 (emphasis added) (internal citations omitted). While it is true that the Eighth Circuit did not explicitly analyze whether medical monitoring is substantive or procedural, this Court must follow the Eighth Circuit's clear directive in *St. Jude I* that legal variations between states' medical monitoring laws precludes class certification.

[24] On remand, the district court determined that Minnesota law should apply to all claims in the nationwide class, and recertified the class pursuant to Rule 23(b)(3). *St. Jude II*, 522 F.3d at 838. In *St. Jude II*, the Eighth Circuit reversed because "the need for detailed and individual factual inquiries concerning the appropriate remedy for any violation still weighs strongly against class certification." *Id.* at 840. While the court noted that the district court "eliminated the diversity of legal issues by applying Minnesota law to all claims," *id.*, the court did not endorse or affirm this approach. *Id.* at 841 ("We recognize that plaintiffs may present certain issues that are common to all of their claims, *assuming it is proper under Minnesota choice of law principles and the Constitution to apply Minnesota law to every claim.*") (emphasis added).

argument that "the differences in state law governing medical monitoring claims . . . should not preclude class certification").

Since, as discussed above, the choice-influencing factors point to several different states, depending upon the playing history and domicile of each class member, the Court would be forced to apply a wide range of legal standards for the recovery of medical monitoring. Someone who played for the New York Rangers or Islanders (such as Plaintiff LaCouture) could not state a claim for medical monitoring without a showing of present injury. A former player for the St. Louis Blues (such as Plaintiff Leeman) could receive medical monitoring as an element of damages without proof of present injury. Someone who played for the Florida Panthers or Tampa Bay Lightning or retired to Florida could be entitled to medical monitoring as an independent cause of action without proof of present injury. A former player for the Minnesota North Stars or the Minnesota Wild or someone who currently lives in Minnesota (such as Plaintiffs Christian and Larson) could receive medical monitoring as a form of damages if he has proof of cellular or subcellular injury. *See Bryson*, 573 N.W.2d at 721 (stating that proof of subcellular damage may suffice to prove the required present injury in a medical monitoring case and is a question of fact for the jury to decide). For a player who retired to Hawaii, the court would be acting on a blank slate with no clear guidance from any court as to whether, and under what circumstances, medical monitoring is a viable claim or an element of damages. As one court explained in denying certification of a medical monitoring class,

> Many states never have recognized a claim for medical monitoring, a circumstance that would force this Court into the undesirable position of attempting to predict how their courts of last resort would resolve that issue. Those states that have done so have adopted widely varying criteria for recovery. There simply is no justification for embarking on so complex a path.

*In re Rezulin Products Liab. Litig.*, 210 F.R.D. 61, 74 (S.D.N.Y. 2002); *see also In re Prempro*, 230 F.R.D. at 563 (denying certification because differing state laws "cannot reasonably be grouped in a comprehensive manner that does not seriously impinge on the integrity of the law of each state").

For all of these reasons, individualized legal issues will substantially predominate over common legal issues in this litigation. *See St. Jude I*, 425 F.3d at 1122; *see also Zehel-Miller v. Astrazenaca Pharm., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004) ("The fact that medical monitoring is not treated uniformly throughout the United States creates a myriad of individual legal issues that defeat the predominance requirement of Rule 23(b)(3)."); *In re Baycol Prods. Litig.*, 218 F.R.D. at 208 ("Differences in state law, no matter how slight" may "swamp any common issues and defeat predominance"). Accordingly, class certification cannot be granted under Rule 23(b)(3).[25]

### D. Rule 23(c)(4), Issue Class

Plaintiffs Leeman and the Ziedel Estate move for Rule 23(c)(4) certification and for their appointment as representatives of Class 2 as to certain issues only—the legal issues of duty of care and breach of duty, including the failure to warn, and factual issues

---

[25] Because the legal issues in this putative class are too highly individualized, it is not necessary for the Court to consider whether the factual issues are too highly individualized to support class treatment.

relevant to whether the head impacts that class members experienced can cause latently-developed NDDCs. More specifically, Plaintiffs seek class certification as to "whether the NHL owed duties of care under negligence standards;" "whether the NHL breached those duties, including by failing to warn;" "whether head impacts experienced in NHL-style play substantially contribute to the development of [NDDCs] as described in the Complaint;" and "whether retired players are at an increased risk of developing" these conditions. (Zimmerman Ltr. 4.)

Limiting issues in this manner, however, cannot be used to evade the predominance and cohesiveness requirements. In *Ebert*, for example, the Eighth Circuit reversed the certification of a class limited to particular issues related to General Mills' liability to property owners for the release of a toxic substance. The court explained that the district court

> abused its discretion in determining that the individualized issues in this case 'do not predominate over the common issues for those questions for which certification is sought.' Indeed, it is the deliberate limiting of issues by this district court in this case that is problematic. Stated earlier, all actions can be articulated so that there are common questions. Here, by bifurcating the case and narrowing the question for which certification was sought, the district court limited the issues and essentially manufactured a case that would satisfy the Rule 23(b)(3) predominance inquiry. Concluding 'that questions on individualized exposure will not be addressed as part of [the] questions for which the Court will agree to certify the class' complicates the litigation of the elements necessary to resolve the plaintiffs' claims. The district court's narrowing and separating of the issues ultimately unravels and undoes any efficiencies gained by the class proceeding because many individual issues will require trial.

823 F.3d at 479. Similarly here, Plaintiffs' proposal to resolve certain issues on a classwide basis would not result in a more efficient resolution of the class members'

claims. Each class member would still require an individualized choice-of-law determination, resulting in the application of widely varying legal standards for their claims, particularly with respect to medical monitoring. *See, e.g.*, *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 632 (D. Kan. 1996) (denying class certification because "instructing the jury in a manner that is both legally sound and understandable to a jury of laypersons would be a herculean task" and "the verdict form necessary to submit the case to the jury would read more like a bar exam"). Since this "limited class certification would do little to increase the efficiency of the litigation," *St. Jude II*, 522 F.3d at 841, certification must be denied.

## IV.  CONCLUSION

The Court is sympathetic to the significant cost and the likelihood of duplicative proof in trying this case many times, for each individual player. This result, however, is mandated by the Supreme Court's guidance in *Dukes* and the Eighth Circuit's rulings in *St. Jude* and *Ebert*. In particular, the "rigorous analysis" required by *Dukes* demonstrates that there are widespread differences in applicable state laws governing medical monitoring. 564 U.S. at 350–51. Given those differences, the Court finds that resolving these claims in a single class action would present significant case management difficulties. *See* Fed. R. Civ. P. 23(b)(3)(D). The Court therefore declines to certify either of Plaintiffs' proposed classes under Rule 23.

## ORDER

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Plaintiffs' Motion for Class Certification and for Appointment of Class

Representatives and Class Counsel (Doc. No. 638) is **DENIED**.


Dated: July 13, 2018                                    s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge